## IN THE UNITED STATES COURT FOR THE DISTRICT OF COLUMBIA

COMPLAINT of CONSTITUTIONAL RIGHTS VIOLATIONS

**FILED**

**OCT 18 2012**

**Clerk, U.S. District and Bankruptcy Courts**

Elizabeth LeTourneau

7829 Belle Point Dr

Greenbelt, MD 20770 (360-441-8004)

)

Plaintiff, *pro se*                                    )

Case: 1:12-cv-01713
Assigned To : Howell, Beryl A.
Assign. Date : 10/18/2012
Description: Pro Se Gen. Civil

v.
_____

)
)

)

Joe Biden,

In his Senatorial Tenure,

In his individual capacity,

1600 Pennsylvania Avenue NW
Washington, DC 20501

Defendant.

## PLAINTIFF DEMANDS TRIAL BY JURY

Defendant, Chief of Corrections Mr. Thoma,

Thurston County Correctional Facility (TCCF),

2000 Lakeridge Dr, Olympia, WA 98502


Defendant, James Kenneth Chambers

408 Kennedy St. Apt. 301 DC 20011

Contractor Dept. Homeland Security


Defendant, Don Madden

3504 16th St NW, WA DC 20010


Defendant Lauren Douglas, co-owner Hoffman LLC

2034 Eisenhower Avenue, Suite 290 | Alexandria, VA 22314


Defendant, Frank and Jane Doe US ARMY civilian counselor, JBLM

HEADQUARTERS, I CORPS AND FORT LEWIS

P.O. BOX 339500

JOINT BASE LEWIS-MCCHORD, WA 98433-5000


Defendant Thurston Co. Commissioners Office

Defendant Officer R. Ditrich Deputy Sheriff,

Thurston Co. Sheriff's Office

**Defendant, Lisa Rook DV victim advocate**

Thurston Co. Prosecutor's Office

Defendant  Ed Holm, former Prosecutor

Defendant  Cynthia Doe, Counselor TCCF

Defendant, Lt. Kay Gunzel, TCCF

Defendant Sgt. Patty Smith, TCCF

Defendant Jennifer Doe, TCCF


2000 LAKERIDGE DRIVE SW

Olympia, WA 98502


**All Defendants are Sued in their individual capacities.**

## JURISDICTION

**1.**    This Complaint invokes federal question jurisdiction under 28 U.S.C. § 1331 for violations of civil rights pursuant to 42 U.S.C. § 1983 and § 1985.

2.    The jurisdiction of this court is invoked pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1332.  Venue is proper for this District under 28 U.S.C. § 1402 and 28 U.S.C. § 1391 *et seq.* Plaintiff asking pendent jurisdiction in separate motion under Federal Court Rules and under 28 U.S.C. § 1332(a) which states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between (1) citizens of different States even if the lawsuit involves a matter typically handled in state court. If the lawsuit is between citizens of different states and the amount of damages in question exceeds $75,000, the case may be filed in federal district court based on diversity of citizenship. In such a diversity of citizenship case, the plaintiff need not claim a violation of federal law; but in order to satisfy the statutory basis for federal court jurisdiction, there must be complete diversity of citizenship of all plaintiffs and all defendants, and there must be more than $75,000 in dispute.

3. Motion for Change of Venue under 28 USC § 1404.  For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented. Upon motion, consent or stipulation of all parties, any action, suit or proceeding of a civil nature or any motion or hearing thereof, may be transferred, in the discretion of the court, from the division in which pending to any other division in the same district. Transfer of proceedings in rem brought by or on behalf of the United States may be transferred under this section without the consent of the United States where all other parties request transfer.

(a) A district court may order any civil action to be tried at any place within the division in which it is pending. (b) Actions Where Defendant Is Officer or Employee of the United States.—

(1) In general — A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (c) the plaintiff resides if no real property is involved in the action. Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be applicable if the United States or one of its officers, employees, or agencies were not a party.

(a) Any civil action in a district court against the United States under subsection (a) of section 1346 of this title may be prosecuted only:

(1) Except as provided in paragraph (2), in the judicial district

where the plaintiff resides;

(2) In the case of a civil action by a corporation under paragraph (1) of subsection (a) of section 1346, in the judicial district in which is located the principal place of business or principal office or agency of the corporation; or if it has no principal place of business or principal office or agency in any judicial district (A) in the judicial district in which is located the office to which was made the return of the tax in respect of which the claim is made, or (B) if no return was made, in the judicial district in which lies the District of Columbia.

(b) Any civil action on a tort claim against the United States under subsection (b) of section 1346 of this title may be prosecuted only in the judicial district where the plaintiff

resides or wherein the act or omission complained of occurred.

## PARTIES

3.    Plaintiff Elizabeth C. Letourneau who appears pro se herein, is a resident of this
      jurisdiction who was deprived of civil rights while confined in Thurston County
      Correctional Facility, also known as TCCF herein.

4.    Plaintiff is a military spouse of an active duty service-member in the United States
      Army.

5. Defendant Joe Biden of the Executive Branch of the Unites states is sued in his individual
   capacity.

6. Defendant Chief Thoma is sued in his individual capacity.

7. Defendant James Kenneth Chambers is sued in his individual capacity

8. Defendant Don Madden is sued is his individual capacity

9.  Defendant Lauren Douglas is sued in under Hoffman LLC as a corporation and in
    individual capacity.

10.  Defendant Jane Doe and Frank Doe are sued in their individual capacities, Rod Ditrich is
     sued in his individual capacity, Defendant Lisa Rook is sued in her individual capacity,
     Defendant Edward Holm is sued in his individual capacity, Defendant Cynthia Doe is sued
     in her individual capacity, Defendant Lt. Kay Gunzel is sued in her individual capacity,
     Defendant Sgt. Patty Smith is sued in her individual capacity, Defendant Correction
     Officer Jennifer Doe is sued in her individual capacity.

## FACTS

3.    Elizabeth C. Letourneau was arrested in March 2009 for domestic violence in Thurston County, Washington **4th Degree Assault, for taking a tape recorder out of her ex-boyfriend and military officer Peter Victor Sulkowski's pocket, because she was arrested per decision of TC sheriff officer Rod Ditrich at Sulkowksi's home at 7026 9th Ave Lacey WA 98503.** She entered an Alford plea for the charged misdemeanor on which she was eventually convicted in the Thurston County Superior Court on May 29, 2009. She was sentenced to 365 days incarceration in the Thurston County Correctional Facility, all but 60 days of which were suspended, and two years of unsupervised probation. With good time credits she spent 41 days incarcerated from May 5, 2009 to her release on June 15, 2009.

4.    Plaintiff had no prior criminal record, and the misdemeanor was not aggravated. **Yet Pretrial Services held Plaintiff without bond:** an act that is a part of an arbitrary and inflexible policy by Pretrial Services, which is run by the prosecutor's office, and will not allow plaintiff to post bond without a person coming into the court and stating that person (in this case plaintiff) resides with them.

a.) Defendants who post bond are not released without this requirement, so defendants can post bond in Thurston county, and WILL sit in jail for months without release if pre-trial services does not authorize release based upon defendant having prior residence and sworn testimony from a person with proof of defendant's permanent residence, and authorization from pretrial services to release defendant upon proof of bond can be denied at pretrial's discretion (which establishes conflict of interest since pretrial services is funded by the prosecutor and Thurston county commissioners office, thereby under the "dirty hands" doctrine it does not need comply with federal and state law if releasing accused conflicts with the prosecutor's interests in detaining accused.)

5.   Plaintiff was the paramour of Peter Sulkowski, who was and is believed to be serving in
the United States military as an active duty Army Major, and who invited plaintiff to live
with him.  The relationship between plaintiff and Mr. Sulkowski was stormy.  The plaintiff
was subjected to severe abuse.

6.    On **October 12, 2008**, Thurston County Sheriff R. Ditrich and two other deputies were
dispatched to plaintiff's residence, at 7026 9th Avenue, 98503, Thurston county,
Washington.  He saw bruises and blood spots on plaintiff's neck which police reports
corroborate.  Plaintiff was fearful of her and her baby's life.

7.   Plaintiff spoke to deputy R. Ditrich, who tried to convince plaintiff to have Sulkowski
arrested. She asked if he could not be criminally charged but forced to attend alcohol
abuse counseling.  The response was to terminate the interview.  Plaintiff was left alone
with Sulkowski.  When the deputies left, Sulkowski told plaintiff:  "If you had told them
what I did, I would've lost my job in the Army.  I would've killed myself . . . and taken
you with me."   Plaintiff was later told by the Domestic Violence Commission in Olympia,
Washington that the deputies duty by law in Washington state is to arrest the aggressor.
Probable cause existed to arrest Mr. Sulkowski, who was the aggressor, because the
visible injuries to the plaintiff was observed by the three deputies, without forcing
plaintiff to "turn in" Sulkowski.

(a) (See attached police reports) Washington state has a mandatory arrest policy regarding
all DV calls, but the three deputy's chose not to follow it that day.

8.   In March 2009, Plaintiff was preparing for final exams at University of Washington (pre-
law major) when Sulkowski became enraged over a Zune player.  Sulkowski began
throwing large objects at Plaintiff's head.  Plaintiff called Thurston County sheriff's office
to report Sulkowski had been throwing objects (including Zune docking station) at her

head in drunken fits.  Sheriff's Deputy Ditrich again arrived on the scene but declined to
arrest Sulkowski.  Defendant Ditrich told Sulkowski he could drink as much as he wanted
in his own house; although both parties had resided in the home for approximately ten
months which grants legal residency **[residency in Washington]** under Washington
law (RCW 59.18 and RCW 59.18.580 A landlord cannot terminate a lease, refuse to
renew your lease, evict you, or refuse to to rent to you  because they are victim of
domestic violence.  Under RCW 59.18.250 a landlord cannot retaliate against you for
exercising your rights to report or complain to a governmental authority for violating the
law – Sulkowski made multiple threats against plaintiff and carried loaded weapons in his
home as well as threatened to commit suicide/homicide on multiple occasions.)

9.    Defendant Ditrich then read plaintiff her Miranda rights and told her she was under
arrest for fourth degree assault and third degree theft.  He booked her into Thurston
County jail.  Plaintiff had no previous arrests.  She was fingerprinted and charged by
prosecutors for Fourth degree assault DV and third degree theft DV for taking a tape
recorder out of sulkowki's pocket.

10.  Under Washington's mandatory arrest law regarding Domestic Violence calls. Plaintiff was
entitled to the protection of that law.  None was provided to her by law enforcement; i.e., three
deputies and their supervisor.  Thurston County Sheriff's office also committed discrimination by
arresting plaintiff when in fact they also violated their own laws regarding mandatory arrest by
not arresting Sulkowski on two prior occasions when Sulkowski committed crimes against
plaintiff.  Sulkowski threw garbage on Plaintiff, hot spaghetti at plaintiff, sprayed plaintiff with a
hose when plaintiff was on way to job interview, and spit on plaintiff in plaintiff'f face (See police
report.) Sulkowksi would also brutally beat his dog Max, by punching the dog until his gums bled,
and hanging the dog using his leash so the dog couldn't breathe.  Plaintiff and other citizens in
Thurston County witnessed this (animal cruelty is a misdemeanor under Lacey Thurston county
statute 7.04.052 Cruelty to animals. The provisions of this section shall apply to the various forms

of cruelty to animals as set forth herein (1) An owner of an animal is guilty of animal cruelty if the person knowingly, recklessly, or with criminal negligence inflicts unnecessary suffering or pain upon the animal (4) Animal cruelty is a misdemeanor.) but plaintiff was too afraid of having abuse turned on her, and did nothing.  That feeling of helplessness, watching a dog piss on itself in fear, is a feeling no one should ever have to experience.

11. Thurston District Court allowed plaintiff to go free on her personal recognizance (PR), but Thurston County Correctional Facility (TCCF) and prosecutor's office can circumvent the judicial decision to grant release of an inmate from jail.  Thurston County's jail is the only jail in Washington State to employ Pre-trial Services before release of an inmate from confinement.  Pre-trial Services requires all inmates to provide a home residential address and must have a person come to office or in person on the phone to verify that the plaintiff resides at a particular address.  Even inmates who have posted bail will not be released until Pre-trial Services (administered by the prosecutor's office) has third party verification of residence address.  If inmate has no residence, or third party cannot contact Pre-trial Services, the inmate will not be released.  Inmates are frequently held for weeks or months after posting bail because Pre-trial Services either has not made contact with a third party, or will refuse the third party verification if Pre-trial Services believe that the inmate does not actually have a permanent address, or believe the address provided is not sufficient for any reason at all; for example if the inmate's parents (as in plaintiff's case) verify the inmate can reside at home but will not permanently be a resident.  This also discriminates against servicemembers who may have no permanent home or may be visiting Thurston county on TDY, and their dependents, as plaintiff was subject to meeting other military spouses in TCCF who had no address and therefore although her (military spouse shall be confidential) husband had $5000 to post her bail, no one could provide a verified address for military spouse and her husband's house was not suitable because she was charged with crimes that

involved her husband's address, therefore leaving the military spouse with no option to post bail even though husband worked for Army active duty for 18 years and had bail funds.

12. Plaintiff was also issued a criminal "no contact" order against alleged "victim" Sulkowski, by the court until trial. This was installed automatically by court and had an expiration date of 5 years – Due to the fact that she was charged w Fourth degree Assault DV & third degree theft DV, for taking a tape recorder out of his pocket in self-defense as he Grabbed her arm and tried to twist her wrist to cause her pain.

13. Plaintiff was unable to verify an address since the only address she had was with victim Sulkowski and she had no other homes. TCCF did not release plaintiff until approximately 36 hrs after plaintiff was released by judge on personal recognizance by a judge. Plaintiff missed crucial final exams at the University of Washington. Her GPA dropped from a 3.25 to a 2.8 average, which threatened her ability to retain her scholarship and grants.

14. Plaintiff did not receive proper medical care by TCCF. She suffered from a debilitating condition which worsened with the stress of pending criminal charges and her incarceration. TCCF refused to obtain reasonable health treatment for plaintiff while in jail or accommodate plaintiff's requests (written repeatedly daily) for health treatment.

15. Plaintiff was booked into TCCF again because of Sulkowski. He ripped her clothes off her body, and smashed her head against a bathtub. This took place on May 5, 2009. Plaintiff could not move her arm or get on the bunk. The overcrowded jail forced her to sleep on the floor with five other inmates between bunks. Eighteen girls shared two open toilets and one shower in one room in the general population living quarters.

The living in such defecation, smell, crowded almost without any space was medieval and in violation of Eighth Amendment, due process of law, and her civil rights.

16. Plaintiff was assaulted in jail, because other inmates resented her early morning phone calls to her appointed public **defender who was only available between 8:30 am – 9:00am.** Because of plaintiff's need to consult with her lawyer, correctional officers John Doe A, Jane Doe B and Jane Doe C correctional officers punished her by segregating her in solitary confinement, **23 hour lockdown confinement in an 8 by 6 cell**.

17. Three inmates assaulted plaintiff. TCCF officers did not intervene. Plaintiff was injured.

18. TCCF has a policy where any inmate who enters the jail is automatically at the mercy of the guards and other inmates. Guards have an unofficial policy of rewarding repeat inmates (repeat criminal offenders) and giving them special favors. The population in TCCF is predominantly white inmates and white guards. Plaintiff is Asian and for that reason is subject to race discrimination, including verbal, physical abuse, and severe psychological trauma. Guards also reward inmates who snitch on each other,

(a) and who are involved in the major drug trade that takes in Thurston County, and much of WA state. Many guards and sheriff's are heavily involved in this drug trade, and much like Prohibition during 1920-1933 have "dirty hands" with the sale and control of illicit drugs, in and out of TCCF. Bribes are common. Guards are too familiar with many inmates. (Plaintiff has filed a complaint with the Civil Rights section of DOJ in coincidence with this complaint.)

19. Guards will allow these inmates to pass notes to family members, notify "special" inmates of phone calls made to them from their family, and allow them to "run" the cell as "Tank Boss." When these leader inmates, who are given special privileges dislike

another inmate for whatever irrelevant reasoning, the guards allow the inmates to write

Inmates out of the main population cell,

With no due process or fair appeals other than the word of the inmates and the favoritism of the guards.

**Thus this process is very similar to that of the VAWA and no contact order enacted by Joe Biden in his Senatorial tenure, a law he wrote and sponsored, where a person can be arrested w no due process, therefore Biden is violating the constitution (and his own constitutional policies that he took an oath under God and Country to uphold in the Senate and any other office in official capacity duties) under U.S.C 42 § 1983.**

20. The leaders of the cell (a one room living quarters holding 10-20 inmates, 25% often sleeping on the floor) can **"KITE "** an inmate out of the cell with a note to a guard saying the inmate is in danger or disliked by other inmates, and the guards immediately remove the inmate to solitary confinement, also referred to as "voting the inmate off the island." The process of "inmates running the jail" policy, is to call each inmate out one by one and ask her to corroborate if the inmate being "KITED" is in fact a problem or nuisance.  No other inquiry determines if the inmate is actually in danger or any kind of threat to the security of the cell.  The decision is based on the majority of inmates corroborating that the inmate in question is indeed a threat and therefore must be immediately removed with no other judicial process.  Since inmates are not exactly known for telling the truth, the process of moving inmates to solitary is merely based on hearsay and inmates not wanting to be picked to be "KITED" next.

21. Inmates who fight on the other hand (assault other inmates) are only given three days in solitary and allowed to be returned to "General Population" after they attend a hearing with Sgt. Jane Doe "B" or "C" who allows the inmate to plead guilty to the punishment of solitary, and return to General Population.

22. An example of lax security facilitating inmate brutality occurred one night. A female inmate was booked and brought into the General Population cell. Another inmate knew this girl and claimed she had stolen money from her male friend in a drug deal. The second inmate savagely beat the new one until her eyes were black before guards arrived. Inmates were taken out one by one and questioned. No prisoner admitted to seeing the beating of the new girl. Instead, each inmate swore the inmate who was beat up started the fight! The new inmate was taken to solitary though there was no probable cause she started the fight. **HAD A VIDEO CAMERA BEEN PRESENT**, the guards would have seen who was actually brutally beaten. The true aggressor came up from behind the victim taken to solitary, had not tried to assault or instigate assaults against other inmates (including plaintiff who was not allowed to be "Tank Boss" nor had the power to KITE out any inmate deemed unworthy of General Population.)

(a) Therefore cameras should be constitutionally mandated to prevent inmates from being assaulted and then punished to solitary, merely on the word of the other inmates and the discrimination of the guards, who frequently favor inmates that snitch on other inmates or provide the guards w favors, by telling them where drug Dealers are located, and other information that guards get on the inside from inmates, who are in fact violent and dangerous criminals, who are favored for their criminal behavior in jail,

(b) while inmates who are not dangerous or violent are punished merely by the fact there is no camera to prove otherwise.

23. Solitary is "jail suicide." The inmate is only allowed phone calls one hour a day, and that hour can be any hour of the day between 6 am - 10 pm. If the inmate receives the allotted hour when no businesses are open, **the inmate cannot contact a lawyer, bail bondsmen, family, or any business that normally operates between 8-5 pm, including VA services for military spouses and veterans.** The inmate also

must take a shower, occasionally watch television by permission, and often is fed during that time, so the remaining time can be **cut to less than half**. The other 23 hours of the day the inmate is locked in an 8 by 6 cell with a few books (plaintiffs' books were confiscated by correction officer Jennifer Doe). Only if the guard on duty allows the inmate in solitary to receive any books is the privilege allowed. However, in General Population library days offering new books are two days per week with a much larger selection and access to a law library where the inmate can look up statutes, rule books, and projected sentencing ranges so they are better prepared in court for their sentencing and know what to expect. Not knowing what is going to happen creates anxiety and can cause a person to go mad – and therefore creates the likelihood and increased probability that inmates will get violent, receive more charges, and get more time – which is exactly what the other inmates want and how they control other inmates.

24. Another aspect of solitary in TCCF is an emergency buzzer to alert guards. Guards are rarely on watch in women's solitary unit and ignore inmate's buzzers as a regular TCCF practice. A buzzer can ring for 30 minutes or more and a guard will not verbally respond or physically check on an inmate, also indicating the outdated, low level of technology in TCCF and inability of TCCF to fund better technology that allows inmates to communicate with guards on an efficient basis without staff increases.

(a)**The consequences of this are that another inmate can easily assault their cellmate in solitary, and if it takes 30 minutes or more to respond a death by assault or accident could occur easily. Deaths have occurred at TCCF by inmates committing suicide while guards were not responsive in due time.**

Solitary also served as women's medical ward and maximum security female offenders. An inmate with a life threatening medical condition who is placed in solitary could die or an inmate could be killed by another inmate and the guards would not know or respond to a buzzer. It

takes an inmate five minutes (or less) to die from a seizure or heart attack/brain embolism, or an attack from another inmate.

For these reasons, being in solitary greatly increases an inmate's emotional distress since it is obvious that enhanced danger lurks in solitary.

25. The men's section of TCCF is far bigger and there are far more units and categories. Therefore those male inmates with life-threatening medical conditions are not punished in solitary but given other options of housing units. Males are segregated by offense standards (classification) so felons convicted, of *e.g.* child rape, are not necessarily put with traffic offenders, yet they are not punished by being put in solitary 23 hour lockdown as women are. This is clear gender discrimination. Ms. Letourneau was subjected to harsher treatment in solitary and she was in greater fear, more danger from inmates because of serious overcrowding compared in solitary and General population to male inmates, and a decided lack of medical care compared to the men. Letourneau experienced all of these adversities in the female population.

26. A policy of TCCF is only males are allowed to work. Female inmates are not allowed to work in the jail. They are allowed on work-release only if ordered by Judge or court order. The same privileges/benefits/financial gain for males should be allowed to women. However, in practice there is no such equality. This is gender discrimination in violation of the constitution of the United States. Plaintiff was a female victim of the policy favoring men.

27. While in solitary, plaintiff could not make phone calls to her lawyer. Plaintiff shared 8 by 6 cell with another inmate who stole her phone card password so plaintiff could not make phone calls to family or friends. The staff had no concern with the deprivation which fell heavily on plaintiff because of her health condition. Also in solitary plaintiff was subject

to being around other inmates who committed violent felonies.  One such inmate was
(name omitted) a female who raped her 8 year old daughter adopted from China
(Plaintiff is also adopted from Asia.) The inmate and her husband performed oral sex acts
on her daughter, yet these inmates are such socio-psychopaths that they claim their
innocence and are often rewarded for their deviant behavior in jail by beating up other
inmates or threatening more subtly, such as stealing other inmates personal information
for later use or to rob from other inmates, or to harm their families, or even hire hits on
other inmates thru intimidation, coercion, and threats – much like being in an abusive
relationship but 24/7 under the non-existent and anti-supportive supervision of guards
who are often bullies and encourage bullying themselves.  (The inmates that are the
most scary are the quiet ones and the ones who do not threaten verbally.  Those are the
ones you want to worry about.)

28. After the phone card theft incident, plaintiff was to be transferred back to general
population. Sgt. Patty Smith, a defendant and a Thurston County deputy sheriff
prevented plaintiff's transfer. As a result, plaintiff was deprived of mental health
treatment, physical medical treatment, and phone calls to her attorney to try to get a bail
hearing or to get a decent criminal defense attorney. Her grievances to the jail were
ignored, including those letters of complaint written to TCCF Captain Deborah Thompson,
also a defendant. Captain Thompson ignored plaintiff's correspondence.

29. Plaintiff was considered a troublemaker and made fun of by the guards for her
condition.  The mental health counselor Cynthia (last name unknown), also a defendant,
continued to deny her requests to be transferred back to General Population where she
would have access to phones, phonebooks, and domestic violence classes. Cynthia's
denial of plaintiff's requests for help and placement in General Population was affirmed
by Defendants Captain Thompson, Lt. Kay Gunzel, Sgt. Patty Smith, co Jennifer Doe, and
subordinates.

30. Plaintiff was not allowed to attend court dates previously scheduled, and missed a scheduled traffic infraction court date while incarcerated in TCCF.  Therefore her license, while previously reinstated, was suspended again for failure to appear, and is still suspended to plaintiff's knowledge.  TCCF is directly under Thurston County Superior Court which is connected by buildings to the district court.

**(Attending the traffic hearing while incarcerated only required an elevator ride up, but the court nor the jail allowed plaintiff to attend traffic hearing despite repeated written requests.)**

31. Plaintiff also made repeated written requests to see a psychiatric nurse and get medical attention.   Those requests were declined by TCCF.  She suffered from depression, and other medical conditions.  She was refused medicine and therapy by TCCF.

32. Plaintiff is a full Korean by birth and has dietary needs that were ignored by TCCF despite written requests.  The food in TCCF is high in carbohydrates, lactose, sugar, and lacking in nutritive value.  These foods caused severe depression and compounded plaintiff's already existing chemical imbalance.  As a result plaintiff suffered from anxiety attacks, panic disorder, PTSD, and further complications.  The forced diet also caused gastro-intestinal medical conditions and hemorrhoids. Plaintiff was also exposed to inmates who were frequent drug users and had a host of illnesses: Hepatitis C, AIDS, etc.

33. Plaintiff still has rectal damage from the sexual assaults which is exacerbated by gastrointestinal and other medical conditions that were not present prior to incarceration.  Plaintiff was therefore vulnerable to sexual assault including object penetration of her bodily cavities.  She was not strong enough to prevent these attacks, and as always, the jail staff provided no security from them.

34. **Thurston County Superior Court** arraigned plaintiff on charges for going to
Sulkowski's residence while under a protective order to prevent domestic violence. Pre-
trial Services no-bail confinement law has been challenged in Washington Supreme
Court, but was not been struck down. Pre-trial services, which is not a constitutional
prosecutorial government funded agency, has been granted the right in Washington
State forbid anyone in district  court with misdemeanor charges who violate their pre-trial
sentencing conditions to be held on a no-bail hold, regardless of the seriousness of the
misdemeanor charges.  Bail may be denied for flight risk or the defendant posts a risk of
danger to himself or others, or certain other crimes that are presumptive of pretrial
incarceration.  Since Washington State requires bail for misdemeanors, Pre-trial Services
has no right to deny release.  Yet that is what was done here when Plaintiff languished in
jail.  Pre-trial Services denied plaintiff due process of law.

35. **Thurston County District Court** held plaintiff without bail under order of District court
judge Susan Dubuisson, and did not allow a special bail hearing to determine if plaintiff
fit within those categories.  Plaintiff had funds to post bond in Superior court, and
Sulkowski asked the Mr. and Mrs. Geisel to allow him to post the $5,000 bond.  Plaintiff's
attorney Edmund Allen (prior to resigning) asked for a second bail hearing.  Bail was
denied again (The District Court appointed Judge Sam Myer to review bond.) Plaintiff had
no prior arrests and no criminal record, other than non-criminal traffic infractions.  The
"victim," Mr. Sulkowski, was deployed with the Army to Kuwait for twelve months. **Mr.
Sulkowski who was not available to testify, nevertheless sent to District Court
and prosecutor several letters asking charges against plaintiff be dropped.**

36. Washington state law specifies pre-trial detainees who are incarcerated are entitled to a
speedy trial within 60 days. Plaintiff was booked May 5, 2009.  Her next court hearing
date after bail was denied was June 24, 2009 in Washington County District court.  This
was not a trial date.  This was a pre-trial hearing scheduled over 50 days after arrest.

Superior Court hearing date was set for July **9** 2009, almost 90 days after arrest, and

therefore was in violation of Washington State's speedy trial requirement

**as written in Washington state law.**

37.  Plaintiff agreed to Alford plea and signed agreement on May 29, 2009 in a plea

agreement that would include two misdemeanor charges: violating a no contact order,

and criminal trespass.  The criminal trespass order never would have been valid if Judge

Christine Pomeroy had not ordered the plaintiff to be evicted, in violation of Washington

state RCW Domestic violence retaliation laws for plaintiff cooperating with the Thurston

county sheriff's office (Detective Steve Schell, formerly an MP with the military and a

detective with Thurston county sheriff's office who was investigating Sulkowski and

recommended charges of 2nd degree assault to the prosecutor which they ignored.

Detective Schell told plaintiff in confidential interviews that Sulkowksi was raping her by

forcing her to have anal sex against her will, and by threatening eviction as well as

retaliation (which he carried out) for reporting the assaults against her and his attempts

to kill her.  Detective Schell told her that Sulkowksi was a danger to her child and to the

community, that he was "an abusive drunk loser," and that sulkowksi's offers to bribe

plaintiff with $2500 (thus using the tape recorder to entrap plaintiff) were fraudulent,

plaintiff could be guilty of accepting a bribe which would hurt her credibility as a witness,

and the money was "blood money."  Schell was sympathetic to plaintiff and understood

that for Plaintiff being with an abusive man was something plaintiff could not control.

(Some people are like bad drugs, plaintiff was addicted to a bad drug that would eventually kill her one day,

but her mental capacity was like that of an addict and therefore too disabled and impaired to understand this

concept.  Plaintiff would argue that love is a chemical reaction in the brain that causes one to lose its ability to

cognitively function, and should be treated as a mental illness, or by court definition plaintiff fell under the

category of someone legally incompetent to understand the nature of the charges against her or the

unintended consequences of giving in to plaintiff's need to feed the drug in her system even if it killed her,

thereby making plaintiff as chemically addicted and incapacitated as a crack addict.)

38. Plaintiff could barely hear judge due to her prior hearing loss. She was confined over 28 days in solitary confinement. As part of plea deal Judge Hicks(now retired) ordered plaintiff to be released on work release and to attend her classes at University of Washington, but TCCF defied the Judge's order and would not allow plaintiff to work or attend class, which was in direct violation of a court order. Plaintiff lost scholarship, grants, and loans. She flunked Spring classes, and was unable to return to University of Washington for summer or fall quarter classes which were the equivalent of the second half of Junior year.

39. Plaintiff was released June 15, 2009, after 41 days of incarceration, and returned to home she rented in Seattle.

40. Plaintiff's treatment while incarcerated caused great damage to plaintiff's physical and mental health. She was suffering from mental deterioration, vitamin deprivation, severe depression and an inability to function after the 28 days in solitary/being unable to speak to family/friends/daughter or anyone in the outside world.

41. Plaintiff checked herself into St. Peter's hospital and sought medication. Plaintiff stayed at St Peter's psychiatric ward for over 10 days but found the medication ineffective although plaintiff continued the treatment.

42. Plaintiff complied with all terms of plea agreement. She was ordered to do a domestic violence evaluation and a mental evaluation. Plaintiff missed a hearing date with Judge Pomeroy to make sure she had complied, and was arrested on a FTA warrant. Plaintiff was held for 7 days, without bail, until Judge Pomeroy determined in a hearing (7 days after arrest) that plaintiff had complied with court terms as well as paying $1000 in fines for her incarceration. Supervised probation was not ordered, so the plaintiff did not have to check in with a probation officer for Dept of Corrections.

43. Plaintiff left for Washington DC in March of 2010 and established residence at 3504 16th Avenue, NW DC 20010.  Plaintiff attempted to gain employment but was denied due to criminal record.  During plaintiff's residency at address, Defendant Don Madden illegally evicted plaintiff, thereby depriving plaintiff of right to property under fifth amendment.  All tenants were evicted, their items were stolen (jewelry and money) by the contracted movers, and the US Marshals stood by and watched.  Plaintiff's expensive $2000 HP laptop was stolen as well as other items.  The Army did nothing to help plaintiff and failed/neglected to respond to plaintiff's request for help or assistance, even though plaintiff *was a military spouse* and in need of assistance in securing her property and housing where thieves would not break in.  During plaintiff's stay at Madden's property thieves broke into house four separate occasions after the movers stole tenants property under illegal eviction.

44. During plaintiff's cooperation with Army CID investigation, plaintiff told Army she had returned to Washington State (although still residing in DC) to comply with court hearings.  Plaintiff wrote letter and pleaded with Sulkowski's command for assistance. General John D Johnson wrote letter denying assistance to plaintiff for counseling, mental health, or legal services.  He also refused to address issues of soldier sexually assaulting plaintiff and bribing plaintiff to drop assault charges with plaintiff's attorney or Thurston county prosecutor or sheriff's office.  (See Exhibits attached letter plaintiff wrote to the General.)  General actually congratulated Sulkowski and treated him like a great soldier, according to plaintiff's sworn affidavit in an email sent to her from Sulkowksi regarding a dinner in which the three star general slapped him on the back and congratulated him for getting rid of plaintiff through the judicial system, while he bragged that his commander Colonel Michael Phillips? (last name unknown) told him he would protect him from further prosecution within the military justice system.

45. Plaintiff returned to District of Columbia to receive medical treatment.  **Plaintiff cannot gain employment or housing even though the military provides employment opportunities and employment** *preferences* **to spouses, including a plethora of jobs available to spouses/dependents of active duty military members.**

46. **Plaintiff asked Patty Murray's office for help -- but was denied.  Amaia Kirtland, wrote her a curtly worded letter in which she was denied the right to speak to her Congressmember OR to attend a coffee meeting.  Letter will be filed in Court Exhibits (at later date.)**

47. Plaintiff resided with James Chambers in DC, who destroyed her personal documentation, writing (plaintiff was in process of writing a book about her events in her life) and stole her personal items, as well as legal evidence Plaintiff brought from WA State, in violation of the Fifth Amendment protection of life, liberty, and property.

48. Chambers assaulted Plaintiff and was arrested by MPD and charged with assault. Chambers was arrested and investigated for stealing ATF, FBI, and MPD badges from the State dept where he worked as a contractor.  Chambers promised plaintiff he would protect her from harm, although he physically and sexually assaulted plaintiff under threat of putting plaintiff into federal prison.  Chambers claimed he had a presidential letter of non-detainment, he was authorized to put terrorists in federal prison, and he worked with the military and ATF to catch criminals, using his desk at the State Dept. Chambers also told Plaintiff in emails that will be submitted that he opened a case at DOJ with Claudia Cubas a DOJ attorney against Sulkowski to file federal charges against him. He also told plaintiff he had registered her as a cop informant so she would be protected from arrest under his authority.  Chambers holds a top secret clearance and claims to work for the Dept. of Homeland Security and can be sued in an official and individual capacity.

49.  A sworn Affadavit regarding Chambers will be filed the court, as well cause of action for depriving plaintiff of right to property, life, under the Equal protection clause thus violating the plaintiff's Fifth and Fourteenth Amendment rights.

50.  (Federal Rule of Criminal Procedure Rule 41(g), 18 U.S.C.A. states: A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.)

**51. Plaintiff alleges that Lauren Douglas of Hoffman LLC unlawfully seized plaintiff's property in violation of the constitution in violation of the Fifth amendment.  Lauren Douglas sent plaintiff settlement agreement and agreement for removal of plaintiff's property (see attached.)  Douglas than left plaintiff's property in an abandoned area of a building to be stolen, seized, or converted. Douglas has violated plaintiff's fifth amendment rights under law, and plaintiff's property (see attached emails.) Plaintiff had important legal documents in property including evidence against other defendants.**

52. Plaintiff asked for help as a miiltary spouse of an active duty soldier in DC.  She has not gotten a response from the White House, who falsely claims to help military and veterans.

(a)The White House is lying when they say they help military or their families, plaintiff has not received legal support or help with housing, or getting her daughter back.  Plaintiff

has been treated like as less than a second class citizen with less than inferior intelligence; and therefore wronged by defendants listed above in acts of negligence and willful and malicious deprivation of rights.

53.  Plaintiff has been ostracized as a pariah from society.  Plaintiff cannot secure a job, plaintiff experience severe and traumatic depressions, plaintiff is banned from military bases due to inability to secure a driving permit or driving license, plaintiff cannot even have normal social connections or associations due the stigma and status of a person who has been incarcerated and continues in a downward spiral (as Jesse Moore, CID agent said) without the hope of a future or seeing plaintiff's child again which can be considered another Amendment violation (A **parent's right** to the custody of his or her children is an element of "liberty" guaranteed by the 5th Amendment and the **14th Amendment** of the United States ... Delaney. 617 P 2d 886, Oklahoma (1980)

Example of this is Plaintiff went to the JAG office at Fort Myer.  Mr. Mitchum the chief of JAG at Fort Myer refused to assist plaintiff, and  his assistant (female Jane Doe) tried to prevent plaintiff from seeking JAG services at another base, then lied to Mr. Mitchum. claiming that plaintiff was causing a disturbance.  Plaintiff was refused and denied services from JAG.  Thus the military continues to neglect obligations required to assist plaintiff in getting legal, medical, or any other resources the plaintiff is entitled to as a military spouse.

54.  Plaintiff alleges that when CID instituted case against Sulkowski, plaintiff asked Family Advocacy at Fort Myer, VA, to keep case restricted reporting.  Frank Doe, a civilian counselor at FAP at JBLM, called plaintiff and alerted Sulkowski that case at CID had been opened.  Therefore Sulkowski retaliated by going to Thurston county prosecutors to get more charges against plaintiff.  Plaintiff further alleges that Sulkowski sent

communications in which he claims that he spoke to a civilian counselor (which are on file with DoD) stating that the female civilian counselor who was supposed to treat him for alcohol abuse recommended he retaliate against plaintiff. Sulkowski also stated that his TDY lawyer at JAG recommended he retaliate against plaintiff and that the Army would support him in getting his charges dropped if he put plaintiff back into jail. Thereby he intimidated and bribed a witness (plaintiff will submit further documentation) by trying to force plaintiff to get his Army charges and investigation dropped, and also obstructed justice since the plaintiff was a witness in a federal investigation and submitting documentation to CID, much of which has been lost due to Chambers, Lauren Douglas, and various other individuals including but not limited to the NYPD who keep stealing plaintiff's property, and trying to deter plaintiff from reporting it.

## FEDERAL VIOLATIONS

. The following are the federal violations involved:

A.  Fourth Amendment Due Process and Fourteenth Amendment Due Process applicable to the States

B.   Eighth Amendment cruel and unusual punishment

C.  Civil Rights statutes

   1.   Title 42, USC 1985 Conspiracy to Violate Civil Rights

   2.   Title 42, USC 1982 / 83 / 84  Violation of Civil Rights

D.  Title 28, USC 343(3)

E.  Plaintiff was denied access to health care and segregated into solitary, on the basis of mental disability and gender. **TCCF defied a Superior Court Judge's Order (Judge Hicks, now retired) and refused to allow plaintiff to attend work-release as mandated by a judge's order.** Had plaintiff attended work release plaintiff could have finished University of Washington, not lost scholarship, and the vicious cycle of abuse plaintiff finds herself in would possibly be broken. **But TCCF denied a judge's order by discriminating against plaintiff and the terms of the plea agreement**, in discriminatory and retaliatory action against the plaintiff for being mentally incompetent and incapacitated to understand the "rules of jail" and for not being violent and fighting back when others attacked plaintiff, thereby being labeled a wuss who "doesn't play nicely with the other inmates" by jail staff, specifically being targeted by Lt Kay Gunzel, Sgt. Patty Smith, and co Jennifer Doe. (Added note: it is not something that someone should want to strive for: to play nicely with other inmates. Plaintiff asserts that not being friends with other inmates is evidence plaintiff had some sanity left despite the inhumane and unusually cruel conditions in which plaintiff had to adapt.)

F.  Violation of the equal protection by discrimination in public accommodations: Federal and state laws prohibit discrimination against certain protected groups in businesses and places that are considered "public accommodations." Government-owned facilities include courthouses, jails, hospitals, parks, and other places owned and operated by federal, state and local government. The constitutional rights of people held in state or local government institutions must be enforced under law.

G.  Violation under Title VI: Not permitting or allowing women to work, prohibiting women from receiving wages in thurston county jail (which if allowed, would first: get the crazy women out of the cell who are driving everyone nuts with their crazy energy, second: would allow women as plaintiff to gain access to funds so when other women are

beating plaintiff up and stealing plaintiff's phone card plaintiff has some means and recourse to earn a new phone card and if necessary bribe other inmates in order to save her life, property, well-being, liberty, dignity, and psychological sanity.)

H. Gender Discrimination under Title VI prohibits discrimination on the basis of gender I programs and activities receiving federal financial assistance. An example of personal discrimination is: Plaintiff's car a Nissan Sentra was stolen by a felon Richard Dilberg. Plaintiff's personal items were stolen in car. Phil Harju deputy prosecuting attorney for Ed Holm, D.A., charged Dilberg, but even though Dilberg had ten prior convictions on record for felony convictions (not just charges or arrests) Hajru gave Dilberg a slap on the wrist by allowing plea agreement where Dilberg served time in drug addiction treatment facility and was released after months of treatment and much living than TCCF. Plaintiff's items were never recovered and Prosecutors never reimbursed plaintiff for expenses of having car towed and stolen under the victims assistance program that required Dilberg to pay restitution to plaintiff for stealing car and personal property.

(1) Another example plaintiff suffered gender discrimination: Eli Tabor is currently serving a prison sentence for pleading guilty to child rape. Tabor is not related to Superior Court Judge Gary Tabor. Eli Tabor raped a boy and molested other children in his daycare teacher class. The daycare was Olympia Early Learning Center. The plaintiff's child attended this daycare center and plaintiff's child had Tabor as a teacher. Eli Tabor was held for trial in TCCF but he was given a bail amount and he was allowed to be around the other male inmates in TCCF who are allowed to work. Women are not allowed to work and are given inferior, overcrowded housing. So the system rewards a person like Tabor simply for being a man. Thousands more cases of how TCCF and Thurston county prosecutor's office has favored men and harshly going extra lengths to punish women can be provided with further documentation.

I. Violations under the ADA – plaintiff should not have been made fun of and treated cruelly. Plaintiff was suffering from mental delusions that Sulkowski loved her and would come back and drop all charges. Defendants had duty and obligation to address plaintiff's health and neglected to do so in violation of ADA federal law.

J. Right to freedom of speech Guaranteed by the First Amendment, in which plaintiff alleges that Fourth Degree Assault is not constitutional because it is an expression of speech which citizens are allowed to express. Without body language being used as a form of speech, we see disasters occur such as Littleton, CO, Giffords, AZ, and Virginia Tech, where if perhaps allowed to express freedom of body language in other forms, the perpetrators would not have resorted to violence that violates the constitutional right to life. By claiming the right to use Fourth Degree Assault as a Domestic Violence statute and claiming deprivation of "victim" Sulkowksi's rights a greater far more flagrant violation of plaintiff's constitutional rights were violated.

K. Thus Biden's law, written by someone who has never encountered a real domestic violence abusive situation as a victim, is the "fruit of the poisonous tree," and allows for off-the-chart violations of the constitution as listed herein – thereby raising the question of Equal protection clause of whose constitutional rights are allowed to be violated and who are not, who is more equal under the constitution, and allowing for anyone, including judges and police and military who are ACTUALLY protecting our country and doing their jobs, to be arrested on suspicion of domestic violence assault simply because the "victim" feels afraid and therefore a no contact order and possible life-destroying allegations of assault can reach the criminal justice level resulting in violations of amendments that protect the rights of citizens and allow for due process -- which Biden's law does not allow -- and deprives citizens a voice for dissent of a law that was written to hand power to those who are most likely to abuse it: victims trying to destroy "abusers" (like plaintiff) reputations, seize their

property, force them to lose their children, jobs or future employment hopes, homes, and self-respect. The deprivation of freedom of expression, equal protection (No contact orders should be federally mandated to go both ways, in that if either party violates it – either party can be arrested by law enforcement to prevent a lot of phony and bogus no contact orders and judicial abuse of those who are manipulating and using the system to their advantage) violation of second amendment rights, violation of property rights, and the list goes on, pales in comparison to losing the right to see your child as plaintiff has experienced first hand.

L.  Plaintiff alleges violation of second amendment rights due to the fact that an accused rights to firearms are automatically revoked when issued a no contact order. The rights can be restored by the states, but there is no federal office that can restore the rights if charges are dismissed or adjudicated, therefore the plaintiff could own a gun thinking state rights are restored and be in violation of federal law with no remedy under current law because there is no office to address the restoration of federal gun rights making it lawful to exercise second amendment possession of a gun to protect oneself from crazy and abusive people (or fake ATF agents.)

## COUNT I

1.  That the allegations of the Complaint are herein are adopted by reference.

2.  TCCF had the duty under the Fifth, Eighth and Fourteenth Amendments, and the Civil Rights Acts, to keep inmates secure and protect them from harm.

3.  Defendants TCCF, Pre-trial Services, and the individuals who either were grossly negligent and/or maliciously caused plaintiff harm, as specified in the fact allegations herein. TCCF

and its employees were negligent in not protecting plaintiff from being  terrorized, sodomized, failed to treat her physical and mental health which adversely affected her well being.

## COUNT II

4.  That the allegations of the Complaint are herein are adopted by reference.

5. Conditions in the TCCF were deplorable and inhumane.  The employee defendants were malicious and uncaring as specified.

## COUNT III

6.  That the allegations of the Complaint are herein are adopted by reference.

7. TCCF and defendants in charge of TCCF and Thurston County provided much better conditions to the men than the women.  Plaintiff is a person who was subjected to the gender discrimination as related in the facts and is cognizable as part of federal jurisdiction.

## COUNT IV

8. That the allegations of the Complaint are herein are adopted by reference.

9. Eighth Amendment:  TCCF permitted inhumane treatment of plaintiff as specified in the fact allegations.

## COUNT V

10. That the allegations of the Complaint are herein are adopted by reference.

11. Pre-trial Services prevented bail and work release despite judicially required.

Plaintiff alleges:  Thurston County had a constitutional duty to protect plaintiff from harm and neglected to do so.

TCCF acted discriminately against plaintiff and allowed other inmates to assault, threaten, and steal from her.  TCCF had a duty to protect plaintiff under the constitution and not to discriminate for disability or deny access to services because of a disability.  Plaintiff had right to have access to lawyers and phone calls, and was punished for her disability instead of protected by being denied access to services.  TCCF refused plaintiff's written requests under disability accommodation laws that are protected by Federal and state laws as well the US Constitution. Plaintiff had right to services without being bullied when asking for services under the disability accommodation and Civil Rights Act, both federally upheld laws.  TCCF neglected to do so resulting in permanent damage to plaintiff.  Plaintiff had right to adequate medical services and was denied.  Plaintiff had right to adequate nutrition and sought medical attention and was denied. Plaintiff had right to psychiatric services for her disability and was denied.  Plaintiff had right to contact federal authorities, and Thurston County has covered up their constitutional violations of law, violated double jeopardy laws, and in order to keep plaintiff from notifying the proper authorities.  Plaintiff's constitutional right to redress grievances to Executive, Congressional, and Judicial review in the  United States of America has been denied because of this cover-up regarding constitutional violations and disdain of upheld Federal laws.

Plaintiff alleges:  Thurston County Sheriff's Office, MPD, and other Federal law enforcemet agencies have a duty to protect plaintiff from harm if criminal acts are committed in their jurisdiction and neglected to do so resulting in a discriminatory threat to plaintiff's life, limb, and property; such negligence resulting in unknown permanent damage to plaintiff's property,

psychological health, and creating an ongoing medical condition that cannot be restored or remedied without the benefit of a civil action following incurring damages that have no apparent end in sight.

Plaintiff asserts:  That her life is a death sentence even though a death warrant has not been issued (yet.)

1)   Plaintiff cannot secure employment even as a military spouse

2)   Plaintiff is ostracized from society due to criminal record

3)   Plaintiff has a high likelihood of returning to jail (as Steven Cash, attorney in DC who claims to work for the CIA so kindly reminded plaintiff, referrals through D.C. bar have been useless, why would plaintiff need to pay $40 to have someone tell her she is on a one way road to hell/jail.)

4)   Plaintiff has high likelihood of suffering from debilitating mental conditions but wants to work, have a normal life, and support her daughter.  Plaintiff is forced to not work and not be useful or contribute to society which makes mental disabilities worse.

5)   Plaintiff is vulnerable to sexual criminal perpetrators and law enforcement refuses to protect plaintiff as evidenced in documentation (will be provided) and prevent further sexual assaults and physical attacks due to plaintiff's criminal record.  The prejudgement basis on which plaintiff suffers from a great disability to bring real criminals to light, causes plaintiff to be forced to be a victim instead of being able to assist the justice system or DoD or whatever federal agency needs plaintiff to testify against attackers and predators prevalent in the DMV area.

**Under Title VI of the 1964 Civil Rights Act, Sec. 2000d-7. Civil rights remedies equalization**

(a) General provision (1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

(b) Effective date

The provisions of subsection (a) of this section shall take effect with respect to violations that occur in whole or in part after October 21, 1986.

*(Pub. L. 99-506, title X, Sec. 1003, Oct. 21, 1986, 100 Stat. 1845.)*

PRAYER FOR RELIEF

4. WHEREFORE,  plaintiff  demands:

Money  damages  in  the  amount  of  TWENTY-FIVE  MILLION  DOLLARS  ($)
against  defendants  jointly  and  severally  and  an  amount  to  be
determined  at  trial  in  an  award  equal  to  injury  suffered  from
Defendant's  violations  of  the  Constitution  including  violating  the  equal
protection  clause  of  the  plaintiff's  protection  of  the  law  under  the
Constitution,  and  any  other  compensatory,  punitive,  and  appropriate
damages  the  court  sees  just,  to  deter  further  law  violation  and  to
compensate  plaintiff  for  injury,  pain,  suffering,  and  deprivation  of  civil
rights,  property,  and  the  right  to  have  a  normal  life  as  a  US  citizen  and
military  dependant.

Permanent  injunction  against  the  defendant  from  performing  certain  acts  in  the  future,
including and not limited to:  Asking Federal court to strike down Washington state law as
unconstitutional, and amending Biden's law under the equal protection clause of the Constitution to
require that any no contact order mandated federally or under local jurisdiction be required to have
a component that requires law enforcement to arrest either party violating the no contact order by a
judge and that the no contact order is authorized to be amended by a judge but cannot require only
one party to be protected by law or discriminate against the law, and further procedures in place to
assure that due process of enforcing the law will be included.

Temporary Injunction against federal funding to Washington State under VAWA federal funding until
constitution law violations are remedied, including places like Safeplace who receive federal funding.
Plaintiff did reside in Safeplace, and Valerie Doe and Casi Totten of Safeplace gave plaintiff's

personal information out to the public so that Plaintiff's landlord evicted her based on this personal information shared voluntarily by Safeplace (who claims to help women in domestic violence situations and propogates No contact orders – Plaintiff realized that Safeplace in many ways was the enemy in more ways than one and not the solution.  Plaintiff's personal property was also stolen while plaintiff stayed at the shelter with her six month old baby, and places like Safeplace are a big reason why plaintiff and other women who are abused stay w their abusers (women are abused in all situations and place and economic statuses, there are women serving in the FBI who are abused, and there are women walking the streets who are killed by johns every day in America, it doesn' t matter abusers find vulnerable women in all stations and statuses of lives.)

INJUCTION:  REQUIREMENT THAT THURSTON COUNTY CORRECTIONAL FACILITIES PLACE CAMERAS IN THE JAIL, SO INMATES CANNOT LIE WHEN THEY ASSAULT OTHER INMATES, OR CREATE NEW FICTITIOUS CHARGES OF ASSAULT OR ANY OTHER CRIMES AGAINST AN INMATE WHO HAS COMMITTED NO CRIMES AND DO NOT DESERVE TO BE FURTHER CHARGED OR PUNISHED.

Any  further  relief  which  the  court  may  deem  appropriate, just or equitable.

TRIAL BY JURY DEMANDED

Dated Sept 18, 2012.

Respectfully Submitted,

Elizabeth LeTourneau, *pro se*