| IN THE UNITED STATES COURT FOR THE DISTRICT OF COLUMBIA | Case No. ______ |
|---|---|
| Name of Plaintiff(s) Elizabeth Letourneau 7829 Belle Pt. Drive Greenbelt, MD 20770 | Department No. ______ |
| VERSUS | MOTION TO |
| Name of Defendant(s) | Pendent Jurisdiction (complete title to describe relief requested) |

COMES NOW, the [ ] Plaintiff [ ] Defendant in the above-entitled matter and files this Motion for the following reasons:

Motion for Grant of Pendent Jurisdiction (eliminating the need for the same facts in a trial hearing potentially reaching opposite conclusions.)

Adjudicating claim under "United Mine Workers of America v. Gibbs," to one trial hearing under federal jurisdiction under U.S.C. 28 section 1367.

I declare under penalty of perjury under the law of THE DISTRICT OF COLUMBIA that the foregoing is true and correct.

(Signature) ______ (Date) Oct 17 2012

(Type or print name) Elizabeth Letourneau

## NOTICE OF MOTION

TO: (Name of Opposing Party) ______

TO: (Name of Attorney for Opposing Party, if any) ______

(Date) ______ (Type or print name) ______ (Signature) ______

## CERTIFICATION OF MAILING

The Undersigned certifies on the ______ day of ______, 20___, a copy of the foregoing MOTION TO ______ ______ was mailed to ______ at ______ ______ by depositing a copy in the United States Mail in an addressed sealed envelope, postage prepaid.

(Date) ______ (Type or print name) ______ (Signature) ______

Per NRS 53.045, "I declare under penalty of perjury under the law that the foregoing is true and correct."

(Signature) ______ (Date) ______

| IN THE UNITED STATES COURT FOR THE DISTRICT OF COLUMBIA | Case No. ______ |
|---|---|
| Name of Plaintiff(s) Elizabeth Letourneau 7829 Belle Pt. Drive Greenbelt, MD 20770 | Department No. ______ |
| VERSUS | **MOTION TO** |
| Name of Defendant(s) | Change of Venue (complete title to describe relief requested) |

COMES NOW, the [ ] Plaintiff [ ] Defendant in the above-entitled matter and files this Motion for the following reasons:

Motion for Change of Venue under 28 USC § 1404. See attached documents.

I declare under penalty of perjury under the law of THE DISTRICT OF COLUMBIA that the foregoing is true and correct.

(Signature) ______ (Date) Oct 17 2012

(Type or print name) Elizabeth LeTourneau

**NOTICE OF MOTION**

TO: (Name of Opposing Party) ______

TO: (Name of Attorney for Opposing Party, if any) ______

(Date) ______ (Type or print name) ______ (Signature) ______

**CERTIFICATION OF MAILING**

The Undersigned certifies on the ______ day of ______, 20___, a copy of the foregoing MOTION TO ______ ______ was mailed to ______ at ______ ______ by depositing a copy in the United States Mail in an addressed sealed envelope, postage prepaid

(Date) ______ (Type or print name) ______ (Signature) ______

Per NRS 53.045, "I declare under penalty of perjury under the law that the foregoing is true and correct."

(Signature) ______ (Date) ______

Original-File Copy-Plaintiff Copy-Defendant

Exhibit A
WA State No Contact Order

| ______________ Court of Washington for ______________ | No. |
|---|---|
| ______________, Plaintiff vs. ______________. Defendant (First, Middle, Last Name) | ☐ Pre-Trial ☐ Post Conviction<br>☐ Replacement Order (paragraph 10)<br>**Domestic Violence No-Contact Order**<br>**(clj=NOCON, Superior cts =ORNC)**<br>**Clerk's action required: Para 9** |

**No-Contact Order**

1. **Protected Person's Identifiers**:

______________
Name (First, Middle, Last)

______________
DOB Gender Race

If a minor, use initials instead of name, provide other info., and complete a Law Enforcement Information Sheet (LEIS).

**Defendant's Identifiers**:

| Date of Birth | |
|---|---|
| | |
| Gender | Race |
| | |

2. **Defendant**:
   A. do not cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk, or keep under surveillance the protected person.
   B do not contact the protected person, directly, indirectly, in person or through others, by phone, mail, or electronic means, except for mailing or service of process of court documents through a third party, or contact by the defendant's lawyers
   C do not knowingly enter, remain, or come within________ (1,000 feet if no distance entered) of the protected person's residence, school, workplace, other: ______________.
   D. other. ______________
   ______________.
3. **Firearms and Weapons, Defendant**:
   ☐ do not obtain or possess a firearm, other dangerous weapon or concealed pistol license. (Pre-Trial, RCW 9.41.800. See findings in paragraph 7, below.)
   ☐ do not obtain, own, possess or control a firearm. (Post Conviction or Pre-Trial, RCW 9.41.040 )
   ☐ shall **immediately surrender** all firearms and other dangerous weapons within the defendant's possession or control and any concealed pistol license to the following law enforcement agency: ______________. (Pre-Trial Order, RCW 9.41.800.)
4. **This no-contact order expires on** ☐ ______________(date and time) or ☐ 1 year ☐ 2 years from today's date.
   If no date is entered and no box is checked, this order expires 5 years from today's date.
   The court may extend a no-contact order even if the defendant does not appear at arraignment.

**Warning**: Violation of the provisions of this order with actual notice of its terms is a criminal offense under chapter 26.50 RCW and will subject a violator to arrest; any assault, drive-by shooting, or reckless endangerment that is a violation of this order is a felony. **You can be arrested even if the person protected by this order invites or allows you to violate the order's prohibitions**. You have the sole

responsibility to avoid or refrain from violating the order's provisions. Only the court can change the order upon written application. (Additional warnings on page 2 of this order.)

**Findings of Fact**

5. Based upon the record both written and oral, the court finds that the defendant has been charged with, arrested for, or convicted of a domestic violence offense, and the court issues this Domestic Violence No-Contact Order under chapter 10.99 RCW to prevent possible recurrence of violence.

6 The court further finds that the defendant's relationship to a person protected by this order is an ☐ Intimate partner (former/current spouse; parent of common child; or former/current cohabitants as intimate partners) or ☐ Other family member as defined by Ch. 10 99 RCW: ________________.

7. ☐ (Pretrial Order) For crimes not defined as a serious offense, the court makes the following mandatory findings pursuant to RCW 9.41.800: ☐ The defendant used, displayed, or threatened to use a firearm or other dangerous weapon in a felony. ☐ The defendant is ineligible to possess a firearm due to a prior conviction pursuant to RCW 9.41.040; or ☐ Possession of a firearm or other dangerous weapon by the defendant presents a serious and imminent threat to public health or safety, or to the health or safety of any individual

***Additional Warnings to Defendant***: This order does not modify or terminate any order entered in any other case. You are still required to comply with other orders.

Willful violation of this order is punishable under RCW 26.50 110. State and federal firearm restrictions apply. 18 U.S.C. § 922(g)(8)(9); RCW 9.41.040.

Pursuant to 18 U.S.C. § 2265, a court in any of the 50 states, the District of Columbia, Puerto Rico, any United States territory, and any tribal land within the United States shall accord full faith and credit to the order.

**Additional Orders**

8. ☐ Civil standby: The appropriate law enforcement agency shall, at a reasonable time and for a reasonable duration, assist the defendant in obtaining personal belongings located at: ________________________________________________.

9. The clerk of the court shall forward a copy of this order on or before the next judicial day to:______________________________ ☐ County Sheriff's Office ☐ City Police Department where the case is filed, which shall enter it in a computer-based criminal intelligence system available in this state used by law enforcement to list outstanding warrants.

10. ☐ This order replaces all prior no-contact orders protecting the same person issued under this cause number.

Dated: ____________________ Time ________ a.m./p.m. ☐ in open court with the defendant present

I acknowledge receipt of a copy of this order:

______________________________
Judge/ Pro Tem/Court Commissioner

______________________
Defendant

The protected person shall be provided with a certified copy of this order.

I am a certified or registered interpreter or found by the court to be qualified to interpret in the ______________________________ language, which the defendant understands. I translated this order for the defendant from English into that language.

Signed at (city) ______________________, (state) __________, on (date) ________________.

Interpreter: ____________________________ print name: ______________________________

Exhibit A

| _______________ Court of Washington for _______________ | No. |
|---|---|
| _______________, Plaintiff vs. _______________. Defendant (First, Middle, Last Name) | ☐ Pre-Trial ☐ Post Conviction ☐ Replacement Order (paragraph 10) **Domestic Violence No-Contact Order** (clj=NOCON, Superior cts =ORNC) Clerk's action required: Para 9 |

**No-Contact Order**

1. **Protected Person's Identifiers**:

_______________
Name (First, Middle, Last)

_______________
DOB Gender Race

If a minor, use initials instead of name, provide other info., and complete a Law Enforcement Information Sheet (LEIS).

**Defendant's Identifiers**:

| Date of Birth | |
|---|---|
| | |
| Gender | Race |
| | |

2. **Defendant**:
   A. do not cause, attempt, or threaten to cause bodily injury to, assault, sexually assault, harass, stalk, or keep under surveillance the protected person.
   B. do not contact the protected person, directly, indirectly, in person or through others, by phone, mail, or electronic means, except for mailing or service of process of court documents through a third party, or contact by the defendant's lawyers.
   C. do not knowingly enter, remain, or come within________ (1,000 feet if no distance entered) of the protected person's residence, school, workplace, other: _______________
   D. other: _______________
   _______________.

3. **Firearms and Weapons, Defendant**
   ☐ do not obtain or possess a firearm, other dangerous weapon or concealed pistol license. (Pre-Trial, RCW 9.41.800. See findings in paragraph 7, below.)
   ☐ do not obtain, own, possess or control a firearm. (Post Conviction or Pre-Trial, RCW 9.41.040.)
   ☐ shall **immediately surrender** all firearms and other dangerous weapons within the defendant's possession or control and any concealed pistol license to the following law enforcement agency: _______________. (Pre-Trial Order, RCW 9.41.800.)

4. **This no-contact order expires on** ☐ _______________(date and time) or ☐ 1 year ☐ 2 years from today's date.
   If no date is entered and no box is checked, this order expires 5 years from today's date.
   The court may extend a no-contact order even if the defendant does not appear at arraignment.

**Warning**: Violation of the provisions of this order with actual notice of its terms is a criminal offense under chapter 26.50 RCW and will subject a violator to arrest; any assault, drive-by shooting, or reckless endangerment that is a violation of this order is a felony. **You can be arrested even if the person protected by this order invites or allows you to violate the order's prohibitions**. You have the sole

responsibility to avoid or refrain from violating the order's provisions. Only the court can change the order upon written application. (Additional warnings on page 2 of this order.)

## Findings of Fact

5. Based upon the record both written and oral, the court finds that the defendant has been charged with, arrested for, or convicted of a domestic violence offense, and the court issues this Domestic Violence No-Contact Order under chapter 10.99 RCW to prevent possible recurrence of violence.
6. The court further finds that the defendant's relationship to a person protected by this order is an ☐ Intimate partner (former/current spouse; parent of common child; or former/current cohabitants as intimate partners) or ☐ Other family member as defined by Ch. 10.99 RCW: ________________.
7. ☐ (Pretrial Order) For crimes not defined as a serious offense, the court makes the following mandatory findings pursuant to RCW 9.41.800: ☐ The defendant used, displayed, or threatened to use a firearm or other dangerous weapon in a felony. ☐ The defendant is ineligible to possess a firearm due to a prior conviction pursuant to RCW 9.41.040; or ☐ Possession of a firearm or other dangerous weapon by the defendant presents a serious and imminent threat to public health or safety, or to the health or safety of any individual.

***Additional Warnings to Defendant***: This order does not modify or terminate any order entered in any other case You are still required to comply with other orders.

Willful violation of this order is punishable under RCW 26.50.110. State and federal firearm restrictions apply. 18 U.S.C. § 922(g)(8)(9); RCW 9.41.040.

Pursuant to 18 U.S.C. § 2265, a court in any of the 50 states, the District of Columbia, Puerto Rico, any United States territory, and any tribal land within the United States shall accord full faith and credit to the order.

## Additional Orders

8. ☐ Civil standby: The appropriate law enforcement agency shall, at a reasonable time and for a reasonable duration, assist the defendant in obtaining personal belongings located at: ______________________________________________.
9. The clerk of the court shall forward a copy of this order on or before the next judicial day to:______________________________ ☐ County Sheriff's Office ☐ City Police Department where the case is filed, which shall enter it in a computer-based criminal intelligence system available in this state used by law enforcement to list outstanding warrants.
10. ☐ This order replaces all prior no-contact orders protecting the same person issued under this cause number.

Dated: ____________________ Time ________ a.m./p.m. ☐ in open court with the defendant present

I acknowledge receipt of a copy of this order:

______________________________
Judge/ Pro Tem/Court Commissioner

______________________
Defendant

The protected person shall be provided with a certified copy of this order.

I am a certified or registered interpreter or found by the court to be qualified to interpret in the ______________________________ language, which the defendant understands. I translated this order for the defendant from English into that language.

Signed at (city) ________________________, (state) ___________, on (date) __________________

Interpreter: ______________________________ print name: ______________________________

Exhibit B

WASHINGTON STATE LEGISLATURE

Find Your Legislator
Visiting the Legislature
Agendas, Schedules and Calendars
Bill Information
Laws and Agency Rules
Legislative Committees
Legislative Agencies
Legislative Information Center
E-mail Notifications
Civic Education
History of the State Legislature

Congress - the Other Washington
TVW
Washington Courts
OFM Fiscal Note Website

Access Washington

## RCW 59.18.580

## Victim protection — limitation on landlord's rental decisions.

(1) A landlord may not terminate a tenancy, fail to renew a tenancy, or refuse to enter into a rental agreement based on the tenant's or applicant's or a household member's status as a victim of domestic violence, sexual assault, or stalking, or based on the tenant or applicant having terminated a rental agreement under RCW [illegible].

(2) A landlord who refuses to enter into a rental agreement in violation of this section may be liable to the tenant or applicant in a civil action for damages sustained by the tenant or applicant. The prevailing party may also recover court costs and reasonable attorneys' fees.

(3) It is a defense to an unlawful detainer action under chapter [illegible] RCW that the action to remove the tenant and recover possession of the premises is in violation of subsection (1) of this section.

(4) This section does not prohibit adverse housing decisions based upon other lawful factors within the landlord's knowledge.

[2004 c 17 § 4 ]

### Notes:

**Findings -- Intent--Effective date--2004 c 17:** See notes following RCW [illegible].

WASHINGTON STATE LEGISLATURE
Legislature Home | Senate | House of Representatives | Contact Us | Search

RCWs > Title 59 > Chapter 59.18 > Section 59.18.250

Find Your Legislator
Visiting the Legislature
Agendas, Schedules and Calendars
Bill Information
Laws and Agency Rules
Legislative Committees
Legislative Agencies
Legislative Information Center
E-mail Notifications
Civic Education
History of the State Legislature

Congress - the Other Washington
TVW
Washington Courts
OFM Fiscal Note Website

Access Washington

59.18.240 << >> 59.18.260

## RCW 59.18.250

## Reprisals or retaliatory actions by landlord — presumptions — rebuttal — costs.

Initiation by the landlord of any action listed in RCW 59.18.240 within ninety days after a good faith and lawful act by the tenant as enumerated in RCW 59.18.240, or within ninety days after any inspection or proceeding of a governmental agency resulting from such act, shall create a rebuttable presumption affecting the burden of proof, that the action is a reprisal or retaliatory action against the tenant: PROVIDED, That if at the time the landlord gives notice of termination of tenancy pursuant to chapter 59.12 RCW the tenant is in arrears in rent or in breach of any other lease or rental obligation, there is a rebuttable presumption affecting the burden of proof that the landlord's action is neither a reprisal nor retaliatory action against the tenant: PROVIDED FURTHER, That if the court finds that the tenant made a complaint or report to a governmental authority within ninety days after notice of a proposed increase in rent or other action in good faith by the landlord, there is a rebuttable presumption that the complaint or report was not made in good faith: PROVIDED FURTHER, That no presumption against the landlord shall arise under this section, with respect to an increase in rent, if the landlord, in a notice to the tenant of increase in rent, specifies reasonable grounds for said increase, which grounds may include a substantial increase in market value due to remedial action under this chapter: PROVIDED FURTHER, That the presumption of retaliation, with respect to an eviction, may be rebutted by evidence that it is not practical to make necessary repairs while the tenant remains in occupancy. In any action or eviction proceeding where the tenant prevails upon his or her claim or defense that the landlord has violated this section, the tenant shall be entitled to recover his or her costs of suit or arbitration, including a reasonable attorney's fee, and where the landlord prevails upon his or her claim he or she shall be entitled to recover his or her costs of suit or arbitration, including a reasonable attorney's fee: PROVIDED FURTHER, That neither party may recover attorney's fees to the extent that their legal services are provided at no cost to them.

[2010 c 8 § 19026; 1983 c 264 § 10; 1973 1st ex.s. c 207 § 25.]

WASHINGTON STATE LEGISLATURE

RCWs > Title 59 > Chapter 59.18 > Section 59.18.240

59.18.230 << >> 59.18.250

Find Your Legislator
Visiting the Legislature
Agendas, Schedules and Calendars
Bill Information
Laws and Agency Rules
Legislative Committees
Legislative Agencies
Legislative Information Center
E-mail Notifications
Civic Education
History of the State Legislature

Congress - the Other Washington
TVW
Washington Courts
OFM Fiscal Note Website

Access Washington

# RCW 59.18.240
## Reprisals or retaliatory actions by landlord — prohibited.

So long as the tenant is in compliance with this chapter, the landlord shall not take or threaten to take reprisals or retaliatory action against the tenant because of any good faith and lawful:

(1) Complaints or reports by the tenant to a governmental authority concerning the failure of the landlord to substantially comply with any code, statute, ordinance, or regulation governing the maintenance or operation of the premises, if such condition may endanger or impair the health or safety of the tenant; or

(2) Assertions or enforcement by the tenant of his or her rights and remedies under this chapter.

"Reprisal or retaliatory action" shall mean and include but not be limited to any of the following actions by the landlord when such actions are intended primarily to retaliate against a tenant because of the tenant's good faith and lawful act:

(a) Eviction of the tenant;

(b) Increasing the rent required of the tenant;

(c) Reduction of services to the tenant; and

(d) Increasing the obligations of the tenant.

[2010 c 8 § 19025, 1983 c 264 § 9, 1973 1st ex s. c 207 § 24.]

Exhibit B

WASHINGTON STATE LEGISLATURE

Legislature Home | Senate | House of Representatives | Contact Us | Search | Help

Inside the Legislature

- Find Your Legislator
- Visiting the Legislature
- Agendas, Schedules and Calendars
- Bill Information
- Laws and Agency Rules
- Legislative Committees
- Legislative Agencies
- Legislative Information Center
- E-mail Notifications
- Civic Education
- History of the State Legislature

Outside the Legislature

- Congress - the Other Washington
- TVW
- Washington Courts
- OFM Fiscal Note Website

Access Washington

2010

RCWs > Title 59 > Chapter 59.18 > Section 59.18.580

59.18.575 << 59.18.580 >> 59.18.585

# RCW 59.18.580

# Victim protection — limitation on landlord's rental decisions.

(1) A landlord may not terminate a tenancy, fail to renew a tenancy, or refuse to enter into a rental agreement based on the tenant's or applicant's or a household member's status as a victim of domestic violence, sexual assault, or stalking, or based on the tenant or applicant having terminated a rental agreement under RCW 59.18.575.

(2) A landlord who refuses to enter into a rental agreement in violation of this section may be liable to the tenant or applicant in a civil action for damages sustained by the tenant or applicant. The prevailing party may also recover court costs and reasonable attorneys' fees.

(3) It is a defense to an unlawful detainer action under chapter 59.12 RCW that the action to remove the tenant and recover possession of the premises is in violation of subsection (1) of this section.

(4) This section does not prohibit adverse housing decisions based upon other lawful factors within the landlord's knowledge.

[2004 c 17 § 4.]

## Notes:

**Findings -- Intent--Effective date--2004 c 17:** See notes following RCW 59.18.570.

WASHINGTON STATE LEGISLATURE
Legislature Home | Senate | House of Representatives | Contact Us | Search | Help

Inside the Legislature

- Find Your Legislator
- Visiting the Legislature
- Agendas, Schedules and Calendars
- Bill Information
- Laws and Agency Rules
- Legislative Committees
- Legislative Agencies
- Legislative Information Center
- E-mail Notifications
- Civic Education
- History of the State Legislature

Outside the Legislature

- Congress - the Other Washington
- TVW
- Washington Courts
- OFM Fiscal Note Website

Access Washington



# RCW 59.18.250
## Reprisals or retaliatory actions by landlord — presumptions — rebuttal — costs.

Initiation by the landlord of any action listed in RCW 59.18.240 within ninety days after a good faith and lawful act by the tenant as enumerated in RCW 59.18.240, or within ninety days after any inspection or proceeding of a governmental agency resulting from such act, shall create a rebuttable presumption affecting the burden of proof, that the action is a reprisal or retaliatory action against the tenant: PROVIDED, That if at the time the landlord gives notice of termination of tenancy pursuant to chapter 59.12 RCW the tenant is in arrears in rent or in breach of any other lease or rental obligation, there is a rebuttable presumption affecting the burden of proof that the landlord's action is neither a reprisal nor retaliatory action against the tenant: PROVIDED FURTHER, That if the court finds that the tenant made a complaint or report to a governmental authority within ninety days after notice of a proposed increase in rent or other action in good faith by the landlord, there is a rebuttable presumption that the complaint or report was not made in good faith: PROVIDED FURTHER, That no presumption against the landlord shall arise under this section, with respect to an increase in rent, if the landlord, in a notice to the tenant of increase in rent, specifies reasonable grounds for said increase, which grounds may include a substantial increase in market value due to remedial action under this chapter: PROVIDED FURTHER, That the presumption of retaliation, with respect to an eviction, may be rebutted by evidence that it is not practical to make necessary repairs while the tenant remains in occupancy. In any action or eviction proceeding where the tenant prevails upon his or her claim or defense that the landlord has violated this section, the tenant shall be entitled to recover his or her costs of suit or arbitration, including a reasonable attorney's fee, and where the landlord prevails upon his or her claim he or she shall be entitled to recover his or her costs of suit or arbitration, including a reasonable attorney's fee: PROVIDED FURTHER, That neither party may recover attorney's fees to the extent that their legal services are provided at no cost to them.

[2010 c 8 § 19026; 1983 c 264 § 10; 1973 1st ex.s. c 207 § 25.]

WASHINGTON STATE LEGISLATURE
Legislature Home | Senate | House of Representatives | Contact Us | Search | Help



RCWs > Title 59 > Chapter 59.18 > Section 59.18.240

59.18.230 << 59.18.240 >> 59.18.250

# RCW 59.18.240

## Reprisals or retaliatory actions by landlord — prohibited.

So long as the tenant is in compliance with this chapter, the landlord shall not take or threaten to take reprisals or retaliatory action against the tenant because of any good faith and lawful:

(1) Complaints or reports by the tenant to a governmental authority concerning the failure of the landlord to substantially comply with any code, statute, ordinance, or regulation governing the maintenance or operation of the premises, if such condition may endanger or impair the health or safety of the tenant; or

(2) Assertions or enforcement by the tenant of his or her rights and remedies under this chapter.

"Reprisal or retaliatory action" shall mean and include but not be limited to any of the following actions by the landlord when such actions are intended primarily to retaliate against a tenant because of the tenant's good faith and lawful act:

(a) Eviction of the tenant;

(b) Increasing the rent required of the tenant;

(c) Reduction of services to the tenant; and

(d) Increasing the obligations of the tenant.

[2010 c 8 § 19025; 1983 c 264 § 9; 1973 1st ex.s. c 207 § 24.]

Exhibit C

# FUMC

Casi Totten (casit@safeplaceolympia.org)
Wed 7/29/09 11:00 AM
elizlet@hotmail.com

Hey,

Wow-just got off the phone w/Elizabeth Letourneau, do you remember her?

Asian, younger girl, with baby named Cassidy…

She's a little high strung & kind of annoying☺ Let me just start by putting that out there.

She is in need of rental assistance & spoke w/ Don from FUMC & they asked her to go through us.

I told Elizabeth, this $ is usually reserved for residents here but I am not sure, Deborah's in charge of this & she will get back to you. I repeated this several times, Elizabeth had attitude, got upset, I kept repeating this is different ways, she vented a while about her frustration in trying to get rental assistance help b/c she an eviction & has finally found someone that will work with her, I empathized but said this doesn't change my answer from the first time.

BLAH-annoying. I could have checked the book but she was just pissing me off☺

She's trying to get into a place by the end of the month. I told her you would be in thurs. afternnon & fri.a.m.

Her phone number is 360.402.7277.

Peace be with you☺

Casi Totten

Lead Residential Services Advocate

360.754.6389 x133

Exhibit C

# FUMC

From: **Casi Totten** (casit@safeplaceolympia.org)
Sent: Wed 7/29/09 11:00 AM
To: elizlet@hotmail.com

Hey,

Wow-just got off the phone w/Elizabeth Letourneau, do you remember her?

Asian, younger girl, with baby named Cassidy…

She's a little high strung & kind of annoying☺ Let me just start by putting that out there.

She is in need of rental assistance & spoke w/ Don from FUMC & they asked her to go through us.

I told Elizabeth, this $ is usually reserved for residents here but I am not sure, Deborah's in charge of this & she will get back to you. I repeated this several times, Elizabeth had attitude, got upset, I kept repeating this is different ways, she vented a while about her frustration in trying to get rental assistance help b/c she an eviction & has finally found someone that will work with her, I empathized but said this doesn't change my answer from the first time.

BLAH-annoying. I could have checked the book but she was just pissing me off☺

She's trying to get into a place by the end of the month. I told her you would be in thurs. afternnon & fri.a.m.

Her phone number is 360.402.7277.

Peace be with you☺

Casi Totten

Lead Residential Services Advocate

360.754.6389 x133

Thomas McPhee was/is an Olympia, Washington Kiwanis friend and Thurston County Judge.

The Olympia Washington Kiwanis members and their friends have cost the Washington State taxpayers over $50 million dollars (so far), because of their willful ignorance of long term, merciless and well known, child abuse that occurred at the Olympia Kiwanis Boys Ranch.

**October 2006 note: This Olympia Kiwanis stuff is old news. I've left this information on the web, because I like the thought that someone will say to one of these Kiwanis friends or members: "Grandma, (Grandpa), are you still friends with those Olympia Kiwanians?"**

Back to the 2009 or 2007 or 2005 or 2003 or 2001 or 1999 or 1997 or 1995 or lbloom.net State of Washington Employees Salaries List

1994 Olympia Kiwanis Members List
2007 Thurston County employees list (pop 207,355)(1,332 employees)**(includes gross & overtime wages, hire date)**
2005 Thurston County employees list (pop 207,355)(1,257 employees)**(includes hire date)**
2002 Thurston County employees list (pop 207,355)(1,569 employees)
2002 Port Of Olympia employees list (pop 42,514)(40 employees)
2009 Oly Evergreen St Col employees list (938 employees)
Olympian Newspaper 2010 Thurston employees list
2006 Olympia School District employees list **(Includes Benefits)**
2002 City of Olympia employees list (pop 42,514)(685 employees)
Olympian Newspaper 2010 city of Lacy employees list
2002 City of Lacey employees list (pop 31,226)(226 employees)
2009 South Puget Sound Com Col employees list (1,001 employees)
Name search of Wash. State voters includes our addresses (**and birthdays**)
Name search of Wash State Court filings Traffic, Criminal, Civil, Domestic, Juvenile Offender, and Probate/Guardianship
Back to the beginning OKBR Home Page(http://lbloom.net/indexok.html)

Thomas McPhee is a Thurston County Superior Court Judge, and his wife is an Olympia City Councilwoman.

Here's a statement Olympia city policewoman Nancy Gassett gave to the Wash. St. Patrol on Nov. 28, 1995 about the OKBR. Officer Gassett said that she thinks Judge Tom McPhee, prosecutor Pat Sutherland, and then deputy prosecutor and now Judge Gary Tabor, conspired to deny her a search warrent for the O.K.B.R.

Present Wash. St. Supreme Court Judge Gerry Alexander and Patrick Sutherland were law partners. Present Thurston County Superior Court Judge Thomas McPhee took over Gerry Alexanders caseload when Alexander was appointed to the Thurston County bench in 1973

Here's a biography from the Feb. 1997 Tacoma News Tribune about Judge Mcphee. He has a high opinion of himself.

Here's an article from the Nov. 1995 Tacoma News Tribune about the O.K. Boys Ranch case in which Judge McPhee said he would preside over the case because other Thurston County judges had some connection to DSHS, the OK Boys' Ranch or the Kiwanis Club.

The Sept. 25, 1994 Olympian, reported that Pierce County Superior Court Judge Thomas Sauriol imposed $160,000 in sanctions Friday against Donald Law, a partner in the firm Law Lyman Daniel & Karne representing the O.K. Boys Ranch.

Pierce County Superior Court Judge Thomas Sauriol, brought in to ensure fairness in the case, found the ranch's board of directors, which included community leaders such as District Court Judge Susan Dubuisson functioned as a standing committee of Kiwanis. Sauriol dismissed claims by Kiwanians that the ranch was independent and not accountable to the club.

Judge McPhee and Judge Hicks ran against each other for Thurston County Superior Court Judge inSeptember, 1990 Mcphee won , 14,000 votes to 10,000 votes.

Judge McPhee and Judge Hicks were asked who is the best qualified? by the 9/14/90 Olympian, McPhee said he was "much better" qualified.

Thurston County Juvenile Court Commissioner Scott Neilson said in his Nov. 16, 1995 statement to the Wa. St. Patrol, that he suspected the directors of the OK Boys Ranch and members of the Kiwanis put pressure on law enforcement agencies and DSHS. He also indicated many members of the Kiwanis group were influential business and political figures in the county along with several other members who were very wealthy. These members had connections to the boys ranch and he felt they put subtle pressure on DSHS to keep the ranch open.

Thomas McPhee is listed in the 49 page index (350kb) of 5,223 pages of documents that the WSP collected about the OKBR. Anybody can order any of those public documents by following the instructions on that page.

Until Oct 1999, I believed that the Kiwanians and their friends were guilty of careless neglect or callous indifference. After hearing frightening audio depositions from some of the abused kids, I now believe that these Thur Co citizens were involved with an "active collaboration with evil." According to these depositioned kids, (which was not contradicted by Kiwanian attorney Don Miles), the OKBR staff was involved in long-term molestation and sadistic abuse of these helpless children. DSHS, Olympia, & the Kiwanians criminally ignored the warning signs and then justified their inaction by claiming ignorance. Many of these inattentive judges, lawyers, & politicians want your vote for re-election.

google is the best search engine. and you can make a detailed search of just this site.

Google Search

Search WWW Search lbloom.net

There were many obvious and long-term warnings about the 1970-94 child abusing Olympia Kiwanis Boys Ranch

- DSHS knew since at least 1977
- The OKBR staff certainly knew
- The abused kids told staff, schools, counselors, police, caseworkers, therapists, ect , about their abuse at the OKBR, but nobody investigated
- Olympia Police Chief Wurner came to an Olympia Kiwanis meeting in 1986 and told the Kiwanis about the troubles at the OKBR Chief Wurner was ignored Maybe he should have done more, but he probably wanted to keep his job
- It was well know by the Thurston County courts These kids were constantly in and out of the Thurston County legal system
- The OKBR was written about in the Kiwanis Komments newsletters, and the Kiwanis Board Ranch minutes
- All the OKBR Board Members had a legal oversight of the OKBR
- Were all Olympia Kiwanis Attorneys & Judges and/or Politicians uninformed?
- It's amazing how blissfully ignorant some people were about the OKBR You can read about their guiltlessness in some of their Washington State Patrol and Office of Special Investigation statements

- Here's Wa St Patrol Olympia Kiwanis member lists of 1987, 1990, 1994
- Here is a 49 page index of 5,223 pages of documents that the WSP collected about the OKBR Anybody can order any of those public documents by following the instructions on that page
- The OKBR sent kids for weekend visits to child abusers who donated land to the Kiwanis The Kiwanians sold the land in 1993 for $125,000
- Can the Olympian Newspaper claim ignorance?

OKBR Director Tom Van Woerdan said in his February 13, 1990 Certified Statement, that; "I can produce, if required, at a minimum 100 different people, parents, local officials, Kiwanians, judges, caseworkers, who would testify that the O.K. Boys Ranch ranks high in the state in terms of the services it provides for the boys who, come there. The staff I have acquired over the years, I am extremely proud of. They do work far and above that require by the numerous WACS, contract provisions and manuals of the State of Washington. These boys are well cared for and, in fact, even though it is a cliche', loved by all members of our staff. If the State of Washington were operating its own group home, it would do well to provide as good service as we do."

Thurston County Juvenile Court Administrator, Corinne Newman, said in her November 10, 1994 statement to the Office of Special Investigation, that many juveniles had no prior criminal history when they came to the OKBR, but they left with an extensive criminal history.

There were many OKBR "red flags" from 1977 to 1994 that should have caused DSHS officials like Rosemary Carr and Olympia Kiwanians to investigate and prevent the abuse of children at the OKBR.

Here's a link to the Official Thurston County Web Page.
Here's a link to the Official Olympia Kiwanis Web Page.
Here's a link to Wa St Patrol Olympia Kiwanis member lists of 1987, 1990, 1994
Here's a link to a mediocre Thurston County Assessor search engine, where a person can (with difficulty) look up any Thurston County property owner, and the value of their property.
Here's a link to Kiwanis Thur Co Citizens of the Year results 1968-99
Here's a link to Thur Co & some Wa St election results 1968-99

Below is a list of the (June 2000) present and some past Thurston County elected officials. These elected officials with links, are either Kiwanis members or have a close association with them.

**Judy Wilson** , District 1 Commis 1993-?(Kiwanis Citizen of the Year 1990)
**Diane Oberquell**, District 2 Commis 1989-? (Kiwanis Citizen of the Year nominee in 1983)
**Kevin J. O'Sullivan**, District 3 Commis 1999-? (Kiwanis Citizen of the Year 1993)
**Richard Q. 'Dick' Nichols**, District 3 Commis 1993-1999 (Kiwanis Citizen of the Year 1978)
**Kevin J. O'Sullivan**, Assessor 1995-1999 (Kiwanis Citizen of the Year 1993)
Patricia Costello, Assessor 1999-?
**Sam Reed** , Auditor 1978-? (longtime Kiw booster, future Oly Kiw Pres 2001)
**Betty J. Gould** , Clerk 1991-? (Oly Kiw member)
**Judy Arnold**, Coroner
**Hewitt Henry**, Prosecuting Attorney 1953-64, Court Judge 64-84 (Oly Kiw member)
**Jerry Buzzard**, Prosecuting Attorney 1969-71 (Future OKBR attorney)
**Patrick Sutherland**, Prosecuting Attorney 1974-1995 (Oly Kiw Pres 1995)
**Bernardean Broadous**, Prosecuting Attorney 1995-1999 (Oly Kiw member)
**Ed Holm**, Prosecuting Attorney 1999-? (married to Oly Kiw member)
**Gary Edwards**, Sheriff 1987-? (Olympia Kiwanis Member)
**Robin Hunt**, Treasurer
District Court Judge **Susan A. Dubuisson** 1984-? (OKBR board member)
District Court Judge **Clifford L. 'Kip' Stilz** Late 1980's-? (Olympia Kiwanis President 1986)

Superior Court Judge **Daniel J. Berschauer** 1984-? (dismissed OKBR case)
Superior Court Judge **Paula Casey** 1984-? (had poor memory about OKBR)
Superior Court Judge **Richard A. Strophy** 1984-? (longtime establishment official, friend of many Oly Kiw)
Superior Court Judge **Wm. Thomas McPhee** 1990-? (held up search warrent for OKBR)
Superior Court Judge **Richard Hicks** 1992-? (may have been an Oly Kiw member)
Superior Court Judge **Christine A. Pomeroy** 1992-? (bikeriding friend of OKBR board member Judge Dubuisson)
Superior Court Judge **Gary R. Tabor** 1996-? (refused to prosecute OKBR officials)

Below is an alphabetical list of Olympia Kiwanis member politicians and/or their good friends, and some of the years they ran for office. Over 80% of these people are/were Olympia Kiwanis members. I put (N.M.) after the 11 politicians who were not Olympia Kiwanis members.

- Gary Alexander current Wa. St. Representative
- Gerry Alexander(N.M.) is a current Wa. Supreme Court Justice and former law partner of Olympia Kiwanis President Patrick Sutherland
- Judy Bainto is an OPD warrants officer and ran for the school board in 1995
- Jennifer Belcher (N.M.) current Wa. St. Lands Commissioner & former OKBR consultant
- Robert Bigelow (N.M.) was a Kiwanis Lt. Governor and ran for the school board in 1973
- Thomas Bjorgen ran for Appeals Court Judge in 1992
- Walter Bowen former Thurston Democratic Chairman
- Reiko Callner (N.M.) tried to get current judge Gary Tabor to prosecute some OKBR officials.
- Keith Callow (N.M.) was a Wa. St. Supreme Court Justice who was defeated for re-election in 1990 by an unknow candidate who barely campaigned, but maybe had a better sounding name
- Greg Canova (N.M.) was an assistant attorney general who ineptly prosecuted some OKBR officials
- Lucille Carlson was a Thurston County Deputy Assessor and ran for the school board in 1971
- Virgil Clarkson is a current Lacey city councilmember and was an OKBR board member
- George Darkenwald ran for Superior Court Judge in 1992
- Ed Davis was a DSHS employee and ran for Olympia council in 1971
- Richard DeBolt current Wa. St. Represenative
- Rex Derr former Olympia Mayor
- Kenneth Eikenberry former Wa. St. Att. Gen.(81-93), ran for Governor in 92
- Les Eldridge was a Thurston County Commissioner from 1982 to 1990
- George Eisentrout ran for Wa St Supt of Public Instruction in 1972
- Jane Field ran for school board in 1993
- Bryan Fischnaller ran for Thurston County Prosecutor in 94
- Eugene Forrester ran for Wa St Senate in 1992
- Karen Fraser current Wa St Senator and spouse of Olympia Kiwanian Tim Malone
- Holly Gadbaw former Olympia Mayor
- Stanton Ganders former Washington State Senator from 1948 to 1957
- Roberta Giovaninni was a OKBR board member and rand for freeholder in in 1986
- Christine Gregoire (N.M.) current Wa. St. Attorney General, she half-heartedly prosecuted the OKBR people and afterward went to their club and gave a talk about the tobbacco settlement
- Jon Halvorson former Lacey Mayor
- Nick Handy (N.M.) is employed by the Olympia Port and is married to Judge Paula Casey
- Maurice Harmon ran for Olympia city council in 1982 and freeholder in 1986
- Lou Anne Houck ran for St. House of Rep. in 92
- Sam Hunt ran for Thurston County Commissioner in 92
- Harris Hunter was elected Thur Co Treasurer in 1974 and was a longtime kiwanis member
- Paul Ingram was a Thur Co Dep Sheriff who pled guilty to "satanic child abuse", ran for the St legislature in 1984, & was an OKBR board member.
- Mark Johnson legislative aide to Sen. Jeannette Wood

- Teresa Jordan ran for Superior Court Judge in 96
- Joseph Kerr current PUD Commissioner, ran for St. House of Rep. in 90
- Jeffery Lane ran for Superior Court Judge in 92
- Donald Law was an Olympia lawyer, and OKBR board member, and school board candidate in 1977
- Timothy Malone is married to Wa. St. Sen. Karen Fraser
- Victoria Meadows (N.M.) was a Mason County Judge and a protege of Susan Dubuisson
- Richard Merchant ran for Olympia council in 1983
- Don Miles was an Olympia lawyer, OKBR board member, and freeholder candidate in 1978
- Ken Mitchell was a freeholder candidate in 1978
- Michael J. Murphy current Wash State Treasurer & former Thurston County Treasurer
- Brad Owen (N.M.) is the current Wa St Lt. Governer who's a longtime Kiwanian
- Vernon Pearson former Wa. St. Supreme Court Justice 82-89
- Cora Pinson former Olympia City Councilwoman
- Ron Rants former Olympia City Councilman
- Barbara Roder current Olympia school board member & former OKBR bookkeepper
- Sandra Romero current Wa. St. Representative
- Doug Sayan (N.M.) is a DSHS Rosemary Carr friend
- Cortland Skinner former Olympia Port Commissioner 78-83
- David Skramstad former Olympia Mayor
- Robert Van Schoorl current Port of Olympia Commissioner.
- Lyle Watson former Olympia Mayor.
- Cathy Wolfe is a current Wa St Representative
- Hal Wolfe was a Kiwanis member who helped found the OKBR
- George Yantis Jr. was a former Thurston County Commissioner
- Lewis Yarbrough was an OKBR board member and ran for Olympia council in 1989

Below is an e-mail I received from a former Olympia, Washington resident.

From: ~~~~~~~~@aol.com
To: Louis Bloom manaco@whidbey.net
Sent: Wednesday, July 28, 1999 11:34 AM
Subject: OKBR
Just came across your pages and felt the urge to respond... In the early 80's (81-83) I was at the OKBR frequently as a young kid walking to/from school, I became friends with some of the boys. At one point a small boy confided to me that he was being raped by another boy in the home. The abusing boy talked about it openly!
Days later I walked the victim to OPD where we both gave statements. Later that evening I began to receive these incredibly threatening phone calls from a woman employee of the ranch who's name I believe was Paulette at my home. She kept calling over and over screaming at me calling me names. It was horrible. I thought I was helping someone. Nothing came of it. Then all these years later, it all comes out ... one of the boys that I had known there left as a young adult and still couldn't get it together, he eventually killed himself. As an adult now I don't often think back to those times but it still saddens me. All those boys that needed a safe nurturing place to be, and how many of them were better off for having been taken there? It's not about money. It cost these boys their lives, their souls, their trust. Those people who knew, who didn't care, they should feel such shame. Just my opinion.

From: louis a bloom manaco@whidbey.net
To: ~~~~~~~@aol.com
Sent: Wednesday, July 28, 1999 7:30 PM
Subject: Re: OKBR
thanks for your e-mail. from what i've read, dshs, the olympia police department, and other "authorities"

didn't consider child on child rape to be against the law. it was considered "normal experimentation". The "paulette" you mention, may have been Collette Queener who was an assistant director at the OKBR. Collette, OKBR Director Tom Van Woerdan, and OKBR counselor Laura Rambo Russell were ineptly charged by Wa. St. with "criminal mistreatment for failing to stop abuse". The charges were dismissed by Thurston County Judge Daniel Berschauer on technicalities. The lawyer who represented Collette Queener said, (Nov. 14, 1996 Olympian), that it was a "witch hunt", and that " a more innocent person (than Queener) you could not have for a client. She's an ex-nun ..... I don't see how you could view her in an evil or negative light."
I congratulate you for doing the right thing, when all those adults looked the other way. I repeat on most pages that the " OKBR has cost the Washington State taxpayers over $35 million dollars (so far)", because I think most people don't care about the kids involved, but they may care that it has cost them (taxpayers) money.
louis bloom

*manaco@whidbey.net*

Thomas McPhee was/is an Olympia, Washington Kiwanis friend and Thurston County Judge.

The Olympia Washington Kiwanis members and their friends have cost the Washington State taxpayers over $50 million dollars (so far), because of their willful ignorance of long term, merciless and well known, child abuse that occurred at the Olympia Kiwanis Boys Ranch.

**October 2006 note: This Olympia Kiwanis stuff is old news. I've left this information on the web, because I like the thought that someone will say to one of these Kiwanis friends or members: "Grandma, (Grandpa), are you still friends with those Olympia Kiwanians?"**

Back to the 2009 or 2007 or 2005 or 2003 or 2001 or 1999 or 1997 or 1995 or lbloom.net State of Washington Employees Salaries List

1994 Olympia Kiwanis Members List
2007 Thurston County employees list (pop 207,355)(1,332 employees)**(includes gross & overtime wages, hire date)**
2005 Thurston County employees list (pop 207,355)(1,257 employees)**(includes hire date)**
2002 Thurston County employees list (pop 207,355)(1,569 employees)
2002 Port Of Olympia employees list (pop 42,514)(40 employees)
2009 Oly Evergreen St Col employees list (938 employees)
Olympian Newspaper 2010 Thurston employees list
2006 Olympia School District employees list **(Includes Benefits)**
2002 City of Olympia employees list (pop 42,514)(685 employees)
Olympian Newspaper 2010 city of Lacy employees list
2002 City of Lacey employees list (pop 31,226)(226 employees)
2009 South Puget Sound Com Col employees list (1,001 employees)
Name search of Wash. State voters includes our addresses (**and birthdays**)
Name search of Wash State Court filings Traffic, Criminal, Civil, Domestic, Juvenile Offender, and Probate/Guardianship
Back to the beginning OKBR Home Page(http://lbloom.net/indexok.html)

Thomas McPhee is a Thurston County Superior Court Judge, and his wife is an Olympia City Councilwoman.

Here's a statement Olympia city policewoman Nancy Gassett gave to the Wash. St. Patrol on Nov. 28, 1995 about the OKBR. Officer Gassett said that she thinks Judge Tom McPhee, prosecutor Pat Sutherland, and then deputy prosecutor and now Judge Gary Tabor, conspired to deny her a search warrent for the O.K.B.R.

Present Wash. St. Supreme Court Judge Gerry Alexander and Patrick Sutherland were law partners. Present Thurston County Superior Court Judge Thomas McPhee took over Gerry Alexanders caseload when Alexander was appointed to the Thurston County bench in 1973

Here's a biography from the Feb. 1997 Tacoma News Tribune about Judge Mcphee. He has a high opinion of himself.

Here's an article from the Nov. 1995 Tacoma News Tribune about the O.K. Boys Ranch case in which Judge McPhee said he would preside over the case because other Thurston County judges had some connection to DSHS, the OK Boys' Ranch or the Kiwanis Club.

The Sept. 25, 1994 Olympian, reported that Pierce County Superior Court Judge Thomas Sauriol imposed $160,000 in sanctions Friday against Donald Law, a partner in the firm Law Lyman Daniel & Karne representing the O.K. Boys Ranch.

Pierce County Superior Court Judge Thomas Sauriol, brought in to ensure fairness in the case, found the ranch's board of directors, which included community leaders such as District Court Judge Susan Dubuisson functioned as a standing committee of Kiwanis. Sauriol dismissed claims by Kiwanians that the ranch was independent and not accountable to the club.

Judge McPhee and Judge Hicks ran against each other for Thurston County Superior Court Judge inSeptember, 1990 Mcphee won , 14,000 votes to 10,000 votes.

Judge McPhee and Judge Hicks were asked who is the best qualified? by the 9/14/90 Olympian, McPhee said he was "much better" qualified.

Thurston County Juvenile Court Commissioner Scott Neilson said in his Nov. 16, 1995 statement to the Wa. St. Patrol, that he suspected the directors of the OK Boys Ranch and members of the Kiwanis put pressure on law enforcement agencies and DSHS. He also indicated many members of the Kiwanis group were influential business and political figures in the county along with several other members who were very wealthy. These members had connections to the boys ranch and he felt they put subtle pressure on DSHS to keep the ranch open.

Thomas McPhee is listed in the 49 page index (350kb) of 5,223 pages of documents that the WSP collected about the OKBR. Anybody can order any of those public documents by following the instructions on that page.

Until Oct 1999, I believed that the Kiwanians and their friends were guilty of careless neglect or callous indifference. After hearing frightening audio depositions from some of the abused kids, I now believe that these Thur Co citizens were involved with an "active collaboration with evil." According to these depositioned kids, (which was not contradicted by Kiwanian attorney Don Miles), the OKBR staff was involved in long-term molestation and sadistic abuse of these helpless children. DSHS, Olympia, & the Kiwanians criminally ignored the warning signs and then justified their inaction by claiming ignorance. Many of these inattentive judges, lawyers, & politicians want your vote for re-election.

google is the best search engine, and you can make a detailed search of just this site.

Google [Google Search]

Search WWW Search lbloom.net

There were many obvious and long-term warnings about the 1970-94 child abusing Olympia Kiwanis Boys Ranch

- DSHS knew since at least 1977
- The OKBR staff certainly knew
- The abused kids told staff, schools, counselors, police, caseworkers, therapists, ect , about their abuse at the OKBR, but nobody investigated
- Olympia Police Chief Wurner came to an Olympia Kiwanis meeting in 1986 and told the Kiwanis about the troubles at the OKBR Chief Wurner was ignored Maybe he should have done more, but he probably wanted to keep his job
- It was well know by the Thurston County courts These kids were constantly in and out of the Thurston County legal system
- The OKBR was written about in the Kiwanis Komments newsletters, and the Kiwanis Board Ranch minutes
- All the OKBR Board Members had a legal oversight of the OKBR
- Were all Olympia Kiwanis Attorneys & Judges and/or Politicians uninformed?
- It's amazing how blissfully ignorant some people were about the OKBR You can read about their guiltlessness in some of their Washington State Patrol and Office of Special Investigation statements

- Here's Wa St Patrol Olympia Kiwanis member lists of 1987, 1990, 1994
- Here is a 49 page index of 5,223 pages of documents that the WSP collected about the OKBR Anybody can order any of those public documents by following the instructions on that page
- The OKBR sent kids for weekend visits to child abusers who donated land to the Kiwanis The Kiwanians sold the land in 1993 for $125,000
- Can the Olympian Newspaper claim ignorance?

OKBR Director Tom Van Woerdan said in his February 13, 1990 Certified Statement, that; "I can produce, if required, at a minimum 100 different people, parents, local officials, Kiwanians, judges, caseworkers, who would testify that the O.K. Boys Ranch ranks high in the state in terms of the services it provides for the boys who, come there. The staff I have acquired over the years, I am extremely proud of. They do work far and above that require by the numerous WACS, contract provisions and manuals of the State of Washington. These boys are well cared for and, in fact, even though it is a cliche', loved by all members of our staff. If the State of Washington were operating its own group home, it would do well to provide as good service as we do."

Thurston County Juvenile Court Administrator, Corinne Newman, said in her November 10, 1994 statement to the Office of Special Investigation, that many juveniles had no prior criminal history when they came to the OKBR, but they left with an extensive criminal history.

There were many OKBR "red flags" from 1977 to 1994 that should have caused DSHS officials like Rosemary Carr and Olympia Kiwanians to investigate and prevent the abuse of children at the OKBR.

Here's a link to the Official Thurston County Web Page.
Here's a link to the Official Olympia Kiwanis Web Page.
Here's a link to Wa St Patrol Olympia Kiwanis member lists of 1987, 1990, 1994
Here's a link to a mediocre Thurston County Assessor search engine, where a person can (with difficulty) look up any Thurston County property owner, and the value of their property.
Here's a link to Kiwanis Thur Co Citizens of the Year results 1968-99
Here's a link to Thur Co & some Wa St election results 1968-99

Below is a list of the (June 2000) present and some past Thurston County elected officials. These elected officials with links, are either Kiwanis members or have a close association with them.

**Judy Wilson** , District 1 Commis 1993-?(Kiwanis Citizen of the Year 1990)
**Diane Oberquell**, District 2 Commis 1989-? (Kiwanis Citizen of the Year nominee in 1983)
**Kevin J. O'Sullivan**, District 3 Commis 1999-? (Kiwanis Citizen of the Year 1993)
**Richard Q. 'Dick' Nichols**, District 3 Commis 1993-1999 (Kiwanis Citizen of the Year 1978)
**Kevin J. O'Sullivan**, Assessor 1995-1999 (Kiwanis Citizen of the Year 1993)
Patricia Costello, Assessor 1999-?
**Sam Reed** , Auditor 1978-? (longtime Kiw booster, future Oly Kiw Pres 2001)
**Betty J. Gould** , Clerk 1991-? (Oly Kiw member)
**Judy Arnold**, Coroner
**Hewitt Henry**, Prosecuting Attorney 1953-64, Court Judge 64-84 (Oly Kiw member)
**Jerry Buzzard**, Prosecuting Attorney 1969-71 (Future OKBR attorney)
**Patrick Sutherland**, Prosecuting Attorney 1974-1995 (Oly Kiw Pres 1995)
**Bernardean Broadous**, Prosecuting Attorney 1995-1999 (Oly Kiw member)
**Ed Holm**, Prosecuting Attorney 1999-? (married to Oly Kiw member)
**Gary Edwards**, Sheriff 1987-? (Olympia Kiwanis Member)
**Robin Hunt**, Treasurer
District Court Judge **Susan A. Dubuisson** 1984-? (OKBR board member)
District Court Judge **Clifford L. 'Kip' Stilz** Late 1980's-? (Olympia Kiwanis President 1986)

Superior Court Judge **Daniel J. Berschauer** 1984-? (dismissed OKBR case)
Superior Court Judge **Paula Casey** 1984-? (had poor memory about OKBR)
Superior Court Judge **Richard A. Strophy** 1984-? (longtime establishment official, friend of many Oly Kiw)
Superior Court Judge **Wm. Thomas McPhee** 1990-? (held up search warrent for OKBR)
Superior Court Judge **Richard Hicks** 1992-? (may have been an Oly Kiw member)
Superior Court Judge **Christine A. Pomeroy** 1992-? (bikeriding friend of OKBR board member Judge Dubuisson)
Superior Court Judge **Gary R. Tabor** 1996-? (refused to prosecute OKBR officials)

Below is an alphabetical list of Olympia Kiwanis member politicians and/or their good friends, and some of the years they ran for office. Over 80% of these people are/were Olympia Kiwanis members. I put (N.M.) after the 11 politicians who were not Olympia Kiwanis members.

- Gary Alexander current Wa. St. Representative
- Gerry Alexander(N.M.) is a current Wa. Supreme Court Justice and former law partner of Olympia Kiwanis President Patrick Sutherland
- Judy Bainto is an OPD warrants officer and ran for the school board in 1995
- Jennifer Belcher (N.M.) current Wa. St. Lands Commissioner & former OKBR consultant
- Robert Bigelow (N.M.) was a Kiwanis Lt. Governor and ran for the school board in 1973
- Thomas Bjorgen ran for Appeals Court Judge in 1992
- Walter Bowen former Thurston Democratic Chairman
- Reiko Callner (N.M.) tried to get current judge Gary Tabor to prosecute some OKBR officials.
- Keith Callow (N.M.) was a Wa. St. Supreme Court Justice who was defeated for re-election in 1990 by an unknow candidate who barely campaigned, but maybe had a better sounding name
- Greg Canova (N.M.) was an assistant attorney general who ineptly prosecuted some OKBR officials
- Lucille Carlson was a Thurston County Deputy Assessor and ran for the school board in 1971
- Virgil Clarkson is a current Lacey city councilmember and was an OKBR board member
- George Darkenwald ran for Superior Court Judge in 1992
- Ed Davis was a DSHS employee and ran for Olympia council in 1971
- Richard DeBolt current Wa. St. Represenative
- Rex Derr former Olympia Mayor
- Kenneth Eikenberry former Wa. St. Att. Gen.(81-93), ran for Governor in 92
- Les Eldridge was a Thurston County Commissioner from 1982 to 1990
- George Eisentrout ran for Wa St Supt of Public Instruction in 1972
- Jane Field ran for school board in 1993
- Bryan Fischnaller ran for Thurston County Prosecutor in 94
- Eugene Forrester ran for Wa St Senate in 1992
- Karen Fraser current Wa St Senator and spouse of Olympia Kiwanian Tim Malone
- Holly Gadbaw former Olympia Mayor
- Stanton Ganders former Washington State Senator from 1948 to 1957
- Roberta Giovaninni was a OKBR board member and rand for freeholder in in 1986
- Christine Gregoire (N.M.) current Wa. St. Attorney General, she half-heartedly prosecuted the OKBR people and afterward went to their club and gave a talk about the tobbacco settlement
- Jon Halvorson former Lacey Mayor
- Nick Handy (N.M.) is employed by the Olympia Port and is married to Judge Paula Casey
- Maurice Harmon ran for Olympia city council in 1982 and freeholder in 1986
- Lou Anne Houck ran for St. House of Rep. in 92
- Sam Hunt ran for Thurston County Commissioner in 92
- Harris Hunter was elected Thur Co Treasurer in 1974 and was a longtime kiwanis member
- Paul Ingram was a Thur Co Dep Sheriff who pled guilty to "satanic child abuse", ran for the St legislature in 1984, & was an OKBR board member.
- Mark Johnson legislative aide to Sen. Jeannette Wood

- Teresa Jordan ran for Superior Court Judge in 96
- Joseph Kerr current PUD Commissioner, ran for St. House of Rep. in 90
- Jeffery Lane ran for Superior Court Judge in 92
- Donald Law was an Olympia lawyer, and OKBR board member, and school board candidate in 1977
- Timothy Malone is married to Wa. St. Sen. Karen Fraser
- Victoria Meadows (N.M.) was a Mason County Judge and a protege of Susan Dubuisson
- Richard Merchant ran for Olympia council in 1983
- Don Miles was an Olympia lawyer, OKBR board member, and freeholder candidate in 1978
- Ken Mitchell was a freeholder candidate in 1978
- Michael J. Murphy current Wash State Treasurer & former Thurston County Treasurer
- Brad Owen (N.M.) is the current Wa St Lt. Governer who's a longtime Kiwanian
- Vernon Pearson former Wa. St. Supreme Court Justice 82-89
- Cora Pinson former Olympia City Councilwoman
- Ron Rants former Olympia City Councilman
- Barbara Roder current Olympia school board member & former OKBR bookkeepper
- Sandra Romero current Wa. St. Representative
- Doug Sayan (N.M.) is a DSHS Rosemary Carr friend
- Cortland Skinner former Olympia Port Commissioner 78-83
- David Skramstad former Olympia Mayor
- Robert Van Schoorl current Port of Olympia Commissioner.
- Lyle Watson former Olympia Mayor.
- Cathy Wolfe is a current Wa St Representative
- Hal Wolfe was a Kiwanis member who helped found the OKBR
- George Yantis Jr. was a former Thurston County Commissioner
- Lewis Yarbrough was an OKBR board member and ran for Olympia council in 1989

Below is an e-mail I received from a former Olympia, Washington resident.

From: ~~~~~~~@aol.com
To: Louis Bloom manaco@whidbey.net
Sent: Wednesday, July 28, 1999 11:34 AM
Subject: OKBR
Just came across your pages and felt the urge to respond... In the early 80's (81-83) I was at the OKBR frequently as a young kid walking to/from school, I became friends with some of the boys. At one point a small boy confided to me that he was being raped by another boy in the home. The abusing boy talked about it openly!
Days later I walked the victim to OPD where we both gave statements. Later that evening I began to receive these incredibly threatening phone calls from a woman employee of the ranch who's name I believe was Paulette at my home. She kept calling over and over screaming at me calling me names. It was horrible. I thought I was helping someone. Nothing came of it. Then all these years later, it all comes out ... one of the boys that I had known there left as a young adult and still couldn't get it together, he eventually killed himself. As an adult now I don't often think back to those times but it still saddens me. All those boys that needed a safe nurturing place to be, and how many of them were better off for having been taken there? It's not about money. It cost these boys their lives, their souls, their trust. Those people who knew, who didn't care, they should feel such shame. Just my opinion.

From: louis a bloom manaco@whidbey.net
To: ~~~~~~~@aol.com
Sent: Wednesday, July 28, 1999 7:30 PM
Subject: Re: OKBR
thanks for your e-mail. from what i've read, dshs, the olympia police department, and other "authorities"

didn't consider child on child rape to be against the law. it was considered "normal experimentation". The "paulette" you mention, may have been Collette Queener who was an assistant director at the OKBR. Collette, OKBR Director Tom Van Woerdan, and OKBR counselor Laura Rambo Russell were ineptly charged by Wa. St. with "criminal mistreatment for failing to stop abuse". The charges were dismissed by Thurston County Judge Daniel Berschauer on technicalities. The lawyer who represented Collette Queener said, (Nov. 14, 1996 Olympian), that it was a "witch hunt", and that " a more innocent person (than Queener) you could not have for a client. She's an ex-nun ..... I don't see how you could view her in an evil or negative light."
I congratulate you for doing the right thing, when all those adults looked the other way. I repeat on most pages that the " OKBR has cost the Washington State taxpayers over $35 million dollars (so far)", because I think most people don't care about the kids involved, but they may care that it has cost them (taxpayers) money.
louis bloom

*manaco@whidbey.net*

Exhibit E

No. 35950-2-II

COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION II

---

AUDREY BROYLES; VONDA SARGENT and
SUSAN SACKETT-DANPULLO,

Respondents,

v.

THURSTON COUNTY,

Appellant.

---

# BRIEF OF RESPONDENTS

---

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

Stephanie Bloomfield, WSBA No. 24251
J. Richard Creatura, WSBA No. 09185
James W. Beck, WSBA No. 34208
Andrea McNeely, WSBA No. 36156
Daniel T. Fasy, WSBA No. 37697
Bryan D. Doran, WSBA No. 38480
Attorneys for Respondents

1201 Pacific Avenue, Suite 2100
P.O. Box 1157
Tacoma, WA 98401-1157
(253) 620-6500

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. ASSIGNMENTS OF ERROR ..... 1

III. STATEMENT OF THE CASE ..... 3

A. Pre-May 2001 Conduct. ..... 3

B. Post-May 2001 Conduct. ..... 8

C. Procedural History. ..... 10

D. Motion for Attorneys' Fees. ..... 13

IV. ARGUMENT ..... 14

A. Thurston County Is Liable for Workplace Discrimination and Retaliation Against Its Employees. ..... 14

1. Standard of Review. ..... 16

2. The County's Factual Admission that the Respondents Were County Employees Is Binding. ..... 16

3. The Trial Court Correctly Determined that Workplace Discrimination and Retaliation Could Be Imputed to Respondents' Employer, Thurston County. ..... 17

4. The Trial Court's Ruling that the County may be Liable for Holm's Conduct Is Consistent with Other Courts. ..... 24

B. The Trial Court Properly Allowed Evidence of Discriminatory Conduct by Harju and Jones that Occurred Outside the Statutory Limitations Period to Prove a Hostile Environment. ..... 25

1. The Trial Court Did Not Err in Refusing the County's Proposed Jury Instructions Regarding the Admissibility of Jones' and Harju's pre-May 6, 2001 Conduct. ..... 30

2. The Trial Court Properly Instructed the Jury Regarding How to Evaluate Evidence of Events Before May 6, 2001. ....31

C. Collateral Estoppel Does Not Prevent Respondents from Arguing that Harju's Acts Were a Component Part of a Hostile Environment. ....33

D. The Trial Court Did Not Err in Allowing Respondents to Present Testimony Regarding Sackett-DanPullo's Assignment to Community Prosecution. ....36

E. The Trial Court Properly Ruled that the Attorney-Client Privilege Prohibited Peters' Testimony Regarding a Meeting with Counsel. ....37

F. The Trial Court did not Abuse Its Discretion in Denying a Motion for Mistrial Based on Counsel's Remarks in Closing. ....39

G. Washington Law Supports the Court's Award of Attorneys' Fees and Costs to Respondents. ....41

1. A Previous Dismissal without Prejudice of the Same WLAD Claims Does Not Foreclose an Award of Fees and Costs for All Time Reasonably Incurred. ....42

2. The Trial Court Correctly Applied a Multiplier on the Requested Attorney Fees. ....46

V. CONCLUSION ....50

APPENDIX

Trial Exhibit 8

Trial Exhibit 11

Trial Exhibit 13

Trial Exhibit 15

Trial Exhibit 17

Trial Exhibit 247

## TABLE OF AUTHORITIES

### Washington Cases

*Allison v. Seattle Housing Auth.*, 118 Wn.2d 79, 821 P.2d 34 (1994)............41

*Amoss v Univ. of Wash.*, 40 Wn. App. 666, 700 P.2d 350 (1985).................37

*Anderson v. Gold Seal Vineyards*, 81 Wn.2d 863, 505 P.2d 790 (1973)..........44

*Antonius v. King County*, 153 Wn.2d 256, 103 P.3d 729 (2004)..........26-29, 32-33

*Arishin v. King County*, 103 Wash. 176, 173 P. 1020 (1918) .......................20

*Ball v. Smith*, 87 Wn.2d 717, 556 P.2d 936 (1976).......................................33

*Beckman v. Wilcox*, 96 Wn. App. 355, 979 P.2d 890 (1999)...................42, 45

*Billias v. Panageotou*, 192 Wash. 523, 76 P.2d 987 (1938)..........................38

*Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581,675 P.2d 193 (1983)..........46-47, 49

*Brothers v. Pub. Sch. Employees of Washington*, 88 Wn. App. 398, 945 P.2d 208 (1997)..........25

*Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 20 P.3d 921 (2001)..........35-36

*Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 864 P.2d 937 (1994)..........16

*Carter v. King County*, 120 Wash. 536, 208 P. 5 (1922) ..............................20

*Christensen v. Grant County Hosp. Dist. 1*, 152 Wn.2d 299, 96 P.3d 957 (2004)..........33-34

*Cork Insulation Sales Co. v. Torgeson*, 54 Wn. App. 702, 775 P.2d 970, *review denied*, 113 Wn.2d 1022 (1989)..........42

*Crossler v. Hille*, 136 Wn.2d 287, 961 P.2d 327 (1998)................................20

*Davis v. Globe Mach. Mfr. Co.*, 102 Wn.2d 68, 684 P.2d 692 (1984)...........36

*Easiley v. Norris*, 107 F. Supp. 2d 1332 (N.D. Ok. 2000)..............................45

*Grand Jury Proceedings Under Seal v. U.S.*, 947 F.2d 1188 (4th Cir. 1991) ..........................................................................38

*Hughes v. Unified Sch. Dist. 330*, 872 F. Supp. 882 (D. Kan. 1994) ............45

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, __ U.S. ___, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007)...................................................33

*Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002).............15

*Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842 (8th Cir. 1994).................................................45

*McGrath- Malott v. Maryland*, 2007 WL 609909 (D. Md. 2007)..................21

*Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988)...................................21-22

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)......................................26-29, 32

*Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993).............................24

*Thompson v. Duke*, 882 F.2d 1180 (7th Cir. 1989) ........................................21

**Cases from Other States**

*Moy v. County of Cook*, 159 Ill.2d 519 (Ill. 1994).........................................22

**Washington Statutes**

RCW 4.16.080(2)..........................................................................................26

RCW 5.60.060 ...............................................................................................37

RCW 36.01.010 .............................................................................................18

RCW 36.01.020 .............................................................................................20

RCW 36.01.030 ........................................................................................ 18-19

RCW 36.16.030 ..................................................................................15, 19, 23

*Seattle Northwest Sec. Corp. v. SDG Holding Co.*, 61 Wn. App. 725, 812 P.2d 488 (1991) ....................37

*Shoemaker v. Bremerton*, 109 Wn.2d 504, 745 P.2d 858 (1987) ....................34

*Smith v. Behr Process Corp.*, 113 Wn. App. 306, 54 P.3d 665 (2002) ....................46

*Southcenter Joint Venture v. Nat'l. Dem. Policy Comm.*, 113 Wn.2d 413, 780 P.2d 1282 (1989) ....................34

*State v. Bryant*, 146 Wn.2d 90, 42 P.3d 1278 (2002) ....................19

*State v. Emmanuel*, 42 Wn.2d 799, 259 P.2d 845 (1953) ....................38

*State v. Knighten*, 109 Wn.2d 896, 748 P.2d 1118 (1998) ....................17

*State v. Korum*, 157 Wn.2d 614, 141 P.3d 13 (2006) ....................41

*State v. Powell*, 62 Wn. App. 914, 816 P.2d 86 (1991) ....................40

*State ex rel McMartin v. Whitney*, 9 Wash. 377, 37 P. 473 (1894) ....................18

*Steele v. Lundgren*, 96 Wn. App. 773, 982 P.2d 619 (1999) ....................44, 46

*University Village Ltd. Partners v. King County*, 106 Wn. App. 321, 23 P.3d 1090, *review denied*, 145 Wn.2d 1002 (2001) ....................26

*Wachovia v. Kraft*, 138 Wn. App. 854, 158 P.3d 1271 (2007) .................... 44- 45

*Whatcom County v. State*, 99 Wn. App. 237, 993 P.2d 273 (2000) ....................19

*Wheeler v. Catholic Archdiocese*, 124 Wn.2d 634, 880 P.2d 29 (1994) ....................43

*Zylstra v. Piva*, 85 Wn.2d 743, 539 P.2d 823 (1975) ....................19

**Federal Cases**

*In re Auclair*, 961 F.2d 65 (5th Cir. 1992) ....................38

*Bratton v. City of Albuquerque*, 375 F. Supp. 2d 1114 (D.N.M. 2004) ....................45

*Coleman v. Kay*, 87 F.3d 1491 (3rd Cir. 1996) ....................24, 25

*Dean v. Riser*, 240 F.3d 505 (5th Cir. 2001) ....................45

*Easiley v. Norris*, 107 F. Supp. 2d 1332 (N.D. Ok. 2000)....45

*Grand Jury Prodeedings Under Seal v. U.S.*, 947 F.2d 1188 (4th Cir. 1991)....38

*Hughes v. Unified Sch. Dist. 330*, 872 F. Supp. 882 (D. Kan. 1994)....45

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, __ U.S. ___, 127 S. Ct. 2162, 167 L. Ed. 2d 982 (2007)....33

*Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002)....15

*Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842 (8th Cir. 1994)....45

*McGrath- Malott v. Maryland*, 2007 WL 609909 (D. Md. 2007)....21

*Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988)....21-22

*National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)....26-29, 32

*Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993)....24

*Thompson v. Duke*, 882 F.2d 1180 (7th Cir. 1989)....21

**Cases from Other States**

*Moy v. County of Cook*, 159 Ill.2d 519 (Ill. 1994)....22

**Washington Statutes**

RCW 4.16.080(2)....26

RCW 5.60.060....37

RCW 36.01.010....18

RCW 36.01.020....20

RCW 36.01.030....18-19

RCW 36.16.030....15, 19, 23

RCW 36.27 *et. seq.* .......... 20

RCW 36.28 *et. seq.* .......... 20

RCW 49.60 *et seq.*("WLAD") .......... *passim*

RCW 49.60.030(2) .......... 41, 43-44, 49

RCW 49.60.040(3) .......... 11, 16

RCW 49.60.180(3) .......... 18

**Washington Court Rules**

Civil Rule 8 .......... 17, 18

Civil Rule 41(a)(1)(B) .......... 42, 50

RAP 2.5(a) .......... 33

RAP 18(a) .......... 49

**Washington Pattern Jury Instructions, Civil**

WPI 50.18 .......... 18

**Federal Statutes**

42 U.S.C. § 1983 .......... 21-22

42 U.S.C. § 2000e *et seq* .......... 43, 53

**Secondary Authorities**

5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 501.11 (5th ed. 2007) .......... 38

8 J. WIGMORE, EVIDENCE § 2322, at 630 (rev. 1961) .......... 37

## I. INTRODUCTION

The name outside the door reads "Thurston County Prosecuting Attorney's Office." Every day, Thurston County Deputy Prosecuting Attorneys appear in the courts of our State claiming to represent the people of Thurston County. In this case the County admitted that Respondents were Thurston County employees. Yet, in this appeal, the County is now attempting to avoid liability by disclaiming responsibility for the actions of its agents and officers, including the head of the office, Prosecuting Attorney Edward Holm.

The County, like any legal entity, can only act through its officers, agents and employees. The Thurston County Prosecutor and his deputy prosecutors are indisputably the County's officers and agents. Respondents respectfully request that this Court hold the County accountable for the gender discrimination and retaliation Respondents experienced in the workplace as Thurston County employees.

## II. ASSIGNMENTS OF ERROR

Respondents offer a more neutral statement of the issues.

1. Whether the County can be held liable for workplace discrimination and retaliation by the County Prosecutor and his Deputy Prosecutors.

2. Whether the trial court abused its discretion by admitting evidence of conduct that occurred more than three years before the filing of the lawsuit to prove a "hostile environment" claim.

3. Whether the trial court erred by allowing evidence of Phil Harju's conduct to prove claims of hostile environment against the County after a court granted summary judgment dismissing claims brought against Harju individually.

4. Whether the trial court abused its discretion in excluding testimony on the basis of attorney-client privilege from Deputy Prosecutor Christen Peters regarding conversations she and the three Respondents had jointly with attorneys regarding a possible claim against the County.

5. Whether the trial court abused its discretion in refusing to grant the County's motion for mistrial based on a comment by Respondents' counsel during closing asking the jury "to determine what fair compensation is and to award that so that what happened to these women will never happen again."

6. Whether the trial court abused its discretion in awarding fees and costs based, in part, on services rendered in a related case that was voluntarily dismissed.

7. Whether the trial court abused its discretion in awarding a 1.5 multiplier for counsel's fees through trial.

## III. STATEMENT OF THE CASE[1]

The County's picture of Edward Holm as a progressive, independent, public servant is not the same person that the jury saw when evaluating the evidence at trial. While the County portrays Respondents as disgruntled and ungrateful employees, what the jury heard and saw were three "rising stars," who were compromised and humiliated in a hostile work environment, and who ultimately lost their careers as prosecutors through retaliation. It is not for this court to choose between these different versions of the facts because the jury has already performed that duty. Respondents offer this counter-statement to provide the court with a more accurate version of what the jury heard so that this court can understand the basis for the trial court's rulings and the jury's decision.

### A. Pre-May 2001 Conduct.

The hostile work environment Respondents experienced began shortly after Holm took office in January 1999. The record is replete with evidence of inappropriate gender-based conduct in the workplace by Holm and his deputy prosecutors during 2000 and 2001. A sampling of Holms' conduct includes:

---

[1] The County quotes Shakespeare's Polonius in Hamlet proclaiming "brevity is the soul of wit," as the introduction to a 75-page brief. The County's invocation of Polonius is certainly apt, although undoubtedly not in the way intended. Polonius, a wordy and sly politician in the most unflattering sense of the word, is generally known to obfuscate the truth and cloud the issues, invariably using ten words when one will do. Here, Thurston County's over length brief substitutes sophistry for substance and length for breadth. Its use of the famous "brevity" quote is as ironic as Shakespeare's, though unwittingly so.

- Making repeated references to women's breasts, such as "being built," having "big knockers," and using hand gestures. CP 4625-26, 4703-04, 4723, 4750, 4790.
- Making comments about women being "good looking," "sexy," or "hot." CP 4722-23, 4740, 4750, 4800.
- Stopping business interactions to turn and ogle or leer at female employees. CP 4750.
- Commenting that he would take a female consultant home with him if he did not have a wife. CP 4698-99, 4705, 4760.
- Commenting about women running around in their underwear. CP 4705, 4801.
- Commenting about his desire to share a hotel room with a female employee. CP 4724-25, 4750-51, 4769, 4773, 4807.
- Suggesting that a female employee should sit on his lap or other men's laps during a meeting. CP 4714, 4722, 4772.
- Telling a female employee that she could come to the restroom with him to "give me a hand." CP 4723, 4763

When the head of the office engages in this kind of inappropriate conduct, it sets the tone for others. There was also abundant evidence regarding offensive and demeaning conduct directed toward Respondents and other women by Deputy Prosecutors Phil Harju and Jack Jones.

Harju would routinely single out Broyles, the only female deputy prosecutor with supervisory authority over felony cases, for negative comments to the effect that she was not working, she was not doing her job, and she was not on calendar rotation. CP 4817-18; RP 1396-97. Harju claimed that Broyles had a "special relationship," with Holm, implying a sexual relationship. CP 4629-30, 4647, 4656, 4672, 4694, 4707; RP 1399. Harju's demeaning, denigrating and offensive conduct made it clear that

women were not valued or important at the Prosecuting Attorney's Office. CP 4631, 4656, 4681-82, 4699, 4707-08; RP 1397-99.

Jack Jones, another male deputy prosecutor, engaged in deliberate, offensive and physically hostile behavior toward women including:

- Verbally attacking and degrading female employees, bringing them to tears. CP 4708, 4781, 4804; RP 1410.
- Throwing files at women. CP 4699, 4726; RP 523-24.
- Yelling and cursing at female employees. CP 4726, 4708; RP 23-24, 1406-08.
- Routinely using his size and body position to intimidate female attorneys and staff. CP 4662, 4708, 4726, 4742; RP 1406-08.
- Intimidating women to the point where they avoided walking in front of his office. RP 1848.

A number of these incidents predated May of 2001, including the following specific events. In early 2000, Jones blew up at deputy prosecutor Christen Peters. Jones yelled at her, once in the main office and again on the same day in the courtroom. She testified that Jones was yelling "f --- you" and threw a case file. RP 416-21, 1626-31.

Phil Harju reported Jones' conduct to Holm, who did nothing:

> I explained what happened to Ed and recommended that we bring Jack in and discuss the issue with him and document that we had that discussion. . . . As far as I know Jack wasn't asked to do any training or anything else in response to that incident.

CP 4770; RP 417.

In May 2000 Jones made offensive statements to a female Judge. Again, Holm did nothing. CP 4770; RP 423.

> In May 2000 Jack had an incident with Judge Pomeroy. She complained to me that Jack was rude to her. . . . I also took this incident to Ed and recommended again that we document this in Jack's personnel file. Ed's response was the same as before, he would talk to Jack, that nothing would be documented in Jack's file and that I needed to do nothing more. *Id.*

Sometime before May 9, 2000, Jones yelled at Vonda Sargent and, true to form, Holm still did nothing. CP 4770; RP 424-25.

> Vonda also complained to me about Jack some time before May 9, 2000. She felt that he was intimidating and unprofessional. I spoke to Jack and he directed an email apology to Vonda. I made the same recommendation, now for the third time, to Ed. Ed again said that he would not put something into Jack's file because it would be "devastating."

Sargent also complained to her supervisor that Jones would carry a handgun around in the office with impunity. RP 424-25. Sackett-DanPullo described how Jones openly cleaned his gun in the office. RP 1407-08.

During all of the events giving rise to this lawsuit, Thurston County had a Sexual Harassment Policy that applied to all of its employees, including those employed in the Prosecutor's Office (CP 2778-83, 2790, 4603) – a policy that was being entirely ignored. The Policy stated:

- Department managers and supervisors shall not allow conduct that creates a sexually intimidating, hostile or offensive work environment. Included and forbidden conduct are lewd gestures, sexually offensive language, or sexually offensive behavior. Failure to adhere to this policy will result in disciplinary action up to and including termination. CP 4603.
- Implicit in the EEOC's guidelines is that the employer and its managers are responsible for the acts of their agents and supervisory employees with respect to preventing sexual harassment in the work place. Prevention is the best

> instrument for eliminating sexual harassment, and an employer should take all precautions necessary to discourage such misbehavior from occurring. CP 4603.

Despite repeated complaints, Respondents were not satisfied that anything was being done to stop the offensive conduct. RP 98-100, 110-12. In November 2000, all four senior women deputy prosecutors (Respondents and Peters) walked into Holm's office to complain. RP 99-100, 519-21. Holm asked the women to speak with County Human Resources Director, Peggy Quan. RP 102-04, 519-21, 1403. Quan interviewed the four women, and took notes documenting their problems, then did nothing. RP 528-29, 110-12, 1418-19; Trial Exhibits 11, 13, 15 and 17.[2]

The County's Sexual Harassment Policy (CP 4604) reads in part:

> Employees or applicants for employment who experience behavior in violation of this policy are urged to contact the County's Affirmative Action Officer. A thorough investigation of the facts will be immediately conducted. If evidence supports such a complaint, immediate action will be taken. All efforts will be taken to protect the individuals involved. Employees may not be retaliated against for reporting or complaining of harassment.

Instead, in January 2001 Holm addressed the complaints by isolating the women who complained and assigning them to less desirable positions in Domestic Violence, Juvenile and Community Prosecution.[3] RP 529-32;

---

[2] The trial exhibits referenced herein are part of the supplemental designation of clerk's papers filed by Respondents on October 4, 2007. Record cites are not yet available, but these exhibits are attached as an Appendix to this brief for ease of reference.

[3] The testimony was clear that the plum assignment for a prosecuting attorney is a position prosecuting major felonies. CP 4713, 4748-49. Assignment to the felony trial team, headed by Harju, was the position Respondents Sackett-DanPullo and Sargent sought and were denied. CP 4736, 4748.

Trial Ex. 8. Additionally, some of the complaining women were transferred from the main office in Olympia and moved to Lacey and cross-town offices. RP 529-32. The male harassers remained assigned to the coveted Felony Trial Team. RP 532-36, Trial Ex. 8.

**B. Post-May 2001 Conduct.**

The hostile environment continued unabated and, if anything, worsened. CP 4737; RP 138-41. Respondents testified that they were still subjected to the same humiliating behavior, and now were also shunned and criticized for complaining. CP 4737; RP 551-53, 1446-55. Sackett-DanPullo described a subsequent run-in with Jones in court. He yelled at her, humiliated her and again used his size to intimidate her. CP 4726; RP 1436-41. Respondents testified that the work environment became increasingly hostile, RP 1446-49, 1452-55, causing Broyles to take a two-month medical leave of absence in July 2001. CP 4700, 4711; RP 130-31.

It was during Broyles' leave that the three Respondents and the fourth female deputy prosecutor, Peters, jointly sought advice from legal counsel. RP 546-48. This ultimately resulted in Respondents filing a tort claim with the County on August 22, 2001. CP 3085-87; RP 548-49. Peters decided not to join in the claim. According to Sackett-DanPullo, Peters feared for her job and her husband's job, because he was also employed as a deputy prosecutor in the Civil Division of the Thurston County Prosecutor's office. RP 1611-13.

After several other incidents, including a complete loss of further felony case assignments, Sargent quit in October 2001 after informing Holm that she had been constructively discharged. CP 4745; RP 551. As a consequence of the continued harassment and retaliation, Sackett-DanPullo was on medical leave in November and December 2001. CP 4736; RP 1455. On December 31, 2001, Holm fired Broyles, who had always received excellent reviews. CP 3165-68; RP 52, 148-49. Broyles asserted that she was terminated in retaliation for filing a claim, and she wrote to the County Council requesting reinstatement. CP 3088; RP 151-53. In March 2002, the Council reinstated her with salary and benefits; however, Holm did not allow Broyles to resume her work. *Id.*

Sackett-DanPullo remained in her position but was forced to take a second medical leave in August 2002 because of the on-going stress caused by the workplace hostility. RP 1465, 1467. Holm terminated her in December 2002. RP 1468-69. Thus, within 16 months of filing the tort claim, all three Respondents had either been fired or constructively discharged, and all of the men who were the subject of their complaints remained in their same positions, without any adverse consequences.[4]

---

[4] Although Jack Jones eventually took a "Violence in the Workplace" class, he never took any classes to address the Respondents' November 2000 complaints of hostile and discriminatory treatment until well after they filed the tort claim with the County in late August 2001. RP 2471-74; Trial Ex. 247.

C. **Procedural History.**

The County's procedural history omits some critical facts and other facts require further explanation. It is indeed true that Respondents filed their first lawsuit (*Broyles I*) in January of 2002 in Thurston County, naming four defendants: "Thurston County: (Thurston County Office of the Prosecuting Attorney)," Edward Holm, Phil Harju and James Powers. In *Broyles I* the County admitted that Respondents were County employees. CP 2758-59.

On September 26, 2003, Harju moved for summary judgment offering three alternative grounds: (1) he was not a manager subject to individual liability under RCW 49.60; (2) he did not take any tangible employment action against Respondents; and (3) his individual actions alone did not create an actionable hostile environment. Visiting Judge Costello granted Harju's motion dismissing all claims against him individually, without explaining the basis for his decision. CP 4992-93.

On April 2, 2004, Holm and Thurston County moved for summary judgment and a dismissal of all claims. Judge Costello granted these motions only with respect to claims for race discrimination and marital status discrimination. Judge Costello denied Holm's motion to dismiss the sex discrimination and retaliation claims against him individually. Judge Costello also denied the County's motion to dismiss Respondents' gender discrimination, hostile environment and retaliation claims against the County. CP 4049-51, 4995-97.

On May 3, 2004, just days before the scheduled jury trial, for the first time the trial court advised Respondents that there would not be a jury trial despite the County's previously filed Jury Demand and the Stipulated Order for Jury Trial previously signed by all parties and the Court. CP 436-37, 631-33. Therefore, Respondents voluntarily dismissed the suit without prejudice and re-filed their claims against Thurston County within days in Mason County (*Broyles II*) to preserve their right to a jury trial. CP 4999.

In its answer to the Complaint in *Broyles II*, the County again admitted that Respondents were County employees and that the County was their "employer" as defined by RCW 49.60.040(3), and further denied that Holm was Respondents' employer. CP 2767 at ¶¶ 1-3, 6. The County later propounded requests for admissions to each Respondent demanding that they admit that Thurston County was their employer, which they did. CP 771, 780, 790. The status of Thurston County's status as Respondents' employer was never disputed during *Broyles I* or *Broyles II* until well after the close of discovery in *Broyles II*, when the County decided to ignore its admissions and concoct a new theory to avoid liability.

On March 6, 2006, after further extensive discovery, the County again filed two motions for summary judgment, which were heard by visiting Judge Brosey. One motion sought dismissal of all claims on the grounds that Holm was the responsible employer, not the County. CP 4375. This motion was denied in its entirety. CP 3514-17. The second motion

sought dismissal of all claims on a variety of grounds. CP 4106. Although Judge Broscy granted partial summary judgment on some limited issues, he denied the County's motion to dismiss Respondents' gender discrimination and retaliation claims. CP 3514-17.

On September 13, 2006, after the County presented orders that, in the opinion of Judge Brosey, were too broad, Judge Brosey orally affirmed his ruling and explicitly stated that in dismissing certain negligence claims he did not intend to limit introduction of evidence that may also support the WLAD claims of gender discrimination and retaliation, interlineating this into his order. CP 3099-3117, 3514-17.

After those rulings, the case was assigned to yet another visiting judge for trial, Judge Foscue. Undaunted by the two previous summary judgment denials, on September 18, 2006, the County filed yet a third motion for summary judgment on many of the same grounds. CP 3425. After losing these motions for the third time, and faced with its admission that it was Respondent's employer, shortly before trial the County moved to amend its Answer to retract its factual admissions. CP 3064. Respondents objected on several grounds, including the County's previous admissions and the undue prejudice it would cause to Respondents. The trial court denied this motion as well. CP 2653-54.

Undeterred, the County filed motions in limine attempting to exclude evidence of events that occurred prior to May 6, 2001. CP 2614.

The court denied the motions insofar as they sought to preclude the introduction of evidence of a hostile work environment that predated May 6, 2001. RP (Oct. 16, 2006) 61-62.

After a three-week jury trial, the trial court instructed the jury with a set of instructions that had been the subject of discussion and argument before the Court. Despite the County's protestations now, it failed to object to Instruction Number 20, an instruction the County drafted and proposed. RP 2360; 3002.

The Verdict Form allowed the jury to consider two separate WLAD causes of action for each Respondent: (1) gender discrimination; and (2) retaliation. CP 898-903. If the jury found liability on either cause of action, then the jury was asked to calculate damages. After two days of deliberation, the jury returned a verdict in favor of each Respondent on both causes of action awarding total damages of $1.47 million. CP 898-903.

**D. Motion for Attorneys' Fees.**

Respondents sought to recover for their work on *Broyles I* and *Broyles II*. They submitted evidence to the trial court to show that the work that was done on *Broyles I* applied to *Broyles II* and that it was part of continuing representation regarding the same set of facts. CP 428-703 Respondents' petition was supported by expert declarations of Paul Stritmatter and Rebecca Roe. CP 706-43. The expert declarations also supported an award of a 1.5 multiplier of the attorneys' fee award. *Id.* In

response, the County did not dispute the hours spent, but instead, argued that the hourly rates were too high and that Respondents' counsel should not be compensated for any of the work in *Broyles I* or for work on related causes of action that had been dismissed. CP 360.

After observing the entire trial, and personally witnessing many of the motions and battles leading to the verdict, the trial court concluded:

> [T]here's no doubt this case required a high – high level of skill. . . . And it not only required a high level of skill in that narrow realm, but also in trial preparation and trial. This – this case was ably prosecuted and it was diligently – and the term was used 'aggressively' defended, and that's true. I mean it was a battle. . . .
>
> [T]he major factor and the major reason why there is consideration of a multiplier is the risk of no recovery and a risk of an insignificant recovery. And I think this is one of those cases. I think . . . the law firm took on a real challenge when they accepted this case . . . .
>
> It's not over yet. RP (Feb. 26, 2007) 23-24.

## IV. ARGUMENT

### A. Thurston County Is Liable for Workplace Discrimination and Retaliation Against Its Employees.

Respondents' claims were brought pursuant to RCW 49.60 *et seq.*, Washington's Law Against Discrimination ("WLAD"). The County argues that its Prosecutor, Edward Holm, is not an officer, agent or employee of Thurston County and it is not responsible for any workplace conduct by Holm or his deputies in violation of WLAD. The County reaches this conclusion by equating the "County" to the "Board of Commissioners," and

ignoring the fact that the Prosecutor is expressly named an "officer" of the County by statute. RCW 36.16.030. The County suggests that because the County's Board of Commissioners cannot exercise control over the Prosecuting Attorney, the County is not liable for his discrimination against County employees. The County is wrong.

The structure of checks and balances within County government does not have any bearing on the County's liability when its employees suffer workplace discrimination and retaliation. The Prosecutor is an officer of the County. Therefore, if he or other persons under his direction and control help create a hostile work environment (or the County allows it to continue), or retaliate when employees complain about discrimination, then the County may be liable. The County has not challenged the jury's determination that the discrimination was imputable to the County.

The County presents this court with a false choice, observing: "the crucial question for this case is whether Holm was an 'owner, manager, partner or corporate officer' of Thurston County, or was he an 'owner, manager, partner or corporate officer' of the Thurston County Prosecuting Attorney's Office." App. Br. at 36. The simple answer is that Holm was both. And even if he wasn't, the County allowed its employees to be subjected to workplace discrimination and harassment, and therefore, remains liable regardless of Holm's legal status. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002).

**1. Standard of Review.**

Appellant challenges the trial court's determination that Thurston County may be responsible for workplace discrimination and retaliation by Holm and other Deputy Prosecutors in violation of WLAD. This finding involves mixed questions of fact and law. *De novo* review is appropriate for the latter, but not the former. Holm's status as an officer of Thurston County may be a question of law, but whether the County should have been aware of the harassment of its employees and whether it took appropriate remedial measures are questions of fact, not challenged on appeal. *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 407, 693 P.2d 708 (1985).

The County's liability may be established by Holm's status as a County officer, and also by Respondents' status as County employees and the County's knowledge of the problem. *De novo* review is inappropriate for the factual determination that Respondents were County employees. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 107-08, 864 P.2d 937 (1994).

**2. The County's Factual Admission that the Respondents Were County Employees Is Binding.**

When the County admitted that it was Respondents' employer under RCW 49.60.040(3) and that Holm was not an employer as defined by WLAD, Respondents justifiably relied upon those factual admissions. A statement of fact made by a party in its pleadings is an admission of fact and

admissible against him. *Neilson v. Vashon Island Sch. Dist. 402*, 87 Wn.2d 955, 958, 558 P.2d 167 (1976).

The County's belated efforts to ignore its own factual admissions and change positions to avoid liability are not permitted. Civil Rule 8(b) provides that "[a] party shall state in short and plain terms his defenses to each claim asserted and shall admit or deny the averments upon which the adverse party relies." Rule 8(d) further provides that "[a]verments in a pleading . . . are admitted when not denied in the responsive pleading."

The County argues that it is not bound by its admission because, "a party concession or admission concerning a question of law . . . as opposed to a statement of fact is not binding on the court." App. Br. at 30 (citing *State v. Knighten*, 109 Wn.2d 896, 902, 748 P.2d 1118 (1998)). It does not state that the admission is not binding on the party. In *Knighten*, the State conceded in briefing that no probable cause existed; however the court disagreed and noted that the State's erroneous legal admission was not binding on the court. However, the County's admission was factual, not legal, and there was never any factual dispute that Respondents were County employees. The County is bound by its admission.

### 3. The Trial Court Correctly Determined that Workplace Discrimination and Retaliation Could Be Imputed to Respondents' Employer, Thurston County.

Even without the admission, the County is liable by imputation, an important component of a sexual discrimination claim under

RCW 49.60.180(3). Respondents must prove that sexual harassment was unwelcome, based on the victim's sex, and affected the victim's work environment. *Glasgow*, 103 Wn.2d at 406. In addition, Respondents must prove that "harassment is imputed to the employer." *Id.* at 407. This is proven in two ways. First, evidence that an "owner, manager, partner or corporate officer personally participates in the harassment" is *per se* evidence of imputation.[5] *Id.* Second, if an employee's supervisor or coworker initiates the harassment, plaintiff must prove the employer knew or should have known about it and failed to respond. *Id.* The County is liable under both theories.

**a) Holm Is an Officer of Thurston County.**

Counties are political subdivisions of the State and are given the capacity of a body corporate in RCW 36.01.010. Thus, counties, like other corporations act through their officers, agents and employees. WPI 50.18. RCW 36.16 expressly addresses the subject of county officers. The county prosecutor is specifically listed as a County "officer" in RCW 36.16.030.[6]

---

[5] The County contends it was unable to control Holm, and analogizes his relationship with the County to that of a foster parent. App. Br. At 34, (citing *DeWater v. State*, 130 Wn.2d 128, 921 P.2d 1059 (1995)). This is not the relevant issue nor is *DeWater* applicable. DeWater's claim of sex discrimination against the State was denied because the court concluded her employer, a foster parent who merely received funds from the State, was not a State employee. *DeWater* is distinguishable. Unlike DeWater, Respondents' employment status is conceded by the County and well supported by the evidence in the record: they were County employees. *DeWater* does not address whether an employer is liable for the discrimination endured by its employee. *DeWater* assumes the victim is not a government employee, and as such is inapplicable.

[6] The County claims that the term "officer" is in the caption heading and so it is not substantive and the Prosecutor is not a County officer. The entire title of Chapter 36.16 is "County Officers -- General". The status of a prosecutor as a County officer has been settled law for over one hundred years. *See State ex rel. McMartin v. Whitney*, 9 Wash. 377, 379, 37 P. 473 (1894).

The powers of a county "can only be exercised by the county commissioners, or by **agents or officers** of the County." RCW 36.01.030 (emphasis added).

A Prosecutor is an agent and officer of the County that he serves and also serves as an agent of the State when engaging in criminal prosecution. *State v. Bryant*, 146 Wn.2d 90, 42 P.3d 1278 (2002). In *Bryant*, the dispute was whether the Prosecutor was acting as an agent of the State, and therefore had the authority to bind other Counties to an immunity agreement. Both the majority and the concurrence concluded that the Prosecutor acted as an agent of the County, and that he also acts, at times, as an agent of the State. *Bryant* 146 Wn.2d at 102 n.5, 107. Nowhere in the opinion is there a holding that the Prosecutor is not an agent of the County. To the contrary, the Prosecutor acts on behalf of the state only when instituting a criminal action in the name of the state, not when making personnel decisions, taking internal administrative action or perpetrating discrimination. *Whatcom County v. State*, 99 Wn. App. 237, 250, 993 P.2d 273 (2000).[7]

A Prosecutor's actions towards employees in the workplace are all within the scope of his employment. "For example, it is clear that a prosecutor acts for the county when performing administrative tasks

[7] *Zylstra v. Piva*, 85 Wn.2d 743, 748, 539 P.2d 823 (1975), found that certain Superior Court employees had a dual status as County employees and Judicial employees. Nothing in the opinion that holds deputy prosecutors are Court employees, or that the County is immune from liability under WLAD when County employees are discriminated against.

unrelated to strictly prosecutorial functions (such as hiring or promotion decisions)." *Whatcom County*, 99 Wn. App. at 246-47.[8]

Under the County's view of the world, Holm is a government unto himself and derives no authority from the County and the County employees have no legal protection from him under WLAD. In *Crossler v. Hille*, 136 Wn.2d 287, 299, 961 P.2d 327 (1998), Justices Talmadge and Madsen wrote a concurring opinion to explain that public employees supervised by elected officials are not exempt from protection by discrimination laws. The County's Policies and Procedures state that all deputy prosecuting attorneys are County employees. CP 2790-91.

In a legal action involving a county, the county itself is the only legal entity capable of suing and being sued and one cannot sue the county council or the prosecutor's office separately. *Nolan v. Snohomish County*, 59 Wn. App. 876, 882-83, 802 P.2d 792 (1990), *review denied*, 116 Wn.2d 1020 (1991) (county council is not a legal entity separate and apart from the county itself, thus plaintiff achieved jurisdiction over the county council by suing the county); RCW 36.01.020. Similarly, the only way to bring suit against the Prosecuting Attorney's Office is to sue the County.

---

[8] The County's reliance on the *Carter v. King County*, 120 Wash. 536, 208 P. 5 (1922), is misplaced. At that time there was a statute stating that, "The county is not responsible for the acts of the sheriff." *Arishin v King County*, 103 Wash. 176, 178, 173 P. 1020 (1918). No such disclaimer of liability exists in the current statutory scheme, (RCW 36.28 *et seq* ), where the duties of the Sheriff are established. Nor does any disclaimer of County liability exist in RCW 36.27 *et seq* , where the duties of the Prosecuting Attorney are established.

The County identifies cases from jurisdictions outside Washington, to support its theory that the County's inability to control Holm absolves it of liability. None support their proposition. In *McGrath-Malott v. Maryland*, 2007 WL 609909 (D. Md. Feb. 23, 2007), the court held that an independently elected Sheriff is not an officer of the County, but instead is an officer of the State. *Id.* at *13-14. The Court rejected the theory that the Sheriff's Office was an independent legal entity, and asserted that the Sheriff's actions are imputed to the State. *Id.* at *21, *36. Under Maryland law, the Sheriff's Office is an office of the State; under Washington law the County Prosecutor is a officer of the County. Under the laws of both states, a public entity does not escape liability simply because the managing officer of a particular agency within it is an autonomous and independent elected official.

The County also refers this court to *Thompson v. Duke*, 882 F.2d 1180 (7th Cir. 1989), which held that a County was not liable under § 1983 for its "failure to train" Sheriff's deputies. *Id.* at 1187. The Court noted that a municipality is liable under § 1983 only if there is a "direct causal link between a municipal policy or custom, and the alleged constitutional deprivation." *Id.* WLAD, unlike § 1983, imposes liability based on conduct that may be imputed to an employer, a concept not applicable in § 1983 claims. *Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988), is also inapposite. *Meade* presents the same holding as *Thompson*: a supervisor's

liability under §1983 cannot be imputed, but requires evidence of specific causation. *Id.* at 1528. Again, this holding sheds no light on imputed liability under the WLAD.

Finally, the County cites *Moy v. County of Cook*, 159 Ill.2d 519 (Ill. 1994), rejecting plaintiff's contention that the Sheriff was an employee of the county, explaining that the Sheriff was an "officer" of the County. *Id.* at 532 ("The sheriff is a county officer and, as such, is not in an employment relationship with the County of Cook.") Its holding is instructive to the limited extent that it identifies an elected official as a county "officer". While it does not address liability under provisions akin to the WLAD, we note that under the WLAD an officer's participation in sexual harassment automatically imputes liability to the employer. *Glasgow*, 103 Wn.2d at 407. None of the cases cited by the County support its contention that the Prosecutor's independence, as an elected official, protects the County from WLAD liability.

Ultimately, WLAD extends strict liability to employers (like the County) for the conduct of high level officers and managers. *Glasgow*, 103 Wn.2d at 407. The elected "officers" of a county are specifically enumerated and the statute lists the prosecuting attorney as a county officer. RCW 36.16.030. Holm admits that the prosecutor's office was subject to the County's sexual harassment and employment policies. CP 3120-25. When Holm joined the office he attended sexual harassment training and he

believes that the County requires every deputy prosecutor to attend. *Id.* Rather than claiming he could do as he pleased, Holm referred to the County Commissioners and the County Executive or "CEO" as the supervisory chain above him, and claimed that the Commissioners and County personnel were responsible for disparate pay for women in the Prosecutor's Office because they would not allow him to adjust women's pay to be equal with men's. CP 3192. The Collective Bargaining Agreement, which the County and the Prosecuting Attorney signed, recognizes applicability of WLAD. CP 312. Therefore, whether or not the County Commissioners had the authority to impose employment policies is irrelevant. Holm was bound by them. CP 2785-2841.

**b) The County Knew of the Harassment and Failed to Take Remedial Measures.**

Since Respondents were County employees, the jury was authorized to examine whether the County, as their employer, properly responded to their gender discrimination complaints. County Human Resource Director Peggy Quan was indisputably an agent of the County. She was fully aware of Respondents' allegations of harassment and hostile work environment and failed to investigate or take remedial steps. Therefore, quite apart from the County's liability for Holm's acts and failures to act, the County is also liable for failing to respond to Respondents' complaints.

### 4. The Trial Court's Ruling that the County may be Liable for Holm's Conduct Is Consistent with Other Courts.

Federal courts have soundly rejected the very argument that the County advances. *See Coleman v. Kay,* 87 F.3d 1491 (3rd Cir. 1996); *Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir. 1993). In *Coleman*, an employee of the Monmouth County Prosecutor's Office in New Jersey sued for employment discrimination after she was thrice passed over for promotion by male candidates. Monmouth County was named as a party in the lawsuit, and it tried to argue that it could not be held liable for the actions of the County Prosecutor for exactly the same reasons that Thurston County argues in its motion. However, the New Jersey Court of Appeals rejected the same arguments Thurston County puts forth here.

> The extension of ... agency principles to Coleman's sex discrimination suit against the County of Monmouth is logically unacceptable because county prosecutors are clearly government officials who, reason dictates, must be acting on behalf of a [sic] some governmental entity when they make personnel decisions. The agency paradigm fails here because it would require us to reach the specious conclusion that [the prosecutor] was not acting under the authority of any state governmental body, either state or county, when he passed Coleman over for promotion. We must therefore look to New Jersey constitutional, statutory and decisional law to determine which level of state government the county prosecutor 'belongs' when making personnel decisions. *Id.* at 1503.

Likewise, the Tenth Circuit, in *Sauers v. Salt Lake County,* held that by naming the Prosecutor's Office as a party, the plaintiff had effectively named the County. *Sauers*, 1 F.3d at 1125. No additional link was necessary for the liability to attach to the County, and no showing of

knowledge of the discriminatory acts by other county actors was necessary to establish liability. *Id.*

> In this case, defendant Cannon is a paradigm example of a supervisor with significant control over plaintiff's hiring, firing, or conditions of employment. The parties agree that, as county attorney, Cannon had the ultimate authority over her employment and working conditions. Consequently, plaintiff's claim of a hostile work environment caused by Cannon's conduct is a claim against Salt Lake County itself, and no knowledge or recklessness on the part of the County must be demonstrated. *Sauers,* 1 F.3d at 1125.

Nothing in any case the County relies upon suggests that a County is not responsible when its officers (or their appointed agents) engage in conduct toward County employees that violates WLAD. Quite the opposite, WLAD imposes liability on employers (like the County) for discriminatory acts of their officers, agents or employees.

**B. The Trial Court Properly Allowed Evidence of Discriminatory Conduct by Harju and Jones that Occurred Outside the Statutory Limitations Period to Prove a Hostile Environment.**

The County claims the trial court erred in denying its summary judgment motion to dismiss Respondents' hostile work environment claims based on conduct that occurred outside the statutory limitations period. This court should disagree. "A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the factfinder." *Brothers v. Pub. Sch. Employees of Washington*, 88 Wn. App. 398, 409, 945 P.2d 208 (1997); *Johnson v. Rothstein*, 52 Wn. App. 303, 304, 759 P.2d 471

(1998). But such an order is subject to review "if the parties dispute no issues of fact and the decision on summary judgment turned solely on a substantive issue of law." *University Village Ltd. Partners v. King County*, 106 Wn. App. 321, 324, 23 P.3d 1090, *review denied*, 145 Wn.2d 1002, (2001). The County raises issues of fact, however, which were properly decided by the jury and are verities on appeal. Further, the trial court's admission of evidence is reviewed for abuse of discretion.

The general three year statute of limitations for tort claims applies to WLAD claims. *Antonius v. King County*, 153 Wn.2d 256, 261-62, 103 P.3d 729 (2004); RCW 4.16.080(2). Thus, a plaintiff must bring discrimination claims within three years of the discriminatory conduct. *Glasgow*, 103 Wn.2d at 405. "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting 42 U.S.C. §2000e-5(e)(1)); *Antonius*, 153 Wn.2d at 264.[9] An "'unlawful employment practice' cannot be said to occur on any particular day . . . It occurs over a series of days or perhaps years, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Antonius*, 153 Wn.2d at 264 (quoting *Morgan*, 536 U.S. at 115). Hostile environment "claims are based on the cumulative effect of individual acts." *Antonius*, 153 Wn.2d at 264.

[9] In *Morgan*, the Supreme Court analyzed a Title VII race discrimination claim. *Morgan*, 536 U.S. at 104. Our Supreme Court adopted *Morgan's* analysis in the context of a hostile work environment sex discrimination claim. *Antonius*, 153 Wn.2d at 270.

For purposes of the statute of limitations, it does not matter that some of the component acts of the hostile work environment fall outside the statute of limitations period. Provided that a single component act of the hostile work environment claim occurs within the statute of limitations period, a court may consider the entire time period of the hostile environment for the purposes of determining liability. *Antonius*, 153 Wn.2d at 264 (citing *Morgan*, 536 U.S. at 117).

> "A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Morgan*, 536 U.S. at 120.

Here, Respondents presented evidence of multiple offensive gender-based actions. Some occurred during the limitations period; some after. All contributed to the overall hostile environment.[10] All three women testified that there was ongoing hostility continuing into summer and fall of 2001. Accordingly, Respondents' hostile work environment claims were timely. Under *Antonius*, the jury was permitted to consider component acts occurring outside the statutory limitations period for the purposes of determining the County's liability. *Antonius*, 153 Wn.2d at 264. Despite the direct precedent of *Antonius*, the County argues that the trial court erred in allowing the jury to consider evidence of any conduct that occurred before May 6, 2001, in evaluating Respondents' hostile environment claim.

---

[10] Because Respondents filed their complaint on May 5, 2004, Respondents only needed to identify a single discriminatory or retaliatory act that occurred after May 5, 2001 to satisfy the statute of limitations regarding their hostile work environment claims, which they did. *See Antonius*, 153 Wn.2d at 261-62

The County claims Respondents should not have been able to maintain a hostile work environment claim based on Jones' and Harju's discriminatory acts prior to May 6, 2001 because Holm reorganized the office and changed their duties. App. Br. at 54. The County must show that Holm's "intervening action" rendered their discriminatory acts prior to May 6, 2001, no longer a part of the Respondents' hostile environment. *Antonius*, 153 Wn.2d at 271. The court and the jury, consistent with Respondents' testimony, found to the contrary.

Prior to May 6, 2001, Jones displayed abusive behavior towards Respondents, including sending offensive e-mails, exhibiting a highly volatile temper, and throwing files at one of the Respondents. RP 91, 206, 499; CP at 4699, 5573, 4699, 4708, 5303, 5308-12, 5588-89. When the Respondents brought Jones' behavior to Harju's attention, Harju was "dismissive" of their claims, recommending they "let it blow over" and telling Respondents to "stay out of [Jones'] way. RP at 93. Instead of demoting Jones, as the County argues, the jury heard evidence that after alerting the County of Jones' conduct, Jones actually received a promotion to the level of his previous supervisor, never changed offices, and never attended any training in sexual harassment. RP 363, 433, 534, 537; Trial Ex. 8. It is not surprising, therefore, that after Holm's "reorganization" of the office, Jones continued to exhibit hostile, intimidating behavior that contributed to Respondents' hostile environment. RP 136, 202. CP 5230-32. Therefore, Jones' pre-May 6, 2001 conduct was a component part of Respondents' timely hostile environment claim.

Similarly, the allegation that Holm's reorganization eliminated Harju's offensive conduct was directly refuted by Broyles. RP 134-35. After Holm and County Human Resources Manager Quan were notified of Harju's behavior, there was no investigation into Harju's behavior, no adverse consequence for Harju, nor was he required to attend any corrective training. RP 428, 530, 534, 2996. In fact, Broyles testified that after Respondents met with Holm about Harju's behavior, Harju's behavior became "increasingly hostile." RP 111. Sargent described her work environment after Respondents spoke with Holm and Quan as "like walking into an enemy camp every morning," with Harju's behavior directly contributing to the hostile work atmosphere. RP 530.

In contrast, the ongoing environment in *Antonius* was much more attenuated. In *Antonius,* the plaintiff actually changed physical locations for her job more than three years prior to filing suit, had an intervening period of no harassment, and then came in contact with different employees within the statutory period, who she claimed created similar conditions that she once suffered. Our Supreme Court held that the prior conduct was still admissible and could be used to prove that this could still be considered when determining whether there was a "hostile environment." The court also held that "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Antonius*, 153 Wn.2d at 264 (quoting *Morgan*, 536 U.S. at 117).

Here, Respondents remained in the same hostile environment with the same perpetrators that caused the problems throughout the entire period. Accordingly, the trial court properly allowed the jury to consider their pre-May 6, 2001 conduct for purposes of determining the County's liability on Respondents' hostile work environment claims.

1. **The Trial Court Did Not Err in Refusing the County's Proposed Jury instructions Regarding the Admissibility of Jones' and Harju's pre-May 6, 2001 Conduct.**

The County also argues that the trial court erred in refusing to provide the jury with its proposed instructions 47, 48 and 61 addressing the admissibility of Jones' and Harju's pre-May 6, 2001 conduct.[11] This court reviews the trial court's refusal to provide proposed jury instructions for abuse of discretion. *Goodman v. Boeing Co.*, 75 Wn. App. 60, 68, 877 P.2d 703 (1994). The jury was properly instructed regarding consideration of acts that occurred before May 6, 2001. Instruction No. 20 properly limited consideration of these acts to the hostile work environment claim. This instruction accurately stated of the law and permitted the jury to consider this evidence only because it was part of a continuing pattern.

A trial court is not required to provide an instruction on every nuance in the law, but rather is charged with the responsibility of providing a clear statement of the law to be applied to the evidence presented. *See*

[11]App. Br. at 54, 55. Specifically, the County focuses on the trial court's decision not to submit its Proposed Jury Instruction Number 47, 48, and 61. Proposed Instructions 48 and 61 deal with the admissibility of Jones' pre-May 6, 2001 hostile and intimidating conduct. CP 1042-44, 1057 Proposed Instruction 48 indirectly deals with the admissibility of Harju's pre-May 6, 2001 conduct. CP 1043. Defendant's Proposed Jury Instruction Number 47 deals with evidence regarding the County's disparate pay and promotion decisions. CP 1042.

*Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). Instead, a trial court has considerable discretion in deciding whether specific instructions are necessary. *Id.* The test is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not misleading, and properly inform the trier of fact of the applicable law. *Gammon*, 104 Wn.2d at 617.

According to the County, the trial court erred by not instructing the jury that there must be a "sufficient nexus" between conduct occurring prior to May 6, 2001 and component acts of the Respondents' hostile work environment claim that occurred after May 6, 2001. App. Br. at 54. The County cites no authority for the proposition that the jury must be instructed to find a "nexus" between discriminatory acts nor is there any WPI on the issue. Instead, the trial court properly instructed the jury on what claims it could consider. It was for the court to decide the issue of admissibility of evidence. The court properly admitted the pre-May 6, 2001 evidence, and properly instructed the jury to consider this evidence for a limited purpose. (Jury Instruction 20). Consistent with *Antonius*, the instructions sufficiently explained the law and allowed the parties to argue their respective theories of the case.

**2. The Trial Court Properly Instructed the Jury Regarding How to Evaluate Evidence of Events Before May 6, 2001.**

Next, the County claims the trial court erred in providing Jury Instruction 20, which instructed the jury to consider evidence of the County's pre-May 6, 2001 failure to pay, promote and transfer Respondents

equally to their male counterparts. App. Br. at 52-53. But the County proposed Instruction 20. RP 2360, 3002. Further, the County did not object to the language in Jury Instruction 20 that went to the jury. *Id.*

Acts such as termination, failure to promote, denial of transfer, refusal to hire, or one-time pay decisions are discrete acts. *See Morgan*, 536 at 110-11; *Antonius*, 153 Wn.2d at 264. For discrete discriminatory or retaliatory acts, the statute of limitations period runs from the date of the act itself. *Antonius*, 153 Wn.2d at 264. However, an untimely discrete act may be admissible as background evidence to support a timely filed unlawful employment practice claim. *Morgan*, 536 U.S. at 112, 113. "Moreover, the nature of the hostile work environment claim strongly indicates that it should not be parsed into component parts for statute of limitations purposes. *Morgan* underscores the fact that the law does not usually allow a remedy in a hostile work environment case unless there is a pervasive pattern of unlawful treatment over a period of time." *Antonius*, 153 Wn.2d at 268.

Here, Instruction 20, allowed the jury to consider evidence of events prior to May 6, 2001 for the limited purpose of evaluating hostile work environment. CP 914. Unlike the County's argument on appeal, at trial, the County did not object to the jury receiving Jury Instruction 20 on the grounds now asserted. RP 3002. Instead, the County objected to the trial court's removal of a line in Instruction 20 that dealt with using evidence of the County's disparate hiring and pay decisions for assessing damages. *Id.*

First, because the County requested Jury Instruction 20, it cannot now complain that the trial court gave such a requested instruction. *Ball v. Smith*, 87 Wn.2d 717, 720, 556 P.2d 936 (1976). Second, because the County failed to object on the grounds it complains of on appeal, this court should refuse to consider its claim. RAP 2.5(a); *see Postema v. Postema Enters., Inc.*, 118 Wn. App. 185, 193, 72 P.3d 1122 (2003). Accordingly, this court should reject the County's challenge to Jury Instruction 20.[12]

### C. Collateral Estoppel Does Not Prevent Respondents from Arguing that Harju's Acts Were a Component Part of a Hostile Environment.

Next, the County argues that the trial court erred in not applying the collateral estoppel doctrine to prevent Respondents from arguing that Harju's acts were component parts of their hostile work environment claims. This court should disagree.

This court reviews *de novo* whether collateral estoppel applies to bar relitigation of an issue. *Christensen v. Grant County Hosp. Dist. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004). "'[C]ollateral estoppel is intended to

[12] Although the county cites *Ledbetter v. Goodyear Tire & Rubber Co , Inc.*, __ U.S. ___, 127 S. Ct. 2162, 2169-70, 167 L. Ed. 2d 982 (2007), for the proposition that pay-setting decisions that fall outside the statute of limitations period cannot be part of an actionable hostile work environment claim, *Ledbetter* addresses the limitations period for back pay in a Title VII claim and does not address what relevant evidence a party may present in a hostile work environment claim. In *Ledbetter*, the plaintiff made no claim that intentionally discriminatory conduct occurred within the EEOC-required 180 day charging period. 127 S. Ct. at 2169 Instead, plaintiff claimed that a non-discriminatory pay decision that occurred within the EEOC charging period was unlawful because it "carried over" the effects of prior, uncharged discriminatory pay decisions that occurred outside the EEOC charging period. 127 S. Ct. at 2167. The Supreme Court held that an employment practice with no improper purposes and no discriminatory intent is not rendered unlawful by giving some effect to an intentional discriminatory act that occurred outside the charging period. *Ledbetter*, 127 S. Ct. at 2172. Here, the *Ledbetter* holding is inapplicable because the Respondents presented actionable hostile work environment claims with component parts occurring within the statute of limitations period.

prevent re-trial of one or more of the crucial issues or determinative facts determined in previous litigation.'" *Christensen*, 152 Wn.2d at 306 (quoting *Luisi Truck Lines, Inc. v. Wash. Utils. & Transp. Comm'n.*, 72 Wn.2d 887, 894, 435 P.2d 654 (1967)).

Washington courts require four elements in applying the collateral estoppel doctrine: "'(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.'" *Southcenter Joint Venture v. Nat'l. Dem. Policy Comm.*, 113 Wn.2d 413, 418, 780 P.2d 1282 (1989) (quoting *Shoemaker v. Bremerton*, 109 Wn.2d 504, 745 P.2d 858 (1987)). The doctrine is inapplicable here because the issues are not identical: the evaluation of an individual's liability under WLAD involves far different considerations than those involved in evaluating an employer's liability under WLAD.

According to the County, the summary judgment order in *Broyles I* dismissing claims against Harju individually estopped Respondents from presenting evidence of Harju's behavior in *Broyles II*. App. Br. at 56-60. The County's collateral estoppel argument is flawed. The summary judgment dismissal of the claims against Harju individually did not determine whether the County was liable for gender discrimination and/or retaliation by Respondents' co-workers, including Harju. Instead, where a supervisor or manager participates in harassment, that person *may* be individually liable and the employer may be liable as well. *Brown v. Scott*

*Paper Worldwide Co.*, 143 Wn.2d 349, 361, 20 P.3d 921 (2001). An employer is not necessarily released from liability if an individual supervisor is not also personally liable for his misconduct. *Id.*

The trial court in *Broyles I* provided no basis in the record for the reasons why it found that Harju was not individually liable under WLAD. CP at 126-27. If, for instance, the court concluded as Harju argued that he was not a manager and therefore was not subject to individual liability under WLAD on that basis, that would not necessarily mean that evidence of Harju's harassing conduct would not be relevant to prove that the County failed to take appropriate steps to remedy the hostile environment. Harju's behavior could still be a component part of the Respondents' hostile environment claims against the County. *See Brown*, 143 Wn.2d at 361. The Respondents' based their hostile work environment claims on the actions of Harju, Holm, Jones, and other male Deputy Prosecuting Attorneys. RP (Oct. 16, 2006) 90.

Whether Harju was individually liable for sexual harassment is a separate issue from whether the County is liable for Respondents' hostile environment claims. Therefore, the collateral estoppel doctrine is inapplicable because these are not identical issues. Harju's conduct may properly be considered one component in establishing "[w]hether the harassment at the workplace [was] sufficiently severe and persistent to seriously affect the emotional or psychological well-being" of the Respondents. *Glasgow*, 103 Wn.2d at 406-07. The trial court did not err in

refusing to apply the collateral estoppel doctrine to prevent Respondents from presenting evidence of Harju's conduct.

**D. The Trial Court Did Not Err in Allowing Respondents to Present Testimony Regarding Sackett-DanPullo's Assignment to Community Prosecution.**

Next, the County argues that because Sargent's race discrimination claims and Sackett-DanPullo's marital discrimination claim were dismissed, Respondents could not offer Sackett-DanPullo's testimony that Holm told her she was being assigned to community prosecution because of her husband's race. App. Br. at 60. This court should disagree. "Admission of evidence lies largely within the sound discretion of the trial court." *Davis v. Globe Mach. Mfr. Co.*, 102 Wn.2d 68, 76, 684 P.2d 692 (1984). An abuse of discretion occurs where the "exercise of discretion is manifestly unreasonable or based upon untenable grounds." *Id.* at 77.

Sackett-DanPullo testified that Holm thought she would be a good candidate for community prosecution because "[she] live[d] out in Lacey . . . And [her] husband's black." RP 1377. The County objected. RP 1378. This testimony was offered as further evidence of the negative treatment of women, who were denied felony trial team positions they requested, and were given assignments based on gender stereotypes, not merit. RP 1379. The trial court overruled the objection. RP 1380.

The County asserts that Sackett-DanPullo's testimony can only be admissible if she had a claim for racial discrimination. Respondent disagrees. The jury may conclude, based in part on this testimony, that Holm's comments suggested that women were not provided the same merit-

based opportunities that men were and Sackett-DanPullo's assignment was gender-based discrimination. The comment could also be construed as a gender-biased comment. Accordingly, the trial court did not abuse its discretion in allowing the testimony.

**E. The Trial Court Properly Ruled that the Attorney-Client Privilege Prohibited Peters' Testimony Regarding a Meeting with Counsel.**

The applicability of the attorney-client privilege is a question of law, which this court reviews *de novo*. *Dietz v. Doe*, 80 Wn. App. 785, 911 P.2d 1025 (1996). However, the determination of whether an attorney-client relationship exists is a question of fact. *Dietz v. Doe*, 131 Wn.2d 835, 844, 935 P.2d 616 (1997). The trial court's factual determination of the existence of the attorney-client relationship is reviewed for abuse of discretion. *Id.* "Once a party claims that the attorney-client privilege applies, 'the trial judge determines whether the facts justify the allowance of the claim.'" *Amoss v. Univ. of Wash.*, 40 Wn. App. 666, 687, 700 P.2d 350 (1985) (quoting 8 J. WIGMORE, EVIDENCE § 2322, at 630 (rev. 1961)). RCW 5.60.060 prohibits disclosure of communications between an attorney and a client given in the course of professional employment. *Seattle Northwest Sec. Corp. v. SDG Holding Co.*, 61 Wn. App. 725, 736, 812 P.2d 488 (1991).

The attorney-client privilege applies to communications that are intended by the party to be confidential. *Seattle Northwest*, 61 Wn. App. at 742. If an attorney speaks with a prospective client and the prospective client decides to retain the attorney, communications between the two prior

to the time the attorney was formally retained are normally privileged. *See Dietz*, 131 Wn.2d at 845; 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 501.11, at 149 (5th ed. 2007). The communications are privileged even if the attorney decides not to represent the client, or the client decides not to retain the attorney. *See In re Auclair*, 961 F.2d 65, 69 (5th Cir. 1992); *Grand Jury Proceedings Under Seal v. U.S.*, 947 F.2d 1188, 1190 (4th Cir. 1991); 5A KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 501.11, at 149 (5th ed. 2007).

When Respondents and Peters met with their attorneys as potential co-parties to a lawsuit, they intended that their communication be protected, even though they had not yet retained counsel to represent all of their interests.[13] *State v. Emmanuel*, 42 Wn.2d 799, 816, 259 P.2d 845 (1953). In *Emmanuel*, the court held that discussions at a meeting between potential defendants and their attorneys were privileged when those present at the meeting had a mutual interest in defending against the allegations of an opposing party's complaint. *Emmanuel*, 42 Wn.2d at 816.

> The meeting was held for a common purpose, and the communications made by either client in the presence of the attorneys were made for the purpose of obtaining legal advice in the preparation of their defense to this lawsuit. They were intended to be confidential at least as to third persons not present at the conference. *Id.*

---

[13] It is only when former clients in a joint representation become opposing parties in a subsequent controversy that the privilege protecting joint discussions is waived. *Billias v. Panageotou*, 192 Wash. 523, 76 P.2d 987 (1938).

Here, allowing Peters to waive the attorney-client privilege would have left Respondents without any avenue to protect joint discussions with attorneys. Accordingly, the trial court correctly ruled that Peters was barred from unilaterally waiving the joint privilege and testifying to attorney-client privileged communications. The court heard extensive argument and received evidence on this subject before ruling. RP 1639-49, 1771-90, 1793, 1951-55. The trial court did not abuse its discretion in determining that the meeting was for a common purpose, and therefore, protected.

Finally, the County fails to explain how the exclusion of this testimony caused any prejudice, since it still had the opportunity to bring into evidence the fact that Respondents sought legal advice during this time frame. In the absence of such a showing, the trial court's ruling should be sustained.

**F. The Trial Court did not Abuse Its Discretion in Denying a Motion for Mistrial Based on Counsel's Remarks in Closing.**

After three weeks of trial, and several hours of closing argument, Respondents' counsel was at the end of his rebuttal argument to the jury. After recapping the liability issues, he turned to damages, spending less than five minutes on the subject. He told the jury that these three women were "rising stars" who had invested their lives into being prosecutors and had not only lost their jobs, but had lost their dignity. RP 3111.

He concluded: "We ask you to use your best judgment to determine what fair compensation is and to award that so that what will happen to these women will never happen again." RP 3112. Hardly a call to arms,

enrapturing the jury in an impassioned plea to punish. Therefore, the trial court, in response to an objection by the County, merely concluded: "I'll let it stand" and excused the jury to begin deliberations. RP 3112. The statement, objection and ruling account for 11 lines out of a 3,112 page trial transcript.

The County claims that this single comment made in during rebuttal asked the jury to "send a message" and award punitive damages. Respondents' counsel never asked the jury to "send a message". The trial judge was present throughout this trial and was able to easily determine that the remark was not the type of flagrant misconduct that requires a new trial and was not likely to confuse or mislead the jury which deliberated a day an a half in reaching its unanimous verdict.

In argument to the jury, counsel is permitted a very wide sweep and is not confined to the very precise bounds which limit the court's instructions. *Krieger v. McLaughlin*, 50 Wn.2d 461, 464, 313 P.2d 361 (1957). Defendant suggests that *State v. Powell*, 62 Wn. App. 914, 918-19, 816 P.2d 86 (1991), requires the court to order a new trial when such a statement is made. In *Powell*, the court reversed a conviction for first degree child molestation for reasons unrelated to argument. In *dicta*, the court commented regarding the issue of the prosecutor's argument that a not guilty verdict would send a message that children reporting sexual abuse would not be believed and would declare "open season on children".

Washington courts have long held that it is improper for a prosecutor to express opinions on the truthfulness of a witness. *State v. Korum*, 157 Wn.2d 614, 650, 141 P.3d 13 (2006). That is a far cry from what was argued in this case and one passing remark out of nearly three weeks of trial should not serve as a basis for a new trial.

**G. Washington Law Supports the Court's Award of Attorneys' Fees and Costs to Respondents.**

WLAD provides that, "[a]ny person deeming himself or herself injured by any act in violation of this chapter shall . . . recover the actual damages . . . together with the cost of suit including reasonable attorneys' fees . . .." RCW 49.60.030(2). "Plaintiffs bringing discrimination cases assume the role of a private attorney general, vindicating a policy of the highest importance." *Allison v. Seattle Housing Auth.*, 118 Wn.2d 79, 86, 821 P.2d 34 (1994) (internal citations omitted). Our Supreme Court "has called for liberal construction of the attorney fee entitlement in order to encourage private enforcement of the Law Against Discrimination." *Martinez v. City of Tacoma*, 81 Wn. App. 228, 235, 914 P.2d 86 (1996). The trial court awarded attorneys' fees and costs supported by Findings of Fact and Conclusions of Law. CP 3-11. The County argues that the trial court abused its discretion by: (1) awarding attorney fees and costs for work performed prior to filing *Broyles II* and (2) for utilizing a standard

multiplier of 1.5. Because the County cannot sustain its high burden of proving abuse of discretion, this court should affirm the decision below.

### 1. A Previous Dismissal without Prejudice of the Same WLAD Claims Does Not Foreclose an Award of Fees and Costs for All Time Reasonably Incurred.

*Broyles I* was dismissed without prejudice and WLAD claims were immediately refiled against the County. CR 41(a)(1)(B) allows a plaintiff to dismiss any action without prejudice. Such a dismissal leaves the parties as if the case had never been filed. *Beckman v. Wilcox*, 96 Wn. App. 355, 359, 979 P.2d 890 (1999) (under the parallel federal rule the effect of a voluntary dismissal "is to render the proceedings a nullity and leave the parties as if the action had never been brought."). The Supreme Court recently stated that: "[A] prevailing party is generally one who receives a judgment in its favor." *Scoccolo Constr., Inc. v. City of Renton*, 158 Wn.2d 506, 521, 145 P.3d 371 (2006). It is clear that "a voluntary nonsuit does not result in an adjudication on the merits and no judgment is entered." *Cork Insulation Sales Co. v. Torgeson*, 54 Wn. App. 702, 706, 775 P.2d 970, *review denied*, 113 Wn.2d 1022 (1989).

The trial court expressly rejected this argument now advanced by the County on appeal.

> Progress toward a jury trial may be derailed by a number of issues, which are common in civil litigation. In this case, Plaintiffs filed a non-suit because of a procedural issue that arose regarding the availability of a jury trial. The nonsuit was

> taken to preserve an important right, the Plaintiffs' right to a jury trial. While the court cannot determine if any fault should be attributed to either party for this nonsuit, it is clear that in this case the nonsuit was not the end of one case and the beginning of a different case, but part of the continued pursuit of the same claims against the County. The nonsuit may have interrupted the progress of the case, but the Plaintiffs ultimately prevailed on the nonsuited claims against the County. Much of the work that was performed in the first case was of value and was used in the second case following the nonsuit. Depositions from before the date of the nonsuit were used at trial, exhibits that were admitted as evidence at trial were documents obtained in discovery before the date of the nonsuit, legal analysis and many pleadings drafted before the date of the nonsuit were subsequently used as well. Much of the work that was required after the nonsuit was the result of the Defendant's discovery and motion initiatives and it was appropriate that Plaintiffs' counsel respond to these initiatives in order to advocate their clients' legal rights. To cut off recovery of attorneys' fees as of the date of the nonsuit would be a contrivance and would not serve the purpose or the remedies provided by Washington's Law Against Discrimination. CP 7-8.

The Washington Supreme Court has long held that the prevailing party in a WLAD action is one who has an affirmative judgment rendered in her favor at the end of the entire case. *Wheeler v. Catholic Archdiocese*, 124 Wn.2d 634, 643, 880 P.2d 29 (1994). Typically this cannot be determined until after a trial on the merits. *Hinman v. Yakima Sch. Dist. No. 7*, 69 Wn. App. 445, 850 P.2d 536 (1993), *review denied*, 125 Wn.2d 1010 (1994). This is consistent with the parallel federal law specifically referenced in RCW 49.60.030(2), the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. It is well established that a plaintiff need not succeed on all claims to "prevail" for purposes of an award of fees and expenses under

RCW 49.60.030(2). *Steele v. Lundgren*, 96 Wn. App. 773, 982 P.2d 619 (1999); *Martinez*, 81 Wn. App. at 243.

There is no case cited by the County that holds that a voluntary dismissal of WLAD claims results in a Defendant being a "prevailing party" for purposes of an award of attorneys' fees. Instead, the County cites cases that are off point and easily distinguished. For instance, in *Anderson v. Gold Seal Vineyards*, 81 Wn.2d 863, 867-68, 505 P.2d 790 (1973), defendant was awarded fees under Washington's long arm statute when the plaintiff's action was voluntarily dismissed.[14] *Id.* The long arm statute is not analogous, because the basis for awarding attorneys' fees to a defendant is to discourage plaintiffs from filing claims where a defendant will have the added expenses of defending in another jurisdiction.

Federal courts considering this issue in the context of a discrimination claim, on the other hand, support the trial court's decision on this issue. Federal courts have repeatedly addressed this issue in the context of plaintiffs who voluntarily dismissed their federal discrimination claims. Every federal court considering this issue has held that in such a situation, the defendant is not a prevailing party. *See, e.g., Dean v. Riser*, 240 F.3d

[14] In a footnote, the County also quotes, out of context, *Wachovia v. Kraft*, 138 Wn. App. 854, 861, 158 P.3d 1271 (2007). App. Br. at 67, fn. 28. Although the county cites the section of this case discussing Washington's long arm statute, it omits the language addressing the common import of a nonsuit pursuant to CR 41. There, the Court stated that "in the attorney fee context, 'the effect of a voluntary dismissal is to render the proceedings a nullity and leave the parties as if the action had never been brought.'" *Id.* at 861 (quoting

505, 511 (5th Cir. 2001); *Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers*, 26 F.3d 842 (8th Cir. 1994); *Bratton v. City of Albuquerque*, 375 F. Supp. 2d 1114, 1119 (D.N.M. 2004); *Hughes v. Unified Sch. Dist. 330*, 872 F. Supp. 882 (D. Kan. 1994); *Easiley v. Norris*, 107 F. Supp. 2d 1332 (N.D. Ok. 2000).

In *Marquart*, the Eighth Circuit addressed whether the defendant prevailed when the plaintiff voluntarily dismissed her complaint with prejudice and chose to proceed forward on parallel state law claims. The court explained that even then, a defendant was not a prevailing party unless it benefited from a judicial determination on the merits of the case and explained that the dismissal was a valid litigation strategy and noted that the plaintiff "should not be penalized for doing precisely what she should have done." *Marquart*, 26 F.3d at 852. Here, the trial court issued findings of fact supporting the award of attorneys' fees. Because these findings are supported by substantial evidence, the decision should be affirmed.

The County argued that if the trial court awarded Respondents any attorneys' fees incurred before the voluntary dismissal, Respondents may not be awarded any fees in the subsequent litigation because all such time was "duplicated effort and unproductive work." CP 367-68. As the trial court recognized, however, the County failed to support this conclusory

---

*Beckman v. Wilcox*, 96 Wn. App. 355, 359, 979 P.2d 890 (1999)). *Wachovia* does not support the County's position.

statement with facts.[15] CP 6. To the contrary, the trial court recognized that the substantial fees Respondents incurred were largely generated by the County's own course of conduct in the litigation. CP 6-8. Simply put, the County defended this case in the most aggressive way possible. The trial court recognized this fact and the County provides no basis to establish that the trial court abused its discretion.

**2. The Trial Court Correctly Applied a Multiplier on the Requested Attorney Fees.**

In calculating the reasonable fee to be awarded, Washington courts require calculation of a "lodestar figure". *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983), which is the product of the attorney's reasonable hourly rate multiplied by the reasonable number of hours the attorney expended in the litigation. *Id.; see also Smith v. Behr Process Corp.*, 113 Wn. App. 306, 341, 54 P.3d 665 (2002). As was the case here, the lodestar calculation is most often the attorney's current hourly rate at the time the petition is filed. *Steele*, 96 Wn. App. at 785-86.

[15] The trial court also found that the work performed in *Broyles I* was interrelated with the work done in *Broyles II*. CP 6-7. Specifically, the trial court found that "[t]he claims against the individual defendants were substantially identical to those that were tried against the County. The legal theories and evidence submitted was overlapping and part of a single set of operative facts. Essentially, the claims dismissed before trial were just different approaches to the same damages and were so closely intertwined with the claims that were tried that there is no reasonable means to segregate time among the various claims." *Id.* Under Washington law, if the claims are "so related that no reasonable segregation of successful and unsuccessful claims can be made, there need be no segregation of attorney fees." *Hume v. American Disposal Co.*, 124 Wn.2d 656, 673, 880 P.2d 988 (1994). Because the County has not assigned error to these findings, they are verities on appeal. *Robel v. Roundup Corp.*, 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

Beyond merely awarding the standard hourly rate, the court may also consider various additional factors including the level of skill required by the litigation, the quality of the work, the amount of the potential recovery, and the undesirability of the case, in determining whether a multiplier is warranted. *Bowers*, 100 Wn.2d at 597. The lodestar may be adjusted upward, if appropriate, to reflect either the contingent and risky nature of the representation and/or the quality of the representation. *Id.* at 597-99.

The legislature had a particular goal in enacting the fee shifting provision in WLAD: to enable vigorous enforcement of modern civil rights litigation and to make it financially feasible for individuals to litigate civil rights violations. *Hume*, 124 Wn.2d at 675. An attorney who takes a discrimination case on a contingent fee basis assumes a substantial risk that a fee will never materialize, or may be paid years down the line. "The experience of the marketplace indicates that lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk." *Bowers*, 100 Wn.2d at 598.

Division One recently addressed the importance of multipliers in a discrimination case, reversing a trial court's decision not to award a multiplier because of the fees not being "proportionate" to the damages

awarded. In remanding for a determination of the appropriate multiplier, the court emphasized the public benefit of this type of representation:

> The value, in the broadest sense of the term, of cases advancing civil rights is not limited to pecuniary considerations only. "Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief." Therefore, a trial court improperly exercises its discretion when it declines to consider a multiplier in a civil rights case solely because of proportionality concerns.

*Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 809 (2004).

The factual findings recognize these values. The trial court noted:

> 2. Hourly Rates. The presumptive reasonable hourly rate for an attorney is the rate the attorney charges. In this case, Plaintiffs have submitted undisputed evidence of their reasonable hourly rates, which are based on the rates they charge other clients for hourly work.[16] Based on the evidence submitted, Plaintiffs' attorney's rates were consistent with rates of other comparable lawyers in the Puget Sound area. There was no evidence offered to suggest that the rates charged by Plaintiffs' counsel were unreasonable. . . . .
>
> 9. Multiplier. The claims involved in this lawsuit required a great deal of lawyer and staff time to pursue them, due to the novelty and difficulty of the claims and the vigorous defense. Undertaking this representation significantly impacted the ability of the lead lawyers to work on other matters and constituted a significant risk to Plaintiffs' law firm if it did not recover fees. This case was unique, involving complex issues of employment law and governmental liability. From the beginning this was an exceptional case that presented an exceptional challenge for Plaintiffs' counsel. This case required a high level of skill in the specialized area of employment law involving governmental entities as well as a high level of skill in trial preparation and trial presentation. This case was taken on a

[16] The County incorrectly asserts that the hourly rates for Respondents' counsel were determined by the contingent nature of the litigation. The trial court's findings, however, confirm that the rates "are based on the rates they charge other clients for hourly work."

> contingency basis and involved substantial risk of no recovery. Few law firms in the Puget Sound region are equipped to take these kinds of risks on behalf of a client. Although the recovery was substantial, at the time of accepting the case it was a significant risk.
>
> 10. The experience, reputation and abilities of the lawyers representing Plaintiffs were of a very high caliber and the lawyers were skilled. I find that Plaintiffs' counsel provided exceptional representation in this case.
>
> 11. In light of the substantial risk and the quality of representation, the court finds that an upward adjustment from the lodestar is appropriate and a multiplier of 1.5 should be applied to all fees through the date of the jury's verdict (November 21, 2006). CP 8.

The trial court's findings were supported by his own observations of the proceedings as well as the expert testimony of Paul Stritmatter and Rebecca Roe, both attorneys with substantial experience in contingent fee litigation throughout Puget Sound and the State. CP 706-43.

In determining whether a multiplier was appropriate, the trial court considered multiple factors, including: (1) the novelty of the claims; (2) the difficulty of the claims; (3) the unusually vigorous defense; (4) the significant impact on the ability of the lawyers to work on other matters; (5) the contingent nature of the fee; (6) the required skill and specialization of counsel; and (7) the undesirability of the case due to the extreme risk and large advancement of costs. Under *Bowers*, the trial court's determination is reasonable and well articulated. There is no showing of any abuse of discretion. Respondents request fees and costs on appeal, as well pursuant to RAP 18.1 and RCW 49.60.030(2).

## V. CONCLUSION

Holm was not a government unto himself. He derived h is power from the people of Thurston County who elected him to office. Washington law is clear that Prosecutors act on behalf of either the County or the State. But, prosecutors act as agents of the State only when prosecuting crimes. State law expressly provides that an elected Prosecutors is a County officer There is no question that in creating a hostile work environment, discriminating and retaliating against Respondents, Holm and other deputy prosecutors were acting as agents of Thurston County. Respondents request that this court Affirm the trial court and the jury's decision in this matter.

Dated this 5th day of October, 2007.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

By Stephanie Bloomfield

Stephanie Bloomfield, WSBA No. 24251
J. Richard Creatura, WSBA No. 09185
James W. Beck, WSBA No. 34208
Andrea McNeely, WSBA No. 36156
Daniel T. Fasy, WSBA No. 37697
Bryan D. Doran, WSBA No. 38480
Attorneys for Respondents

# APPENDIX

# THURSTON COUNTY PROSECUTING ATTORNEY

January 25, 2001




EXH. 8 Page____

November 7, 2000

Meeting with Christine

Purpose to discuss concerns of females in felony division of PAO's office. According to Christine, there have been no long-term female incumbents in the felony division. Chris Pomeroy and Bernardean Brodeous were former but shorter term members of this division. Audrey first female back in the felony division after Bernardean was elected. She has been there for 4 years, Christine 3 years, Vonda 1 year and Susan 1 month.

Concerns with Jack:

- He is overt in his behavior to women, Phil's problem is failure to act
- Jack is hostile with females – "You don't know what you are doing." "I'll do this for you." Swears at women – "You don't know shit about SRA's." Has made support staff cry, yells at them, intimidates them.
- Jack has said he uses his size against male defense attorneys. Believes he uses size against to intimidate women.
- Last April or May – Jack and Christine had agreed to work on a plea re. Mavis Knight. Reports that he did not live up to agreement. Told her he was not going to do shit about the case. Christine went to Phil about concerns. Phil went to Ed and Jim and eventually got an apology from Jack via email. Jack has been avoiding her since then.
- About two weeks ago Christine and John Tunheim were preparing a CLE. Jack coordinates these trainings. John and Christine ended up having last minute conflicts with scheduled time. John emailed Jack about conflicts and request to reschedule training. Jack responded by emailing Christine with a cc to John. Unhappy about the change. Christine spoke with John – just smooth things over. Phil encourages smoothing things over as well.
- During recent lunch at the Keg – was a farewell for another employee, but also Jack's birthday. Jack did not want people to sing happy birthday. Others did not take him seriously and ended up singing. Jack got up, tore up his check and left.
- Believes men on staff do not want to deal with Jack
- Another female, Jody Erickson, not in the felony division – Jack took issue with her accusing her of highlighting court documents. Jody said she did not do that. Jack then talked to John said hey buddy – you shouldn't use a highlighter.
- Re. Vanda – Jack came into her office while she was meeting with a defense attorney. He yelled at her and questioned her work in front of the attorney.
- Women avoid Jack's office – they walk around behind staff to avoid walking in front of his office.
- Jack carries a weapon to work. Women are concerned about this because he flies off the handle and then apologizes. He could do anything.

Re. Phil:

- He has failed to rein in Jack
- He does not take women seriously

November 8, 2000

Meeting with Audrey Broyles

Expressed concerns about gender bias. She has been in the office since 1993 and complains of supervision or lack of it from Phil. She expressed concern of desperate treatment between men and women. The work situation with Phil has become intolerable and he perpetuates bad feelings in the office.

Regarding Jack Jones – he is very malicious and nefarious. He makes no bones about his arrogance, is very demeaning and treats her poorly as a peer. He says things like "let me show you this". He is the self-proclaimed mentor for Susan. Has said derogatory things to Christie and Vonda.

Audrey had made a trip to Portland and there were complaints about her taking time off when she had an appeal brief due. Audrey had Susan help her with it. Phil would ask her where she was going and what will you be doing when she asks for time off. Men who go hunting or who have childcare issues don't get questioned. Phil made felony meetings mandatory but let men off the hook.

Phil talked to Audrey and Christine about the Sexual Assault Unit and said they did not have enough filings. John Tunheim was not told the same thing. Were consistently told that females did not work hard enough. Phil has implicated that she Audrey gets special treatment by the boss.

Regarding Jack – Audrey recounted a lunch at the Keg when the group tried to sing happy birthday to Jack. He said that if you are going to sing to me I am not going to pay the check. He tore up his check and put it on her tray and left. Audrey avoids any contact with him and works around him in the office.

Audrey recounted the email that Jack sent that was a cc to some and a blind copy to others. It was all in capitol letters. Believed it was a call to arms.

There was a situation when a new attorney in the office was questioned by Jack about using a highlighter. She said she had not done it and he kept questioning her. It is really miserable to come to work and is getting worse. Is has been made worse by promotion of females.

Phil does not deal with issues. She has no confidence that he doesn't undermine the situation. Phil has never said that he talked to Jack and this will never happen again – he would blow it off. The environment is oppressive. Phil does not support women. She is seeking relief from the situation.

- He has never done any sexual offense cases – they take more time than other cases. Phil has taken issue with Christine about the number of filings. She has had 40 – 50 more than John. She believes he has never questioned John about this. Feels women have to work harder to prove themselves.
- Phil likes to talk about the good old days.
- With regards to leave issues – he asks the females to give specific details about where they will be – when asked about the absences of males, he does not know where they are. Holds males to a different standard.
- Make insinuations about if only women would carry their load. Has made insinuations that Audrey has something going with the boss. Complains she has special arrangement with the boss.
- Recently started pre-filing rotation – had Christine lead off the first week, followed by each of the other females. This allowed men to catch up.
- Phil has clearly targeted Vonda. Jack was yelling at Vonda. Vonda asked Christine what to do. Christine told her to talk to Phil. Said he would see what he could do but did not ever do anything about. Essentially told her she should get over it. Believes it is related to previous issues with Bernardean. Believes he was really oppressed by Bernardean.
- Phil did not ever give Susan a good orientation.

Christine concluded that they are tough but the office is not a good place to work. They are looking for long term-sustained solution. Believes people are hoping this will blow over.

Suggests that I speak with Judge Pomeroy, legal assistants and staff in Office of Assigned Council.

November 8, 2001

Meeting with Susan Sackett-Danpullo

- The email from Jack was the straw that broke the camel's back.
- Jack had told Susan that he was her mentor.
- Susan had completed a point sheet on SRA's and Jack asked her to review all pleas with him. Susan told him she had run them by Christie. Jack said that Christie doesn't know anything about it – neither does Audrey. He also asked Susan to assign certain cases to him.
- Susan described the email as hostile and demeaning – she was to provide me with a copy of the email. She described it as a screw you Audrey email.
- Susan said she was more uncomfortable in the past couple if days. Feels Jack is getting too close to her and is scared of him. He has a reputation for having a temper. Jack was her supervisor when she interned at the AG's office. I got the impression that went well. She went on to say that Jack can be intimidating, abrupt and rude. Has seen him use his size to intimidate. Feel Jack is rewarded for his volatility. He is not watched.
- Jack is offensive to female jurors if they don't answer his questions.
- Jack cleans his gun in the office and left his gun in the break room.
- Jack gets the high profile cases.
- Phil is the Chief Criminal Deputy – Susan likes Phil. He does not support people he supervises. He is protective of felony DPA's even though he is over Juvenile, District Court and Felony. He favors felony.
- The SAU unit has smaller caseloads due to the type of work and he perpetuates the fact that the SAU does not do anything. Men say Audrey does not do any work and he (Phil) does not defend or support her. He infers a lot with regard to her. He supported Mark as Sr. DPA for District Court and did not support Audrey.
- The "good old boy's" network is a joke to Phil.
- Defense counsel will go to Jim Powers and circumvent Susan or Vonda. Jim deals with the issues.
- Usually Christie and Audrey get slammed for low workloads. John Tunheim has a smaller caseload but does not get questioned.
- Vonda tends to be volatile and picks fights. When she is volatile she is really wicked.
- Phil does not back up anyone – he shucks and jives with the good old boys.
- Phil brought Susan in and told her where her office was. Provided no orientation. Susan asked questions and got no answers from Phil.
- Felony is in the hierarchy. It is where you want to progress. Christie and Audrey went to bat for Susan to get to felony.

November 8, 2000

Meeting with Vanda Sargent

The meeting with Ed Holm on November 3, 2000 was precipitated by email from Jack. Prior to that they had a meeting with Jim Powers with Phil in the room. Each of the females told Jim about their issues.

Regarding the email from Jack – he sends blind copies to others – sees this as a call to arms on his part. Believes there are gender-based issues and in her case probably race based issues as well.

Phil is supposed to solve problems and he does not do that. Vanda believes that Phil does not like her. Ed moved Vanda from District Court to Superior Court, which would be considered a promotion. Phil told Vanda she was the lesser of two evils, as Colin would not make it. Vanda went on to explain that she had attended a domestic violence conference in Anaheim that started on a Friday and ended on the following Thursday. Upon her return, Vanda was to attend a meeting or training on Friday at 9:00 am. Phil insisted that Vanda come into the office Friday for a meeting at 8:15. John Tunheim had to attend a child's event and was not required to come in for the meeting. During the meeting Wheeler and another attorney got into a disagreement and Vanda said she was leaving. Believes these meetings are a waste of time. When Vanda returned, Phil told her there would be a mandatory meeting on Oct. 20 to figure things out. Jim Powers heard about the meeting and said it would not happen without him.

Phil has required Vanda to do excessive paper work. She had Terry assigned to her and she was not able to do work competently. Phil would not intervene on her behalf and told her she could not talk to Ed Holm about it. She needed to go through the chain of command. Finally Vanda talked directly to Ed Holm and Ed assigned Sheila Kirby.

She is currently practicing in both District Court and Superior Court. It is very challenging and a set up to lose. Does not want to go back to District Court. It is a set up because the procedures between the two courts are very different and you have to keep remembering what court you are in.

She believes that Phil retaliates against her. She said she is very tired of the whole situation and that she has a journal and emails to back her up. She indicated she would not be the one leaving.

Jack is a bully, carries a handgun, she asked to see it and he showed it to her. He has yelled at her in court and has thrown files at her. Phil's response it that is just Jack, wait until he calms down. Jack behaves the same to both men and women. She believes she is treated different than other "white" girls. She will not walk by his office. She will wait until she thinks he has left the office before putting things in his office.

She believes that Phil revels in disruption. She has no faith that things will change unless you "clean out the office". Phil has required Vanda to get own coverage when she is away from the office. Believes others are not required to get their own backup. She has changed offices three times since Ed took office. Rob got to choose what office he wanted and Vanda had to take what was left.

Mark Thompson came to her and told her she should handle a certain case. The guy was black and was pulling the race card. Vanda said she had nothing in common with the black man, she is an attorney and he is in cuffs.

Phil told Christie that her filings were down. Vanda declined to attend the meeting on Oct. 20 – Phil said she had to go, Vanda said no. Later Mark told Phil he could not attend the meeting – Phil came back to Vanda and said that Mark could not attend so they would have to change the meeting. It was okay for Mark to cancel but not Vanda. Phil has ordered Vanda to call others and not use email. Vanda has declined because then things to not get documented and she is not going to leave herself open. Phil and Mark have done things to impact her credibility. Complains that others have inserted themselves into her cases. Example is Rob Lund got involved in a case of Vanda's due to friendship.

Jack is a bully, she is afraid of him; he carries a gun, uses size to intimidate people. He has a temper problem.

Again – she will be the one staying.

Jack is an equal opportunity Dick, Phil has a special hard spot for Vanda and she does not know why. Mark talked to her about issues, she took him a bunch of emails and he refused to look at them – they were regarding a situation where district court screwed her over.

Phil treats Audrey and Christy poorly but treats he worse.

APR-19-04 MON 04:24 PM FAX NO. P. 03/05

# THURSTON COUNTY
## Employee Training Record

Beginning: 1/1/1995
- Ending: 4/15/2004

**Jones, John (Jack)**

| DATE | | COURSE NAME | HOURS REQUIRED | CLASS ID | HOURS COMPLETED | COURSE COMPLETED |
|---|---|---|---|---|---|---|
| 03/16/1995 | 2 | Sexual Harassment Prevention | 3.00 | 39 | 3.00 | ☑ |
| 03/07/1996 | 3 | Cultural Diversity Awareness | 16.00 | 165 | 16 00 | ☑ |
| 01/26/2001 | 22 | Violence in the Workplace | 3.00 | 931 | 3.00 | ☑ |
| 10/16/2001 | 54 | The Leader in Each of Us | 4.00 | 1070 | 4.00 | ☑ |
| 10/23/2001 | 51 | Proactive Listening | 4.00 | 1072 | 4.00 | ☑ |
| 11/06/2001 | 50 | Give Constructive Feedback | 4.00 | 1075 | 4.00 | ☑ |
| 05/10/2002 | 56 | Harassment Prevention | 1 50 | 1162 | 1.50 | ☑ |
| 11/05/2002 | 58 | Harassment Prevention:Managers | 2.00 | 1259 | 2.00 | ☑ |

Monday, April 19, 2004



EXH. 247 Page____

04/19/2004 MON 16:30 [TX/RX NO 6530] ☑003

COURT OF APPEALS, DIVISION II
OF STATE OF WASHINGTON

| | |
|---|---|
| AUDREY BROYLES, VONDA SARGENT AND SUSAN SACKETT-DANPULLO,<br>Respondents,<br>vs<br>THURSTON COUNTY,<br>Appellant. | NO. 35950-2-II<br>CERTIFICATE OF SERVICE |

The undersigned certifies that on the 5th day of October, 2007, she placed with ABC Legal Messengers, Inc. a true and correct copy of the Respondent's Opening Brief for hand delivery to counsel of record.

Michael A. Patterson
Patricia K. Buchanan
Karen A. Kalzer
Patterson, Buchanan, Fobes, Leitch & Kalzer, PS
601 Union Street, Suite 4200
Seattle, WA 98101
(206) 652-3500 phone

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

By Gina A. Mitchell
Gina A. Mitchell

Exhibit F

# RE: McClanahan Powers, PLLC - Retainer Agreement

**Dirk McClanahan** (dmcclanahan@mcplegal.com)
Thu 10/11/12 10:36 AM
'elizabeth lavigne' (elizlet@hotmail.com)
1 attachment

Liz,

We have just received a shipment of your possessions, which based on the volume, I assume to be the totality of your possessions from Hoffman. In addition, there was a separate delivery of an envelope containing small ectronics, including a letter, which I have attached. Nothing was signed for, the couriers apparently just dropped everything off in front of our office space. As we stated previously, we are not taking possession, custody, or care of any of the possessions. I understand that you did not send them intentionally, and that this was done by the Hoffman Company. Unfortuantely, however, we do not have the intention nor means of taking or holding or controlling your possessions. As no agent or representative of ours accepted the possession, they are simply free standing items in the building. We have not spoken with the building manager, and therefore, I have no idea if he will have them removed and/or disposed of. I expressly stated to Ms. Douglas that we could not and did not have the means to possess the property and that therefore she could not send them to us.

In addition, pursuant to Ms. Douglas' letter, it appears that the Hoffman Company, LLC is taking the position that they will not continue a negotiation with you and that any offer proposed is terminated.

Please feel free to contact us with any questions or concerns you may have.

Thank you,

Dirk

Dirk McClanahan, Attorney

McClanahan Powers, PLLC

1604 Spring Hill Rd., Suite 321

# GENERAL RELEASE AND SETTLEMENT AGREEMENT

**Elizabeth Lavigne** ("Lavigne") and **Hoffman Management, Inc.** ("Hoffman") (collectively the "Parties") hereby enter into this General Release Agreement ("Agreement") as a full and final compromise and settlement of all matters covered by the general release set forth below, including but not limited to, any and all claims relating to Lavigne's stay at the Holiday Inn Alexandria SW at Hoffman Town Center located in Alexandria, Virginia ("Claims").

## 1. CONSIDERATION

In consideration of the mutual covenants set forth herein and for other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

a. Actions Required of Lavigne. Lavigne agrees to do the following:

   i. Lavigne will deliver to Hoffman a copy of this Agreement executed by Lavigne via email to Lauren K. Douglas via email ldouglas@hoffmantowncenter.com by close of business on October 16, 2012;

   ii. Lavigne will return the executed copy of this Agreement to Lauren K. Douglas by mail to 2034 Eisenhower Ave., Suite 290, Alexandria, Virginia 22314; and

   iii. Lavigne will pick up all her personal items from the Hoffman Center located at 2034 Eisenhower Avenue, Alexandria, Virginia 22314 by October 16, 2012. Lavigne shall give Lauren Douglas twenty-four hours notice of the date and time she plans on retrieving her items.

b. Actions Required of Hoffman. Hoffman agrees to do the following:

   i. Hoffman will hand deliver to Lavigne's attorney __________________ a check in the amount of $1,263.32 made out to ____________________ to be delivered to _________________________ by close of business on October 16, 2012;

## 2. GENERAL RELEASE

Lavigne, on behalf of herself and her past, present, and future agents, representatives, administrators, executors, heirs, devises, predecessors, successors, and assigns, (collectively the "Releasing Parties") hereby releases and forever discharges Hoffman Management, Inc. and each

of their respective past, present, and future employees, stockholders, members, officers, directors, partners, agents, brokers, contractors, servants, affiliates, subsidiaries, parents, departments, divisions, insurers, attorneys, predecessors, successors and assigns (collectively, the "Released Parties"), and each of them, jointly and severally, from any and all claims or counterclaims, causes of action, remedies, damages, liabilities, debts, suits, demands, actions, costs, expenses, fees, controversies, set-offs, third party actions or proceedings of whatever kind or nature, whether at law, equity, administrative, arbitration or otherwise, whether known or unknown, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, which Lavigne or any of the Releasing Parties may now have, have ever had, or in the future have against any and each of the Released Parties, without exception or limitation, including but not limited to any and all claims arising directly or indirectly from or in any way relating to the Account and/or the Claim or for attorney's fees or costs relating thereto.

**3. AUTHORITY / REPRESENTATION**

Lavigne represents and warrants that: (i) Lavigne is duly authorized to enter into this Agreement and may lawfully bind Lavigne and all persons or entities on whose behalf Lavigne has agreed herein; (ii) Lavigne has not sold, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of the claims released in the general release above; and (iii) Lavigne has no other and knows of no other claims against Hoffman.

**4. TAX CONSEQUENCES**

Lavigne acknowledges and agrees that Hoffman may issue one or more 1099 Forms in accordance with federal law related to payments made by Hoffman to or for the benefit of Lavigne and/or Lavigne's counsel pursuant to this Agreement. Lavigne is solely responsible and agrees to release and hold Hoffman harmless for any and all potential and/or actual tax consequences that result from this Agreement.

**5. CONFIDENTIALITY**

Lavigne and (Insert Name of Law Firm) (together "Lavigne's Attorney"), agree to keep strictly confidential and not to disclose either the terms, facts or the amount of this Agreement and negotiations leading up to the Agreement to any person other than Lavigne's attorney, accountant, income tax preparer or similar professional, taxing authorities, or as compelled by process of law. To the extent that Lavigne, or Lavigne's Attorney, is compelled to disclose the terms, facts or amount of this Agreement by process of law, Lavigne, or Lavigne's Attorney,

shall promptly notify the Designated Representative set forth in Part 1(a)(i) above at least seven calendar days prior to producing this information. To the extent Lavigne is required to disclose this information in obtaining professional advice, Lavigne shall instruct such professional that this information is to be kept confidential.

Lavigne and Lavigne's Attorney represent and warrant that they have not publicized the details of this settlement. With respect to the settlement, this Agreement, and the facts and circumstances underlying the settlement and Agreement, Lavigne and Lavigne's Attorney agree not to initiate contact with or otherwise respond to inquiries from the media, nor will Lavigne or Lavigne's Attorney issue press releases, public statements, or otherwise publicize same.

## 6. DISCLAIMER OF LIABILITY

Hoffman expressly denies liability in connection with the claims Lavigne has made, and this Agreement and the performances provided hereunder are made and assumed for the compromise and settlement of disputed claims and are not, and shall not be construed to be, an admission of liability, an admission of the truth of any fact, or a declaration against interest on the part of Hoffman or any of the other Released Parties.

## 7. LEGAL ADVICE

All Parties represent and warrant that they have or had the opportunity to obtain the advice of counsel of their choice, and/or such other persons as they may have deemed appropriate; that they have carefully read and fully understand all of the terms of this Agreement, including the general release and obligations contained herein; and that they enter into this Agreement voluntarily.

## 8. CHOICE OF LAW AND WAIVER

This Agreement is to be construed in accordance with and governed by the laws of the United States of America and by the internal laws of the Commonwealth of Virginia without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the laws of the United States of America or the internal laws of the Commonwealth of Virginia to the rights and duties of the parties.

**IN WITNESS WHEREOF**, the Parties sign below indicating their intent to be bound by all of the terms and conditions of this Agreement.

WITNESS the following signature verified under seal this ________ day of October, 2012.

___________________________________ (Seal)
ELIZABETH LAVIGNE

Commonwealth of Virginia
City/County of ___________________ to-wit:

The foregoing instrument was acknowledged before me, a Notary Public for the Commonwealth of Virginia by ______________________, and ______________________, this ___ day of _________________, 2012.

___________________________________

Notary Public

My commission expires: _____________________

WITNESS the following signature verified under seal this ________ day of October, 2012.

By: HOFFMAN MANAGEMENT, INC.

__________________________________________ (Seal)
HUBERT N. HOFFMAN, III, Chairman of the Board

Commonwealth of Virginia

City/County of ___________________ to-wit:

The foregoing instrument was acknowledged before me, a Notary Public for the Commonwealth of Virginia by _______________________, and _______________________, this ___ day of _________________, 2012.

___________________________________

Notary Public

My commission expires: _____________________

Any failure to enforce any terms or conditions of this Agreement by any of the Parties shall not constitute a waiver of any right to assert any of the terms and conditions of this Agreement.

## 9. SUCCESSORS AND COUNTERPARTS

This Agreement shall be binding upon and inure to the benefit of the Parties and their agents, next of kin, executors, administrators, legal representatives, successors and assigns. This Agreement may be executed in counterparts, and may be executed by facsimile, pdf, and as so executed shall constitute one agreement.

## 10. ENTIRE AGREEMENT AND SEVERABILITY

This Agreement reflects the entire agreement by and between the Parties, and no statement, promise or inducement that is not contained herein shall be valid and binding. If any provision or portion of this Agreement is held invalid, void or unenforceable under any applicable statute or rule of law, only that provision, or portion thereof, shall be deemed omitted from this Agreement, and only to the extent to which it is held invalid, and the remainder of the Agreement shall remain in full force and effect.

**Remainder of page left intentionally blank.**

Exhibit F

# RE: McClanahan Powers, PLLC - Retainer Agreement

From Dirk McClanahan (dmcclanahan@mcplegal.com)
Sent Thu 10/11/12 10:36 AM
To 'elizabeth lavigne' (elizlet@hotmail.com)

1 attachment

Liz,

We have just received a shipment of your possessions, which based on the volume, I assume to be the totality of your possessions from Hoffman. In addition, there was a separate delivery of an envelope containing small ectronics, including a letter, which I have attached. Nothing was signed for, the couriers apparently just dropped everything off in front of our office space. As we stated previously, we are not taking possession, custody, or care of any of the possessions. I understand that you did not send them intentionally, and that this was done by the Hoffman Company. Unfortuantely, however, we do not have the intention nor means of taking or holding or controlling your possessions. As no agent or representative of ours accepted the possession, they are simply free standing items in the building. We have not spoken with the building manager, and therefore, I have no idea if he will have them removed and/or disposed of. I expressly stated to Ms. Douglas that we could not and did not have the means to possess the property and that therefore she could not send them to us.

In addition, pursuant to Ms. Douglas' letter, it appears that the Hoffman Company, LLC is taking the position that they will not continue a negotiation with you and that any offer proposed is terminated.

Please feel free to contact us with any questions or concerns you may have.

Thank you,

Dirk

Dirk McClanahan, Attorney

McClanahan Powers, PLLC

1604 Spring Hill Rd., Suite 321

# GENERAL RELEASE AND SETTLEMENT AGREEMENT

**Elizabeth Lavigne** ("Lavigne") and **Hoffman Management, Inc.** ("Hoffman") (collectively the "Parties") hereby enter into this General Release Agreement ("Agreement") as a full and final compromise and settlement of all matters covered by the general release set forth below, including but not limited to, any and all claims relating to Lavigne's stay at the Holiday Inn Alexandria SW at Hoffman Town Center located in Alexandria, Virginia ("Claims").

## 1. CONSIDERATION

In consideration of the mutual covenants set forth herein and for other good and valuable consideration, the adequacy, sufficiency and receipt of which is hereby acknowledged, the Parties agree as follows:

a. Actions Required of Lavigne. Lavigne agrees to do the following:

   i. Lavigne will deliver to Hoffman a copy of this Agreement executed by Lavigne via email to Lauren K. Douglas via email ldouglas@hoffmantowncenter.com by close of business on October 16, 2012;

   ii. Lavigne will return the executed copy of this Agreement to Lauren K. Douglas by mail to 2034 Eisenhower Ave., Suite 290, Alexandria, Virginia 22314; and

   iii. Lavigne will pick up all her personal items from the Hoffman Center located at 2034 Eisenhower Avenue, Alexandria, Virginia 22314 by October 16, 2012. Lavigne shall give Lauren Douglas twenty-four hours notice of the date and time she plans on retrieving her items.

b. Actions Required of Hoffman. Hoffman agrees to do the following:

   i. Hoffman will hand deliver to Lavigne's attorney __________________ a check in the amount of $1,263.32 made out to ____________________ to be delivered to __________________________ by close of business on October 16, 2012;

## 2. GENERAL RELEASE

Lavigne, on behalf of herself and her past, present, and future agents, representatives, administrators, executors, heirs, devises, predecessors, successors, and assigns, (collectively the "Releasing Parties") hereby releases and forever discharges Hoffman Management, Inc. and each

of their respective past, present, and future employees, stockholders, members, officers, directors, partners, agents, brokers, contractors, servants, affiliates, subsidiaries, parents, departments, divisions, insurers, attorneys, predecessors, successors and assigns (collectively, the "Released Parties"), and each of them, jointly and severally, from any and all claims or counterclaims, causes of action, remedies, damages, liabilities, debts, suits, demands, actions, costs, expenses, fees, controversies, set-offs, third party actions or proceedings of whatever kind or nature, whether at law, equity, administrative, arbitration or otherwise, whether known or unknown, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, which Lavigne or any of the Releasing Parties may now have, have ever had, or in the future have against any and each of the Released Parties, without exception or limitation, including but not limited to any and all claims arising directly or indirectly from or in any way relating to the Account and/or the Claim or for attorney's fees or costs relating thereto.

## 3. AUTHORITY / REPRESENTATION

Lavigne represents and warrants that: (i) Lavigne is duly authorized to enter into this Agreement and may lawfully bind Lavigne and all persons or entities on whose behalf Lavigne has agreed herein; (ii) Lavigne has not sold, pledged, encumbered, or otherwise disposed of, in whole or in part, voluntarily or involuntarily, any of the claims released in the general release above; and (iii) Lavigne has no other and knows of no other claims against Hoffman.

## 4. TAX CONSEQUENCES

Lavigne acknowledges and agrees that Hoffman may issue one or more 1099 Forms in accordance with federal law related to payments made by Hoffman to or for the benefit of Lavigne and/or Lavigne's counsel pursuant to this Agreement. Lavigne is solely responsible and agrees to release and hold Hoffman harmless for any and all potential and/or actual tax consequences that result from this Agreement.

## 5. CONFIDENTIALITY

Lavigne and (Insert Name of Law Firm) (together "Lavigne's Attorney"), agree to keep strictly confidential and not to disclose either the terms, facts or the amount of this Agreement and negotiations leading up to the Agreement to any person other than Lavigne's attorney, accountant, income tax preparer or similar professional, taxing authorities, or as compelled by process of law. To the extent that Lavigne, or Lavigne's Attorney, is compelled to disclose the terms, facts or amount of this Agreement by process of law, Lavigne, or Lavigne's Attorney,

shall promptly notify the Designated Representative set forth in Part 1(a)(i) above at least seven calendar days prior to producing this information. To the extent Lavigne is required to disclose this information in obtaining professional advice, Lavigne shall instruct such professional that this information is to be kept confidential.

Lavigne and Lavigne's Attorney represent and warrant that they have not publicized the details of this settlement. With respect to the settlement, this Agreement, and the facts and circumstances underlying the settlement and Agreement, Lavigne and Lavigne's Attorney agree not to initiate contact with or otherwise respond to inquiries from the media, nor will Lavigne or Lavigne's Attorney issue press releases, public statements, or otherwise publicize same.

## 6. DISCLAIMER OF LIABILITY

Hoffman expressly denies liability in connection with the claims Lavigne has made, and this Agreement and the performances provided hereunder are made and assumed for the compromise and settlement of disputed claims and are not, and shall not be construed to be, an admission of liability, an admission of the truth of any fact, or a declaration against interest on the part of Hoffman or any of the other Released Parties.

## 7. LEGAL ADVICE

All Parties represent and warrant that they have or had the opportunity to obtain the advice of counsel of their choice, and/or such other persons as they may have deemed appropriate; that they have carefully read and fully understand all of the terms of this Agreement, including the general release and obligations contained herein; and that they enter into this Agreement voluntarily.

## 8. CHOICE OF LAW AND WAIVER

This Agreement is to be construed in accordance with and governed by the laws of the United States of America and by the internal laws of the Commonwealth of Virginia without giving effect to any choice of law rule that would cause the application of the laws of any jurisdiction other than the laws of the United States of America or the internal laws of the Commonwealth of Virginia to the rights and duties of the parties.

**IN WITNESS WHEREOF**, the Parties sign below indicating their intent to be bound by all of the terms and conditions of this Agreement.

WITNESS the following signature verified under seal this ________ day of October, 2012.

____________________________________ (Seal)
ELIZABETH LAVIGNE

Commonwealth of Virginia
City/County of ___________________ to-wit:

The foregoing instrument was acknowledged before me, a Notary Public for the Commonwealth of Virginia by _______________________, and _______________________, this ___ day of _________________, 2012.

____________________________________
Notary Public

My commission expires: _____________________

WITNESS the following signature verified under seal this ________ day of October, 2012.

By: HOFFMAN MANAGEMENT, INC.

_______________________________________ (Seal)
HUBERT N. HOFFMAN, III, Chairman of the Board

Commonwealth of Virginia

City/County of __________________ to-wit:

The foregoing instrument was acknowledged before me, a Notary Public for the Commonwealth of Virginia by _____________________, and _____________________, this ___ day of _________________, 2012.

_________________________________

Notary Public

My commission expires: ____________________

Any failure to enforce any terms or conditions of this Agreement by any of the Parties shall not constitute a waiver of any right to assert any of the terms and conditions of this Agreement.

**9. SUCCESSORS AND COUNTERPARTS**

This Agreement shall be binding upon and inure to the benefit of the Parties and their agents, next of kin, executors, administrators, legal representatives, successors and assigns. This Agreement may be executed in counterparts, and may be executed by facsimile, pdf, and as so executed shall constitute one agreement.

**10. ENTIRE AGREEMENT AND SEVERABILITY**

This Agreement reflects the entire agreement by and between the Parties, and no statement, promise or inducement that is not contained herein shall be valid and binding. If any provision or portion of this Agreement is held invalid, void or unenforceable under any applicable statute or rule of law, only that provision, or portion thereof, shall be deemed omitted from this Agreement, and only to the extent to which it is held invalid, and the remainder of the Agreement shall remain in full force and effect.

**Remainder of page left intentionally blank.**